Jennifer J. Middleton, OSB No. 071510
jmiddleton@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLETON PC
975 Oak Street, Suite 1050
Eugene, OR 97401
Tel: (541) 484-2434

Arthur H. Bryant, PHV
abryant@baileyglasser.com
BAILEY & GLASSER, LLP
1999 Harrison Street, Suite 660
Oakland, CA 94612
Tel: (510) 272-8000

*Attorneys for Plaintiffs and the proposed classes*
[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| ASHLEY SCHROEDER, KENDALL CLARK, HALLI FIELDS, NATASHA GEORGE, JOSIE GRIFFITHS, JADE BERNAL, DAHLIA MCALLISTER, PRESLEY MCCASKILL, ABIGAIL PLEVIN, VALERIE PETERSON, ELLA TYUS, SIULOLOVAO FOLAU, ALEX LAITA, BATIA ROTSHTEIN, ZOE ALMANZA, BEATRICE WETTON, MIA LOPEZ, DELANEY HOPEN, CARLY WALLACE, SAVANNAH SIEGRIST, ANASTASIA LIMA, MADELYN LAFOLLETTE, ALEXANDRA HADEN, JOSIE COLE, ALAINA THOMAS, VIVIAN DONOVAN, ELISE HAVERLAND, RIVER RIBEIRO, SOPHIA SCHMITZ, SYDNEY WEDDLE, CLAIRE DALEY and ANNA MARIA KNIGHT, Individually and on behalf of all those similarly situated, | Case No.: 6:23-cv-1806 _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> For violations of Title IX of the Education Amendments of 1972, 20 U.S.C.§1681 <br><br><br> **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| v. | |
| UNIVERSITY OF OREGON, | |
| Defendant. | |

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 4

**JURISDICTION AND VENUE** ...................................................................... 4

**THE PARTIES** ................................................................................................. 9

*Beach Volleyball Plaintiffs* ............................................................................... 9

*Rowing Plaintiffs* ........................................................................................... 46

*Defendant* ....................................................................................................... 53

**FACTUAL ALLEGATIONS** ......................................................................... 53

**TITLE IX BARS OREGON FROM DISCRIMINATING AGAINST ITS FEMALE STUDENT-ATHLETES ON THE BASIS OF THEIR SEX.** ............ 53

**Title IX's Equal Athletic Treatment and Benefits Requirements** .................. 55

**Title IX's Equal Athletic Financial Aid Requirements** ................................. 56

**Title IX's Equal Athletic Participation Opportunities Requirements** ........... 59

**OREGON HAS BEEN AND IS DISCRIMINATING AGAINST ITS FEMALE STUDENT-ATHLETES ON THE BASIS OF THEIR SEX.** ............. 60

**Oregon's Violations of Title IX's Equal Treatment and Benefits Requirements** .......... 61

*Provision of Equipment and Supplies* ............................................................. 62

*Scheduling of Games and Practice Time* ........................................................ 68

*Travel and Per Diem Allowances* ................................................................... 69

*Opportunity to Receive Coaching and Academic Tutoring* ............................. 72

*Assignment and Compensation of Coaches and Tutors* .................................. 73

*Provision of Locker Rooms, Practice, and Competitive Facilities* .................. 78

*Provision of Medical and Training Services* ................................................... 92

*Publicity* ......................................................................................................... 94

*Recruiting* ....................................................................................................... 96

**Oregon's Violation of Title IX's Athletic Financial Aid Requirements** ......................... 98

**Oregon's Violation of Title IX's Equal Participation Opportunities Requirements** ... 101

**CLASS ALLEGATIONS** ...................................................................................... 105

**COUNT I: UNEQUAL TREATMENT AND BENEFITS** ................................... 110

**COUNT II: UNEQUAL ATHLETIC FINANCIAL AID** .................................... 111

**COUNT III: UNEQUAL PARTICIPATION OPPORTUNITIES** ....................... 112

**PRAYER FOR RELIEF** ....................................................................................... 114

## INTRODUCTION

1.      This is a sex discrimination class action against the University of Oregon ("Oregon") for depriving its female student-athletes of equal treatment, equal athletic financial aid, and equal opportunities to participate in varsity athletics in violation of Title IX of the Education Amendments of 1972 ("Title IX").

2.      Plaintiffs Ashley Schroeder, Kendall Clark, Halli Fields, Natasha George, Josie Griffiths, Jade Bernal, Dahlia McAllister, Presley McCaskill, Abigail Plevin, Valerie Peterson, Ella Tyus, Siulolovao Folau, Alex Laita, Batia Rotshtein, Zoe Almanza, Beatrice Wetton, Mia Lopez, Delaney Hopen, Carly Wallace, Savannah Siegrist, Anastasia Lima, Madelyn Lafollette, Alexandra Haden, Josie Cole, Alaina Thomas, and Vivian Donovan are female varsity student-athletes on Oregon's beach volleyball team and Plaintiffs Elise Haverland, River Ribeiro, Sophia Schmitz, Sydney Weddle, Claire Daley and Anna Maria Knight are female club student-athletes on Oregon's rowing team.

3.      Together, Plaintiffs seek to hold Oregon accountable for discriminating against all of its female student-athletes and potential student-athletes, make Oregon pay damages to the women it has deprived and is depriving of equal treatment and equal athletic financial aid, and stop Oregon from violating Title IX in the future.

4.      In particular, the women's beach volleyball team members aim to hold Oregon accountable for depriving them and all varsity female student-athletes of equal treatment and equal athletic financial aid in violation of Title IX. The women's club rowing team members seek to hold Oregon accountable for depriving them and all present and future female students at Oregon of equal opportunities to participate in varsity athletics.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

5.    Plaintiffs are suing Oregon for depriving women of equal treatment in its varsity intercollegiate athletics program because Oregon has been and is treating its varsity male student-athletes shockingly better than its varsity female student-athletes.

6.    To cite the most egregious example, Oregon gives *more than a third of its male student-athletes*—the men on its football team—unbelievably better treatment than it gives to *any of its female student-athletes*: palatial locker rooms, "fitting" rooms, and player lounges; state-of-the-art, personalized gear and equipment in seemingly endless quantities; preferential scheduling for training, practices, and games; chartered flights to away games; hotel stays before home games; huge quantities of food and travel per diems for more food, whether the money is needed or used for food or not; professional-quality practice and competitive facilities; their own theatre with seats upholstered in Ferrari leather, where they can watch movies and sporting events together; round-the-clock access to trainers and medical professionals; nearly-unlimited publicity, including to advance their name, image, and likeness (NIL) opportunities and income; highly-paid coaches and assistant coaches with plush offices and special amenities, including their own hot tub; and myriad other forms of support that one can hardly imagine.

7.    In contrast, to cite the counterexample, *the female student-athletes on Oregon's women's beach volleyball team* are treated far worse than *any of its male student-athletes*. They are treated so badly that, on July 23, 2023, *The Oregonian* published a front-page investigative report, "Oregon Ducks beach volleyball players detail disparate treatment that experts say could violate Title IX," exposing the school's discrimination against them, including Oregon's failure to give them any athletic scholarships; adequate locker rooms, practice and competitive facilities; sufficient travel accommodations and daily allowances; appropriate equipment and supplies; even minimal publicity and recognition; and honest or fair recruiting support. The following day, *The*

*Oregonian* published a follow-up article on Oregon's mistreatment of these women: "Bill Oram: Oregon Ducks could cut corners with beach volleyball team because it's beach volleyball. And that is exactly the problem."

8.    Oregon does not provide the women's beach volleyball team with any practice or competitive facilities. Instead, it forces the team members to practice and compete at a public park with obviously inadequate facilities to support a competitive varsity team. For example, the public park lacks any stands for spectators, has bathrooms with no doors on the stalls, and is frequently littered with feces, drug paraphernalia, and other discarded items. No men's team faces anything remotely similar.

9.    While the men's football team members receive brand-new, exclusive, personally tailored gear, the women's beach volleyball team members share a limited amount of tattered gear, handed down for years, that often does not fit.

10.    While the men's football team members have dedicated staffs of medical personnel awaiting their every need, members of the women's beach volleyball team often have to provide each other with medical care or, when necessary, drive each other—at their own personal expense in their own vehicles—to medical facilities.

11.    While the men's football team members are given so much publicity and NIL support that Oregon's quarterback, running back, and wide receiver are listed in *On3*'s NIL 100 list as, respectively, the 8th, 28th, and 76th highest NIL recipients in the country, the women's beach volleyball players receive so little publicity and NIL support that none of them—or any other Oregon female student-athlete—receives anywhere near the amounts mentioned on the list. https://www.on3.com/nil/rankings/player/nil-100/ (visited on 11/27/23).

12.    This is so even though, or perhaps because, Oregon's NIL collective, Division

Street, is, according to *On3*, the third most ambitious NIL collective in the nation.

https://www.on3.com/nil/news/on3-top-20-most-ambitious-nil-collectives-year-2-tennessee-

texas-am-oregon/. As *On3*'s report on the top 20 most ambitious NIL collectives says, "Oregon

has figured out how to best use Division Street... [Phil] Knight's name was trending on Twitter by

noon ET of December's National Signing Day. And as one agent pointed out, 'No head coach in

the country is more aggressive about NIL than [Oregon football head coach] Dan Lanning.'"

13.    The football and beach volleyball teams are just the most glaring examples of the

far superior treatment that Oregon provides to its male student-athletes program-wide. Oregon's

own financial numbers show the bottom line.

14.    According to the most recent publicly available Equity in Athletics Disclosure Act

("EADA") data, which Oregon submitted and verified as accurate to the U.S. Department of

Education for 2021-22, women are just over 49% of the varsity athletes at Oregon, but the school

spent only 25% of its total athletic expenditures on them and only 15% of its recruiting dollars on

them.

15.    At the same time, Oregon also awards its male student-athletes with much more

athletic financial aid than it awards to its female student-athletes. Oregon does not award a single

dollar of athletic financial aid to the women's beach volleyball team members. No other varsity

team at Oregon—or in the Pac-12—is subject to such discrimination.

16.    And, again, Oregon's financial numbers show the bottom line. According to the

data in its annual EADA reports, Oregon will have to pay over $4.5 million to its female student-

athletes for the past five years for which information is publicly available, 2017-18 to 2021-22, to

make its payments to them proportional to the athletic financial aid it gave to its male student-

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

athletes. This disproportionate aid was in violation of Title IX. Plaintiffs do not yet know the amounts of equal athletic financial aid Oregon deprived its female student-athletes of in 2022-23, is depriving them of this year, or will deprive them of in future years if it isn't stopped.

17. On top of these glaring Title IX violations, Oregon also fails to offer women equal opportunities to participate in varsity athletics. Again, according to its most recent publicly available numbers, given the number of male student-athletes on Oregon's men's varsity teams, it would have to add at least ninety-four female student-athletes to its varsity athletic program to achieve proportionality and comply with Title IX. Yet, despite the enormous success of its women's club rowing team, Oregon has refused to sponsor a women's varsity rowing team, for which interest, ability, and competition are plainly available.

18. Title IX has been the law for more than fifty years.

19. Oregon needs to comply with it, now.

## JURISDICTION AND VENUE

20. This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et. seq.*, and the regulations and policies promulgated pursuant to that law.

21. This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

22. Declaratory and other relief is authorized pursuant to 28 U.S.C §§ 2201 and 2202 to obtain the correct interpretation of the legal requirements described in this Complaint, which is necessary and appropriate to determine the parties' respective rights and duties.

23. Venue is proper in the United States District Court of Oregon, Eugene Division, pursuant to 28 U.S.C. § 1391(b), because the University of Oregon is located in Eugene, Oregon,

which is within this Court's jurisdiction. In addition, the events giving rise to the Complaint occurred in Eugene, Oregon, which is within the Court's jurisdiction.

## THE PARTIES

24.     Plaintiffs are comprised of two groups: (1) past and current female varsity student-athletes on the women's beach volleyball team at Oregon ("beach volleyball Plaintiffs") and (2) current female club student-athletes on the rowing team at Oregon ("rowing Plaintiffs").

### *Beach Volleyball Plaintiffs*

25.     The beach volleyball Plaintiffs bring claims against Oregon for failing to provide female varsity student-athletes with equal athletic treatment and benefits and equal athletic financial aid as compared to male varsity student-athletes.

26.     On a program-wide basis, the male student-athletes on the men's varsity teams at Oregon are provided with more resources and are treated better than the female student-athletes on the women's varsity teams.

27.     Each beach volleyball Plaintiff who is a current varsity student-athlete has athletic eligibility remaining and intends to continue to participate as a varsity student-athlete until she has graduated and/or exhausted her eligibility to participate in intercollegiate varsity sports.

28.     Each beach volleyball Plaintiff who is a current varsity student-athlete is being deprived of treatment and benefits equal to those provided to male student-athletes at Oregon.

29.     Each beach volleyball Plaintiff who is a former varsity student-athlete at Oregon was deprived of treatment and benefits equal to those provided to male student-athletes at Oregon.

30.     When it comes to Oregon's allocation of treatment and benefits, each beach volleyball Plaintiff was treated like a second-class citizen at Oregon because of her sex, which is inherently degrading, stigmatizing, and affected each of the Plaintiff's experiences.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

31.     Oregon's failure to provide its female varsity student-athletes with equal benefits and resources harmed each beach volleyball Plaintiff by causing her to lose educational opportunities and competitive advantage, by creating lower quality participation opportunities, by subjecting her to sex discrimination, and by giving rise to degrading and stigmatizing effects of that treatment.

32.     While transferring to a new university is technically possible for some students, transferring can disrupt students' lives and be very difficult. It often leads to adding a year or more to one's college career because almost all universities have residency credits—a single credit given for each semester the student attends that specific institution—and minimum requirements for residency credits for students to receive a degree from the school. More semesters at a new school can also equal more tuition and other expenses for the student. These realities and others can make transferring schools financially and logistically impossible.

33.     At all times relevant to this case, varsity student-athletes at Oregon were and are eligible for athletic financial aid up to and including full scholarships, cost-of-living stipends, summer aid, fifth-year aid, and NCAA Special Assistance Funds.

34.     Oregon is a member of the NCAA and it participates in NCAA Division I athletics, the highest level of intercollegiate competition.

35.     In 1971, Oregon was one of the original member schools of the Association for Intercollegiate Athletics for Women and operated an inferior women's athletic department under the university's physical education department.

36.     In 1977, Oregon allowed its women's athletics department to merge with the men's athletic department and operated both under the university's athletic department, but the men's and women's teams remained segregated based on sex.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

37.    Since 1981, when the NCAA began sponsoring women's sports, Oregon has sponsored women's and men's varsity NCAA Division I intercollegiate athletic teams, segregated based on sex.

38.    Each of the beach volleyball Plaintiffs and all of the female varsity student-athletes at Oregon have participated on a women's Division I intercollegiate athletic team.

39.    NCAA rules place a maximum on the number of full grant-in-aid athletic scholarships ("full athletic scholarship") that Oregon can award to student-athletes on its men's and women's varsity teams.

40.    A full grant-in-aid scholarship includes tuition and fees, room and board, books, and other expenses related to attendance at the institution up to the cost of attendance.

41.    The "cost of attendance" at Oregon in the 2023-24 academic year is $35,721 for students that are Oregon residents ("in-state" students) and $64,302 for students that are nonresidents ("out-of-state" students). In the 2022-23 academic year the cost of attendance for resident students was $33,639 and $61,275 for nonresident students. (https://financialaid.uoregon.edu/cost_of_attendance). The cost of attendance for academic years prior to 2022-23 is not available on Oregon's university webpage.

42.    NCAA rules do not place any minimum on the number of full athletic scholarships Oregon must award to any given team.

43.    NCAA rules do not and cannot authorize Oregon to violate Title IX.

44.    Oregon could comply both with Title IX and with NCAA athletic financial aid limitations.

45.    Oregon has chosen, however, to deprive its female student-athletes of equal athletic financial aid and of equal opportunities to receive such aid in violation of Title IX.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

46.    The NCAA scholarship rules state that scholarships for men's basketball and football and women's basketball, gymnastics, tennis, and volleyball must be awarded as full athletic scholarships on a per-athlete basis. These sports are referred to as head-count sports.

47.    The NCAA scholarship rules state that all other varsity sports may split up a full athletic scholarship among many athletes. These sports are referred to as equivalency sports.

48.    Under NCAA rules, women's beach volleyball is an equivalency sport.

49.    The NCAA rules permit Oregon to award the equivalent of up to six full athletic scholarships to the female student-athletes on the women's varsity beach volleyball team.

50.    Oregon, however, gives no athletic financial aid (full or partial athletic scholarships) to the female student-athletes on the women's varsity beach volleyball team.

51.    Members of the women's beach volleyball team who received *no athletic financial aid* could have been awarded full or partial scholarships without Oregon running afoul of NCAA rules.

52.    Members of the women's beach volleyball team who did not receive athletic scholarships were ready and able to receive that athletic financial aid—and the coach of the women's beach volleyball team would have awarded athletic financial aid to the members of the team if Oregon had not withheld it.

53.    The only impediment to these awards of athletic financial aid was Oregon's intentional decision to create a disproportionately large pool of athletic aid for male varsity student-athletes and a disproportionately small pool for female varsity student-athletes. This decision harmed the beach volleyball Plaintiffs.

54.    If Oregon had created proportional pools of athletic financial aid money for men and women, additional money could have flowed to the beach volleyball Plaintiffs, as none were or are receiving full athletic aid.

55.    Each beach volleyball Plaintiff was entitled, under Title IX, to an opportunity to be awarded athletic financial aid on an equal basis with male varsity student-athletes. *See, e.g.*, 34 C.F.R. § 106.37(c) (providing that, when a school offers athletic financial awards, it "must provide reasonable *opportunities* for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics" (emphasis added)).

56.    Because of the disproportionate pools of aid allocated to men and women, each beach volleyball Plaintiff was denied that opportunity.

57.    If Oregon complied with Title IX and granted equal athletic financial aid to its female varsity student-athletes and male varsity student-athletes, each of the beach volleyball Plaintiffs would have had an opportunity to receive her fair share of equal athletic financial aid.

58.    Instead, each of the beach volleyball Plaintiffs was denied the opportunity to receive equal financial aid, despite Title IX's express protection of that opportunity.

59.    If Oregon complied with Title IX and granted equal athletic financial aid to its female varsity student-athletes and male varsity student-athletes, each of the beach volleyball Plaintiffs would have been free of second-class treatment in the allocation of financial aid at Oregon.

60.    Instead, each of the beach volleyball Plaintiffs was forced to endure an environment in which her school actively discriminated against her because of her sex.

61.    This denial of equal athletic financial aid was and is inherently degrading and stigmatizing, and each of the beach volleyball Plaintiffs experienced the harms and injuries caused by Oregon's intentional decision to treat female varsity student-athletes like second-class citizens.

62.    Each beach volleyball Plaintiff was harmed by Oregon's discriminatory conduct with respect to athletic financial aid in at least the following ways:

- She was denied the *opportunity* to compete for and receive equal athletic financial aid because of her sex;

- She was forced to confront a sex-based *barrier* to receiving athletic financial aid that male varsity student-athletes did not confront and that made it more difficult for her to receive financial aid than it was for male varsity student-athletes;

- She received *a smaller financial aid award*, simply because of her sex, in an amount that exceeded $1.00;

- She was forced to endure *degrading and stigmatizing second-class treatment* as Oregon intentionally treated her and other female varsity student-athletes worse than male varsity student-athletes when it came to athletic financial aid, and the psychological harm resulting from that degrading and stigmatizing treatment is ongoing and persists even today.

63.    The precise amount of damages in unequal athletic financial aid each beach volleyball Plaintiff was deprived of cannot be determined from publicly available information. Instead, it will depend on information that is uniquely in Oregon's control.

64.    The amount of unequal athletic financial aid each beach volleyball Plaintiff was illegally deprived of can, however, be conceptualized based on publicly available information

through data Oregon submitted and verified as accurate to the federal government pursuant to the Equity in Athletics Disclosure Act (EADA). *See* 20 U.S.C. § 1092(g); *see also* 34 C.F.R. § 668.47.[1]

65.      According to that data, in 2017–18, Oregon deprived each female student-athlete of an average of $4,662.63 in equal athletic financial aid. In 2018–19, Oregon deprived each female student-athlete of an average of $2,343.74. In 2019–20, Oregon deprived each female varsity student-athlete of an average of $5,240.93. In 2020–21, Oregon deprived each female varsity student-athlete of an average of $3,636.37. In 2021–22, Oregon deprived each female varsity student-athlete of an average of $3,343.25. In 2022–23 and this academic year, Oregon deprived and is still depriving female varsity student-athletes of equal financial aid in presently unknown amounts.

66.      So, each of the beach volleyball Plaintiffs, like other female varsity athletes who received no athletic financial aid during these years at Oregon, was illegally deprived of at least these amounts and is entitled to recover damages as a result.

67.      This potential damages calculation and distribution—the athletic financial aid dollars the class members were illegally deprived of divided by and among the number of people in the class—comports with damages theories in similar contexts. *See, e.g., Dougherty v. Barry*, 869 F.2d 605, 615 (D.C. Cir. 1989) (dividing, in the context of employment discrimination, the

---

[1] Oregon has exclusive access to its Title IX athletic participation and detailed athletic financial aid data and has not yet disclosed that information to Plaintiffs or the public. For that reason, Plaintiffs rely in this Complaint on public EADA data that Oregon has certified as accurate to the U.S. Department of Education, which the courts have held is appropriate. *See, e.g., Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010) (finding that "EADA reports contain[ed] ample data demonstrating that [the educational institution] could not satisfy the substantial proportionality option"); *Anders v. Cal. State Univ.*, No. 1:21-179, 2021 WL 3115867, at *7 (E.D. Cal. July 22, 2021) ("[T]he Ninth Circuit has specifically recognized that EADA counts may be used in assessing substantial proportionality under Title IX, as have other courts. . . . Thus, the Court sees nothing inherently improper about using them in the manner alleged in the FAC.").

value of withheld promotions among multiple plaintiffs eligible for such promotions when the court could not discern with certainty which plaintiffs would have been promoted).

68.     But the ultimate calculation of damages is unnecessary when considering whether each beach volleyball Plaintiff suffered cognizable harm. As alleged above, Oregon's intentional discrimination deprived each beach volleyball Plaintiff of at least $1 in athletic financial aid each year.

69.     If Oregon had created proportional pools of athletic financial aid for men and women and/or had fully funded scholarships for the women's beach volleyball team, each beach volleyball Plaintiff would have been ready and able to receive—and would have competed for— the additional athletic financial aid that Oregon instead chose to withhold.

### Plaintiff Ashley Schroeder

70.     Ashley Schroeder is an out-of-state student and is currently a senior at Oregon, majoring in Psychology and Law.

71.     Ashley was and is a member of the varsity women's beach volleyball team for the 2020–21, 2021–22, 2022–23, and 2023–24 seasons.

72.      Ashley played volleyball throughout high school in central California and discovered her love for beach volleyball the summer after her sophomore year. The saying "there's no bench on the beach" resonated with her. She loved that, in beach volleyball, it is up to you and your partner to work with each other's strengths and weaknesses to create a strategy for winning.

73.     After returning to high school in the fall of that year, she realized she missed the sand and wanted to find a way to play beach volleyball in college.

74.     In her junior year, she committed herself to becoming an excellent beach volleyball player by moving to southern California, training hours each day with former beach volleyball

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

Olympians, and ultimately made the USA High Performance A1 2018 and 2019 beach volleyball teams.

75.     She went on to receive the Women's AA rating and placed first in several high-level tournaments.

76.     Ashley was recruited by several colleges, including Oregon, St. Mary's, Loyola Marymount University, University of California–Santa Clara, Missouri State, Concordia University, Houston Christian University, University of California–Davis, and Texas A&M.

77.     Oregon's coach Janice Harrer personally attended several of Ashely's high school competitions and invited her to Oregon's summer camp and an unofficial visit, where Coach Harrer promised that women's beach volleyball courts and scholarships would be forthcoming.

78.     During Ashley's visit, Oregon's coaches showed her some recreational beach volleyball courts located on campus and took her to watch a practice of the women's indoor volleyball team, leaving her with the impression that the beach volleyball team also practiced on campus—not at Amazon Park, a city park more than a ten minute drive from campus. She was never shown the beach volleyball team's current facilities at Amazon Park prior to committing to Oregon.

79.     Out of all the schools that recruited her, Ashley chose Oregon because of its public reputation for excellence in sports.

80.     Ashley was selected as the women's beach volleyball co-captain for both the 2022–23 and 2023–24 seasons at Oregon. Currently, she has scored the second highest number of career wins for the women's beach volleyball team and has been on the Pac-12 Academic Honor Roll each year of her college career.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

81.    Ashley has encountered a different experience than what she was promised by Oregon. The school has not built facilities for the beach volleyball team on campus. Ashley also has not received any athletic scholarship money, which Oregon promised her would be forthcoming.

82.    Due to the high cost of tuition at Oregon and the lack of any athletic financial aid, Ashley takes twelve units per term instead of the fifteen to sixteen units per term that is recommended because tuition costs are based on the number of "units" students take.

<u>Plaintiff Kendall Clark</u>

83.    Kendall Clark is an out-of-state student and is currently a sophomore at Oregon, majoring in Psychology.

84.    Kendall was and is a member of the varsity women's beach volleyball team for the 2022–23 and 2023–24 seasons.

85.    From a young age, Kendall played volleyball and fell in love with the sport. As she grew, her passion for the sport also grew. Volleyball became more than a hobby—it became a source of comfort and a way to help define herself. Being on the court felt like home to her, as a place to create lifelong habits and gain affirmation. Volleyball became part of who she was as a person. She enjoyed the camaraderie that she experienced among her teammates. The bonds she gained with her teams were incredibly fulfilling, providing not only friendships, but a second family. Volleyball gave her a sense of belonging and confidence.

86.    In high school, Kendall received athletic and academic recognition from the Washington Interscholastic Athletic Association. She was a two-time class 4A First Team All-League winner, as well as a two-time Honors All-League player.

87.     Kendall chose to attend Oregon because it is close to her home, and her entire family has been enthusiastic Oregon fans since she was a child. Playing a varsity sport at Oregon seemed prestigious and she believed it was an opportunity she could not pass up.

<u>Plaintiff Halli Fields</u>

88.     Halli Fields is an out-of-state student and is currently a sophomore at Oregon, majoring in Multidisciplinary Science.

89.     Halli was and is a member of the varsity women's beach volleyball team for the 2022-23 and 2023-24 seasons.

90.     Halli grew up in Ventura, California. She first started playing beach volleyball when she was very young and has loved it ever since. She played both indoor and beach volleyball for her high school and played on elite level club teams for both sports as well.

91.     Halli's hard work, athletic talent, and leadership ability led to her being chosen as a team captain in her junior and senior years for both the indoor and beach teams. In her senior year of high school, she won an award for being the best offensive player on her team and she was selected for the Ventura County First Team—which only selects one or two girls from each high school in the county.

92.     Halli was drawn to Oregon because it is a great school both athletically and academically. She was thrilled to be able to play beach volleyball at the collegiate level.

93.     While she was being recruited, Halli was told that Oregon was working on scholarships and facilities for the varsity beach volleyball team. Unfortunately, those scholarships and facilities have never materialized.

<u>Plaintiff Natasha George</u>

94.     Natasha George is an out-of-state student and is currently a sophomore at Oregon, majoring in Business.

95.     Natasha was and is a member of the varsity women's beach volleyball team for the 2022–23 and 2023–24 seasons.

96.     Natasha grew up in Huntington Beach, California, where beach volleyball is very popular. Natasha is passionate about growing the sport, so she spends her summers coaching youth beach volleyball.

97.     Natasha started playing beach volleyball at a young age and immediately fell in love with the sport and the amazing community of beach volleyball players. She dreamed of playing beach volleyball in college.

98.     In her junior year of high school, Natasha placed third at the AAU Junior Olympic Games and, in her senior year, she placed in the top twenty in nationals.

99.     Natasha chose to attend Oregon because of its developing beach volleyball team, which she hoped would increase her chance to get playing time her freshman year.

100.    When she was recruited to Oregon, Natasha was told the beach volleyball team would be given athletic financial aid within her time on the team.

101.    During her freshman year at Oregon, she and her beach volleyball partner had the second longest winning streak of the season and had huge wins against top-twenty teams, including the University of Washington and Arizona State University.

102.    Despite assurances that the varsity beach volleyball team would start receiving athletic aid, Natasha has not received any athletic financial aid, which has placed financial strain on her and her family.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

<u>Plaintiff Josie Griffiths</u>

103.    Josie Griffiths is an out-of-state student and is currently a sophomore at Oregon, majoring in Business Administration.

104.    Josie G. was and is a member of the varsity women's beach volleyball team for the 2022–23 and 2023–24 seasons.

105.    Josie G. has played volleyball since the fourth grade. As a child, she participated in many sports—horseback riding, soccer, swimming—but she found that volleyball was the first sport she really enjoyed. She started playing beach volleyball in 2022.

106.    Josie G. is very passionate about sports, and she hopes to enter the business side of the professional sports industry after college.

107.    Josie G. chose to attend Oregon because of its strong school spirit and sports teams.

108.    Josie G. has not received any athletic financial aid, which has caused stress on her and her family. She has considered transferring schools because she does not want to pay off student loans for decades to come just to play beach volleyball at a university that does not care about the team.

<u>Plaintiff Dahlia McAllister</u>

109.    Dahlia McAllister is an out-of-state student and is currently a junior at Oregon, majoring in Multidisciplinary Science.

110.    Dahlia was and is a member of the varsity women's beach volleyball team for the 2020–21, 2021–22, 2022-23, and 2023-24 seasons.

111.    During high school, Dahlia was a highly competitive runner. She ran several track events, but the 400M and long jump were her main events.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

112.    Dahlia also played volleyball in high school and started playing beach volleyball on a club team in her junior year of high school.

113.    Although she was actively recruited to run track by a number of Division I schools, she decided to also explore Division I beach volleyball programs.

114.     When she was offered the opportunity to play beach volleyball at Oregon, she decided it was where she most wanted to go to school and play.

115.    She loved Oregon, its academic and athletic facilities, and its reputation for being an amazing place to be a student-athlete.

116.    When Dahlia was recruited by Oregon while she was still in high school, she was assured that the university was going to bring the team on campus, instead of having it continue to play in a public park that was more than a ten minute drive from campus.

117.    Oregon also told her that the beach volleyball team would have athletic scholarships the next year.

118.    However, neither of these things has happened and it has been four years.

119.    During her time at Oregon, Dahlia has lived up to her end of being a Division I student-athlete—reporting to school to start training weeks before the school year begins, practicing five days a week for at least three and a half hours, year-round, with tournaments on the weekend during the season; but Oregon has not made good on its promises or lived up to its responsibilities to the beach volleyball team.

<u>Plaintiff Presley McCaskill</u>

120.    Presley McCaskill is an in-state student and is currently a junior at Oregon, majoring in Journalism.

121.    Presley was and is a member of the varsity women's beach volleyball team for the 2022–23 and 2023–24 seasons.

122.    Presley began playing volleyball when she was twelve and always wanted to play in college. Presley is very proud of her commitment to her sport and the hard work she put in to accomplish that goal.

123.    Presley loves volleyball because it serves as an outlet in her life and is a space where she always feels like herself.

124.    In high school, Presley was team captain of the varsity volleyball team for two years. Her high school team won district and state championships two years in a row.

125.    Presley decided to transfer to Oregon after her freshman year at Houston Baptist University because she wanted to be closer to home.

126.    At Oregon, Presley was able to play in her first college tournament in her sophomore year.

127.    Without athletic financial aid, Presley struggles to pay for both classes and books. She is unable to afford the more expensive online courses, which would give her more flexibility in her schedule for beach volleyball.

<u>Plaintiff Abigail Plevin</u>

128.    Abigail Plevin is an out-of-state student and is currently a senior at Oregon, majoring in Public Relations.

129.    Abigail was and is a member of the varsity women's beach volleyball team for the 2020–21, 2021–22, 2022–23, and 2023–24 seasons.

130.    Abigail has played indoor and beach volleyball since she was very young. She received several awards in high school, including most valuable player awards and the Young Gun

Award, which is awarded by the Association of Volleyball Professionals to only ten female junior athletes in beach volleyball at the youth championships.

131.    When she decided to attend Oregon, Abigail was told the beach volleyball team would have access to new courts, scholarships, and equal treatment.

132.    Despite her hard work, Oregon's failure to provide necessary support and equipment has restricted her growth and improvement. Abigail and her teammates have done what they could to overcome these barriers and have had successes on the court against other top ranked schools.

133.    Because Oregon does not provide athletic financial aid to the beach volleyball team, Abigail is unable to accumulate any savings and must rely on her family for monetary support, which causes her stress. She is unable to buy healthy food for herself because it is too expensive.

134.    Abigail had a goal of playing beach volleyball for her last year of NCAA eligibility in Florida while in graduate school after she graduated from Oregon, but, due to the lack of support for her team, her skills have not had the opportunity to develop as they should have in a fully supported college program.

<u>Plaintiff Valerie Peterson</u>

135.    Valerie Peterson is an out-of-state student and is currently a junior at Oregon, majoring in Advertising with a minor in Sports Business.

136.    Valerie was and is a member of the varsity women's beach volleyball team for the 2022–23 and 2023–24 seasons. She also redshirted for the 2021-2022 season. She will have two more years of sports eligibility after this season.

137.    Valerie grew up in Palo Alto, California, and has played beach volleyball since she was in seventh grade. She prefers beach volleyball to indoor volleyball because she finds beach

volleyball to be more dynamic and active. Overall, playing volleyball has taught her invaluable lessons in teamwork, communication, and leadership.

138.    Valerie was recruited to play at Oregon in her senior year of high school. She also considered attending Santa Clara, San Jose State, and Long Beach State.

139.    Ultimately, Valerie chose to attend Oregon because it seemed to have the perfect mix of top-tier athletics and academics. She takes both very seriously, as is demonstrated by her recent placement on the 2023 Pac-12 honor roll.

140.    Since Valerie does not receive any athletic financial aid, she has to rely on her family to help with tuition, which places a heavy burden on her entire family.

<u>Plaintiff Ella Tyus</u>

141.    Ella Tyus is an out-of-state student and is currently a junior at Oregon, majoring in Business.

142.    Ella was a member of the varsity women's beach volleyball team for the 2021–22 and 2022–23 seasons.

143.    Ella grew up on the beaches of southern California and always loved playing beach volleyball. She also played club indoor volleyball for years and for her high school team. During her sophomore year of high school, she tried out for the beach volleyball team and immediately knew she had found her sport.

144.    Ella chose to attend Oregon because she fell in love with the athletic programs and beautiful campus during her on-campus visit during high school.

145.    Ella and her partner hold the school record for the most wins in Oregon women's beach volleyball history.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

146.    The lack of athletic financial aid from Oregon has caused Ella a large amount of stress for her and her family to pay out-of-state tuition costs. She has had to take a full year of remote community college credits to help cut the cost of tuition at Oregon.

<u>Plaintiff Siulolovao Folau</u>

147.    Siulolovao "Lolo" Folau is an out-of-state student and is currently a senior at Oregon, majoring in Applied Business and Economics.

148.     Lolo was and is a member of the varsity women's beach volleyball team for the 2022–23 and 2023–24 seasons.

149.    Lolo started playing volleyball when she was nine and has not stopped. She has always loved being competitive and working with a team. Lolo grew up with all brothers and she and her brothers always played sports. But Lolo was the only one that picked up volleyball and it provided her with an outlet to be herself and excel at something that was entirely her own.

150.    In high school, Lolo was varsity captain of the volleyball team. She received several awards, including PAL League Region First Team, Aragon High School Most Improved Player, and Aragon High School Best Utility Player.

151.    Lolo chose to attend Oregon because of its competitive business school and to play volleyball.

152.    Because Lolo did not receive any athletic financial aid, her family had to take out loans to give her the opportunity to have a good education and play beach volleyball.

<u>Plaintiff Alexandra Laita</u>

153.    Alexandra "Alex" Laita is an out-of-state student and is currently in her fifth year at Oregon, majoring in Family and Human Services.

154.    Alex was a member of the varsity women's beach volleyball team for the 2019–20 and 2021–22 seasons.

155.    Alex loves beach volleyball because of the freedom as an athlete she feels when she plays and the lifelong friendships she has cultivated through the sport.

156.    Alex chose to attend Oregon because she wanted to play beach volleyball at a high level, and she was eager to attend college on a campus that was surrounded by nature and outdoor recreation opportunities.

157.    While Alex was on Oregon's beach volleyball team, the team was never provided with the support it needed to perform its best and the conditions of the team's practice area were unsanitary and unsafe at times.

158.    Alex was proud of her team's ability to overcome these conditions and achieve victories over other universities in the Pac-12.

159.    Oregon's failure to award athletic scholarships to the beach volleyball team caused Alex a great deal of stress and placed financial strain on her and her family who helped her pay for her schooling and housing.

<u>Plaintiff Batia Rotshtein</u>

160.    Batia Rotshtein is an out-of-state student and is currently a senior at Oregon, majoring in Sports Business and Media Studies.

161.    Batia was and is a member of the varsity women's beach volleyball team for the 2020–21, 2021–22, and 2022–23 seasons.

162.    Her freshman year of high school, Batia began to participate in the college recruiting process for indoor volleyball. That same year, she also began playing beach volleyball. It did not take long before she realized that she wanted to play beach volleyball in college.

163.    Batia fell in love with beach volleyball because of the atmosphere surrounding the sport and playing with close-knit friends.

164.    Batia chose Oregon because of the promises made to her during recruitment. She was promised that Oregon would focus on growing the beach volleyball program and that she would be an integral part of that growth.

165.    She was also promised that by her sophomore year Oregon would be investing into the beach volleyball program by providing facilities and scholarships increase the program's prestige, reputation, and exposure. Batia is now in her senior year and Oregon has failed to follow through on its promises, despite her and her teammates' continuous efforts. She has even had to spend her own money on food during tournament travel and to ensure she has proper equipment for play.

166.    During her sophomore year at Oregon, while competing in the Pac-12 North Beach Volleyball Tournament, the team beat seventeenth-ranked University of Arizona, which was the first time the team beat a ranked team in program history.

167.    She was on the Pac-12 Spring Academic Honor Roll from 2021–23 and on the Dean's List Fall 2020 and Fall 2021.

168.    Since Batia does not receive any athletic financial aid, but still has the schedule of a top-performing Division I athlete, she has not had the opportunity to have a job that can provide a steady income to contribute towards rent and tuition. This has taken a financial toll on her and her family.

169.    Due to Oregon's discriminatory treatment of her team and failure to follow through on its promises, Batia is not playing beach volleyball in the 2023-24 season and is putting in the work to graduate early.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

<u>Plaintiff Zoe Almanza</u>

170.     Zoe Almanza is an out-of-state student and is currently a senior at Oregon, majoring in Film Studies.

171.     Zoe was a member of Oregon's varsity women's beach volleyball team for the 2019-20, 2020-21, 2021–22 and 2022–23 seasons.

172.     Zoe started playing volleyball when she was eleven years old. At twelve years old, Zoe was selected for an elite-level club volleyball team that placed fifth at the Junior Olympics. The same year, Zoe also placed first at the Junior Olympics for beach volleyball. For the four years that followed, she placed in at least the top five at the junior Olympics.

173.     In high school, Zoe was awarded First Team All-League for indoor volleyball three years in a row. She placed in the top five in more than 100 beach volleyball tournaments against teams from all over the country.

174.     In high school, Zoe was a member of the varsity volleyball team from her freshman to junior years. In her senior year, Zoe decided to focus solely on beach volleyball because her dream was to play beach volleyball in college. Zoe loved beach volleyball because, in addition to being able to play her sport in the beauty of nature, she could play the entire court instead of being limited to one position on an indoor volleyball team.

175.     In addition to Oregon, Zoe was recruited to play beach volleyball by Stanford, Loyola Marymount University, University of Southern California, University of California–Berkeley, and University of California–Santa Clara.

176.     In her junior year of high school Zoe came to campus for an unofficial recruitment trip. During her time on campus, Oregon showed Zoe the indoor volleyball practice area and locker

rooms, but did not take her to the public park where the beach volleyball team actually practiced and played.

177.    During the trip, Oregon told Zoe that the beach volleyball team would have new competition and practice facilities on campus that were to be completed by the 2020-21 season. She was also told that, by the 2020-21 season, the beach volleyball team would be given scholarships and, specifically, that she would be awarded at least a partial scholarship and a monthly stipend to help with housing and food costs.

178.    Oregon never fulfilled these promises; instead the team still does not have practice or competition facilities on campus and has still not be given scholarships.

179.    The beach volleyball did not have a locker room at all until the end of Zoe's time on the team and, even then, the women were not given a locker room of their own—only access to whatever visiting team locker room was not in use on any given day. Additionally, for most of Zoe's freshman and sophomore years the beach volleyball student-athletes were running their own practices because the coaches would not show up to every practice.

180.    When Zoe and her teammates would complain about the treatment of their varsity team, Oregon told the women they should just be grateful for what they were given, even though it was nothing close to what the men's teams were given.

181.    Student-athletes on Oregon's other varsity teams would often tell Zoe that they did not know the beach volleyball team was a varsity team and students on campus thought the team that Zoe and her teammates dedicated their lives to was just a club team.

182.    Oregon's discriminatory treatment and constant diminishing of the women's legitimate complaints caused Zoe to lose her love for the sport entirely. She has not picked up a volleyball since she left Oregon's campus after the 2023 spring semester.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

183.     Even though she has a year of athletic eligibility remaining, Zoe is finishing her final year at Oregon exclusively through online classes, because she could not endure another year of Oregon's discriminatory treatment of the beach volleyball team.

Plaintiff Beatrice Wetton

184.     Beatrice Wetton was an in-state student and graduated from Oregon in 2023 with a degree in Art and Technology.

185.     Beatrice was a member of the varsity women's beach volleyball team for the 2019–20, 2020–21, 2021–22, and 2022–23 seasons.

186.     Beatrice fell in love with beach volleyball because it gave her a chance to learn great mental strength and taught her to work hard to achieve her goals.

187.     Beatrice played beach volleyball throughout high school and received several awards, including the Referees Scholarship for Good Sportsmanship, First Team All-Conference, and All-State Player.

188.     Beatrice came to Oregon based on Oregon's false promises of providing scholarships and supporting the beach volleyball team.

189.     During her time on Oregon's women's beach volleyball team, Beatrice received the Chi Alpha Sigma Award, an award for athletic and academic excellence, was team captain, and was on the Pac-12 Spring Academic Honor Roll for 2021-22.

190.     She also holds the record for the most wins in program history and the record for most pair wins in a season in program history.

191.     During her time on the women's beach volleyball team, Beatrice often felt inferior to male student-athletes on varsity teams. Beatrice never received any of the amenities Oregon promised while it was recruiting her to the program, but by the time it became clear to her that

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

Oregon had no intention of following through on its promises, it would have cost Beatrice more time in school and more money to transfer to another university and finish her education there.

Plaintiff Mia Lopez

192.    Mia Lopez was an out-of-state student and graduated from Oregon in May 2023 with a degree in Business Administration and a minor in Multimedia.

193.    Mia was a member of the varsity women's beach volleyball team for the 2019–20 and 2020–21 seasons.

194.    Mia grew up in Seal Beach, California, and played beach volleyball for most of her childhood. She loves beach volleyball because she enjoys the atmosphere and the strategy of the game, and she was thrilled to play at the collegiate level at Oregon.

195.    Mia specifically chose to attend Oregon because the university told her about its great athletic program and the amazing improvements it was going to make to the beach volleyball program. For example, she was told that there would be dedicated courts and locker rooms on campus for the women's beach volleyball team completed by her second year. Mia was also promised during her recruitment that there would be beach volleyball scholarships given out within her time on the team. All of these factors drew her to Oregon.

196.    Once she arrived at Oregon, Mia realized that the women's beach volleyball team was treated worse than any men's varsity team. Oregon never followed through on the promises that attracted Mia to the school and the university's lack of support for her team caused Mia to leave the team.

Plaintiff Delaney Hopen

197.    Delaney Hopen was an out-of-state student and graduated from Oregon in May 2023 with a master's degree in Landscape Architecture.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

198.    Delaney was a member of the varsity women's beach volleyball team for the 2020–21 season.

199.    Delaney grew up in Seattle, Washington, and fell in love with volleyball when she was ten years old. She credits volleyball with making her the woman she is today. Playing volleyball has brought her enduring friendships and has been irreplaceable to her personal development. Specifically, she learned collaboration, time management, healthy communication, and how to be a leader.

200.    In high school, Delaney earned a wealth of athletic awards and acknowledgements. She was a 4-time All-WESCO Conference selection and a 2-time Washington Interscholastic Athletic Association athlete of the week. She was twice named the "Player to Watch" in the *Seattle Times* and *Everett Herald*.

201.    These accomplishments led to her recruitment for Division I volleyball. In the 2016–17 to 2019–20 academic years, Delaney played varsity volleyball for the University of Idaho as a defensive specialist. She was the lauded recipient of a volleyball scholarship for two and a half years there. During her time at Idaho, she and her team went to the conference championships every year. In the 2018 season, the team won the northern conference and took second in the conference championships. In total that year, the team had twenty-three wins and only ten losses (fifteen wins and only three losses against other conference schools).

202.    When Delaney was choosing a graduate school, one of the most important factors to her was playing volleyball. She wanted to pair her final years of playing eligibility with an academically rigorous architecture program, which is why she came to Oregon.

203.    While at Oregon, Delaney accumulated a substantial amount of student debt. While on the beach volleyball team, she provided overnight care for dogs to support herself financially.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

And she took a job at a local bar immediately after volleyball season ended to try to pay off some of her debt for food, travel, and expenses from the season.

204.    When Delaney played at the University of Idaho, she accumulated close to thirty pairs of spandex shorts and sports bras given to her by the school. At Oregon, she would give out her used equipment to freshman teammates because Oregon did not provide these varsity student-athletes with proper gear.

205.    During the 2021–22 school year, Delaney organized an in-person meeting with Lisa Peterson, Oregon's senior women's administrator at the time, to ask her why players were falsely promised scholarships and why the university did not provide appropriate facilities and equipment for the women's beach volleyball team. Instead of addressing these concerns, Ms. Peterson informed the student-athletes that, if they had more fans, they would have more money for resources. Oregon took no responsibility for failing to treat the women's beach volleyball team equitably.

<u>Plaintiff Carly Wallace</u>

206.    Carly Wallace graduated from Oregon in 2022 with a degree in Public Relations and Sports Business.

207.    Carly was a member of the varsity women's beach volleyball team for the 2018–19, 2019–20, 2020–21, and 2021–22 seasons.

208.    Carly has played volleyball for years. She loves the culture of beach volleyball, including the competition and community.

209.    Carly chose to attend Oregon because she loved the coaches, the team members, and Oregon's perceived prestigious athletic program.

210.    While at Oregon, Carly was the women's beach volleyball team co-captain from 2019 to 2022. In the 2018-19 season, the team made it past the first round of playoffs in the Pac-12 for the first time in Oregon's beach volleyball history.

211.    Carly was promised a scholarship her sophomore year, but never received one. Throughout her time at Oregon, the university continued to make promises about how things would improve the next year and Carly was hopeful these were not empty promises.

212.    Unfortunately, Carly's hope was misplaced. Oregon's failure to provide the promised support caused Carly and her family a significant amount of stress and financial hardship.

Plaintiff Savannah Siegrist

213.    Savannah Siegrist was an out-of-state student and graduated from Oregon in 2021 with a degree in Business Administration and in 2022 with a master's degree in Sports Business.

214.    Savannah was a member of the varsity women's beach volleyball team for the 2019–20, 2020–21, and 2021–22 seasons.

215.    Savannah grew up with a sand volleyball court in her backyard and started playing when she was young. Her dad started a junior recreational volleyball league for her county and a volleyball club. Volleyball has always been a major part of her life.

216.    Savannah played volleyball all throughout high school. She was named the Baltimore Metropolitan Volleyball Player of the Year (2016), the Anne Arundel County Volleyball Player of the Year (2016) and selected as a member of the USA Volleyball A2 High Performance Team.

217.    She also attended beach volleyball high performance camps in the summers during high school. Savannah has met lifelong friends through beach volleyball.

218.    Savannah chose to attend Oregon because of the strong sports business master's program, the experience of helping to shape the growing beach volleyball program, and the opportunity to participate in Pac-12 competition.

219.    While at Oregon, Savannah did not receive any athletic financial aid, so she had a large amount of student debt. Paying off her debt made it impossible for her to take unpaid internship opportunities while in school and affected her ability to accept some job offers because of the financial hardship and the stress related to being financially unstable.

220.    Oregon's treatment of the women's beach volleyball team made Savannah feel as though she and her team were disposable to Oregon. She felt a heavy burden to perform well athletically and academically to help Oregon see the value of her program.

<u>Plaintiff Anastasia Lima</u>

221.    Anastasia Lima was an out-of-state student and graduated from Oregon in June 2022 with degrees in Psychology and Business.

222.    Anastasia was a member of the varsity women's beach volleyball team for the 2019–20, 2020–21, and 2021–22 seasons.

223.    After watching her first volleyball game, Anastasia immediately knew that she wanted to play, so she started learning how to play when she was just seven years old.

224.    Anastasia played both indoor and beach volleyball and was on national teams under the USA Volleyball National Team Development Program for both sports.

225.    By the time she entered her freshman year of high school, Anastasia had six Division I scholarship offers. She committed to Columbia University when she was only thirteen years old.

226.    By the time she was a sophomore in high school, Anastasia had won or placed in more than fifty tournaments around the country. She was nationally ranked in the top fifty players in the country for her age group.

227.    When she received a scholarship offer from the University of Southern California for beach volleyball, she decided to decommit from Columbia University.

228.    During her senior year of high school, she was approached by Oregon's beach volleyball coach Janice Harer and Oregon's indoor volleyball coach Matt Ulmer about committing to Oregon. She was enticed by the promise of scholarships, guaranteed play time, new team facilities by her sophomore year, and support from coaching staff. Oregon volleyball coaches told Anastasia that she could change the program and would never come off the court.

229.    Even though she was recruited by more than a dozen colleges for both indoor and beach volleyball after winning or placing in over 100 tournaments, she chose Oregon based on the promises Oregon made to her about things such as athletic scholarships and facilities.

230.    Playing volleyball at the highest level was integral to Anastasia's decision to attend Oregon. While she was at Oregon, the beach volleyball team had the highest winning record in Oregon's history her freshman year and made it past the first round of the Pac-12 championships for the first time.

231.    Anastasia was led on by Oregon with promises of how well Oregon treated its athletes. Regrettably, Anastasia's experience did not align with the recruiting promises. Instead, the women's beach volleyball team has received far inferior treatment to the men's varsity teams.

232.    Anastasia never received most of the promises Oregon made, including scholarship money, new sand volleyball courts, new facilities, staffing support, coaching support, or even support from the Oregon athletic department.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

233.    Oregon's treatment of its female student-athletes has crushed Anastasia's love of the sport.

Plaintiff Madelyn LaFollette

234.    Madelyn LaFollette was an out-of-state student and graduated from Oregon in May 2021 with a degree in Business Administration and in 2022 with her master's degree in Sports Business.

235.    Madelyn was a member of the varsity women's beach volleyball team for the 2019–20, 2020–21, and 2021–22 seasons.

236.    Madelyn began playing volleyball in fourth grade as a way to have fun and enjoy time with her friends. As she developed as a player and individual, her love for the sport grew. She enjoys the heavy correlation between beach volleyball and life. For every rally, there is a distinct winner and loser. After a rally, you have an opportunity to rebound from a loss or continue with the same momentum. She loves beach volleyball for the important life lessons she learns, such as working on a team and persevering through challenges.

237.    Madelyn attended the University of San Francisco from 2017–19. While there, Madelyn was awarded the Dante Benedetti Award, an accolade for student-athletes who serve as an inspiration to their teammates through their unwavering sense of loyalty, self-sacrifice, unselfishness, positive attitude, and hard work. She was also named to the West Coast Conference All Freshman Beach Volleyball Team.

238.    Madelyn chose to attend Oregon for its high caliber athletics and academics. Having been injured in the past and realizing the risks of investing solely in athletics, Madelyn wanted to also focus on academics that could support her after her time on the beach volleyball team ended.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

239.    While at Oregon, the beach volleyball team beat the University of Arizona in 2022, which was the team's first ranked win in its history.

240.    Because Madelyn was not awarded any athletic financial aid, she graduated from Oregon with a large amount of student debt, which has created hardship in her life.

<u>Plaintiff Alexandra Haden</u>

241.    Alexandra Haden was an out-of-state student and graduated from Oregon in 2022 with a degree in Applied Business and Economics.

242.    Alexandra was a member of the varsity women's beach volleyball team for the 2018–19, 2019–20, 2020–21, and 2021–22 seasons.

243.    Alexandra fell in love with volleyball in large part due to the sense of family she felt from her teammates. She has always had strong bonds with her teammates who offer support and help push her. After a bad car accident in her junior year of college, her teammates were there to take care of her, comfort her, and help her while she recovered.

244.    Alexandra chose Oregon to play varsity beach volleyball. During her visit, she fell in love with the coaches, team, and everything she thought Oregon had to offer. She trusted that committing to Oregon with no scholarship money because Oregon promised that the team would have courts and scholarships by her junior year.

245.    During her sophomore year at Oregon, in 2020, Alexandra and her women's beach volleyball partner broke a school record for the number of wins in a single season. During her senior year at Oregon, the women's beach volleyball team was ranked higher than the University of Washington and the University of Utah going into the Pac-12 championship.

246.    Alexandra never received an athletic scholarship from Oregon as promised, which led to financial hardships while trying to pay the full out-of-state tuition. Alexandra had to take out large loans and now has to deal with significant student debt.

Plaintiff Josie Cole

247.    Josie Cole was an out-of-state student and graduated from Oregon in 2021 with a degree in Business and Economics.

248.    Josie C. was a member of the varsity women's beach volleyball team for the 2017–18, 2018–19, 2019–20, and 2020–21 seasons.

249.    Before attending Oregon, Josie C. had played beach volleyball for many years. She started playing at the age of twelve and, by the end of high school, she was playing on an elite level club team year-round.

250.    Josie C. also played indoor volleyball and ran track in high school.

251.    Josie C. was originally recruited to play Division I indoor volleyball at the University of California, Irvine. She attended UC Irvine in the fall of 2017, but, after suffering a serious back injury, Josie was told that, if she wanted to continue to play volleyball, she should switch to beach volleyball, because it would have less impact on her back.

252.    Josie C. loved volleyball and playing at the Division I level, so, after her recovery, she started looking at Division I beach volleyball programs.

253.    While she had the option to play in several other programs, she knew Oregon was where she wanted to play.

254.    To Josie C., Oregon was the dream place to play sports, given the school's sports legacy and its reputation for educating some of the best athletes in the world and providing them with excellent treatment and support to train and compete to the best of their abilities.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

255.    After her official visit to the campus in 2017, she left with the understanding that the beach volleyball courts were going to be on-campus within a year and that the sand courts in the public park off campus were just temporary. Six years later, however, the beach volleyball team still plays in the public park.

256.    Josie C. also understood that there would be scholarship money available to the beach volleyball program by her second year with the program and that, at the very least, she would be eligible for a non-resident tuition waiver—allowing out-of-state student athletes to attend university only paying the in-state tuition—as permitted by the NCAA.

257.    Josie C. was the captain of the Oregon beach volleyball team for three of her four years on the team.

258.    By her last year on the team, Josie C. was doing so much of the administrative work to keep the team organized, practicing, and playing that she felt like an assistant administrator and coach rather than a student and a player.

259.    Since Josie C. did not receive any athletic financial aid, she had to work during her very limited free time to be able to afford basic necessities. If she did receive athletic financial aid, she would have been able to focus solely on training and school rather than worrying about having money for things like food.

260.    Oregon's promises to Josie went unfulfilled, and her expectations were quickly crushed. Josie C. felt like what she worked hard for her entire life was devalued by Oregon's treatment of the varsity women's beach volleyball team.

261.    Josie C. had a fifth year of eligibility to play Division I beach volleyball because of Covid-19, but she was so tired of the treatment that she and the team were receiving from Oregon

that she played her final year at Tulane University in graduate school, where she finally learned what a Division I beach volleyball program that supports and respects its athletes looks like.

<u>Plaintiff Alaina Thomas</u>

262.    Alaina Thomas was an out-of-state student and attended Oregon for the 2020–21 academic year, majoring in Human Physiology.

263.     Alaina was a member of the varsity women's beach volleyball team for the 2020–21 season.

264.    Alaina transferred to Oregon from Irvine Valley Community College, where she and her teammates went undefeated in conference and placed third in the state in 2019.

265.    Alaina decided to transfer to Oregon for the beach volleyball program because she wanted to play volleyball at the highest level. After talking to the head coach at the time, she felt Oregon would provide a positive and supportive environment and she was led to believe Oregon would begin offering athletic financial aid in the future and at the very least, she would be eligible for a non-resident tuition waiver—allowing out-of-state student athletes to attend university only paying the in-state tuition—as permitted by the NCAA.

266.    Alaina came to Oregon with a 4.0 grade average and, during her time at Oregon, Alaina received the Chi Alpha Sigma Award, an academic achievement award from an honor society for intercollegiate student-athletes. As a recipient of the award, she had her name engraved onto a bench in the Jaqua Center, the student-athlete tutoring and academic center.

267.    Regrettably, Alaina's experience did not align with Oregon's recruiting promises. Instead, Alaina received no athletic financial aid, no tuition wavier, and she and her teammates on the women's beach volleyball team were treated worse than the men's varsity teams at Oregon.

268.    Alaina attended the meeting Delaney Hopen organized with Lisa Peterson. Ms. Peterson informed the beach volleyball team that, even though team members knew individuals willing to donate to the program, the players were not allowed to raise money on their own for the program because only teams that awarded athletic financial aid were permitted to fundraise. In addition, Oregon did not address the players' concerns and failed to provide the team with the fundraising support it provided to men's teams.

269.    Due to Oregon's discriminatory treatment of the female student-athletes, Alaina opted out of the season halfway through, transferred to the University of California, Santa Barbara ("UCSB"), and lost her passion for the sport completely.

270.    Alaina's year at Oregon put her in substantial debt, which is very daunting for her and causes her significant stress. Moreover, as a recent college graduate from UCSB, her choices for graduate school are limited because of her massive debt from attending Oregon. For example, she got into USC's high-ranking doctorate program, but she cannot attend due to her debt from Oregon. Her inability to attend the graduate school of her choice due to her debt from Oregon will impact her education, her efficiency as a healthcare practitioner in the future, and her future career opportunities.

<u>Plaintiff Vivian Donovan</u>

271.    Vivian Donovan was an out-of-state student and graduated from Oregon in May 2022 with a degree in General Social Science.

272.    Vivian was a member of the varsity women's beach volleyball team for the 2020–21 and 2021–22 seasons.

273.    Vivian grew up in Southern California, where she fell in love with volleyball. She began playing when she was a preteen and she played year-round, competing on both elite level

club teams and high school teams. She loved the sport and took pride in her dedication. She also valued the work ethic she learned. She knew from a young age that she was going to pursue playing volleyball at both a collegiate and professional level.

274.    Before volleyball, she would often keep to herself as a child. Playing volleyball helped her open up to other people and gave her the ability to relate to other women like her. She believes that volleyball helped her find qualities in herself that she would not have discovered if she did not play volleyball.

275.    Vivian began her college career at Manhattan College, where she played indoor volleyball for the 2018–19 and 2019–20 seasons.

276.    Vivian chose to transfer to Oregon for beach volleyball because she admired Oregon's reputation for having great athletic programs. The level of play in New York was much lower than what she was used to, and she wanted to play for a school where athletics was taken seriously. She was also drawn to the idea of helping build Oregon's newer beach volleyball program. She believed that she could offer the team something and that she would also thrive there. She learned to love beach volleyball because it was a challenge where the women have to be versatile in all aspects of the game, rather than specific positions.

277.    Unfortunately, Oregon's treatment of the beach volleyball team did not match the school's reputation. For example, Vivian was embarrassed to play her varsity sport at a public park that was in poor condition, which contributed to other teams not taking the Oregon team seriously.

278.    Oregon's discriminatory treatment of the female student-athletes made Vivian's athletic ambitions impossible. Indeed, despite her desire to play her senior year, she did not do so because she could not afford it and instead had to work to afford to live and attend classes.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

<u>Plaintiff Jade Bernal</u>

279.    Jade Kellina Bernal is currently a sophomore at the University of Texas at San Antonio, majoring in Political Science. She was previously an out-of-state student at Oregon where she was a member of the varsity beach volleyball team for the 2021-22 season.

280.    Jade grew up in San Antonio, Texas, and played volleyball since she was eight years old. The sport has shaped who she is as a person and has brought her so much joy and lifelong relationships.

281.    Jade worked hard to become the skilled athlete she is today, as is demonstrated by her slew of accomplishments. For example, she received the Academic All-District award in her sophomore, junior, and senior years of high school. Her sophomore year of high school, she also won the Kauai Bikini National Championship in beach volleyball. Her senior year, she also won First Team All-District.

282.    Jade originally chose Oregon because during her recruitment she was promised amazing things from the program, and she trusted that she would be able to play beach volleyball at the highest level. Among other things, she was told that there would be athletic financial aid for the team in the future, even though the beach volleyball coaches could not offer it immediately.

283.    Jade relied on this promise of future athletic financial aid, but it never materialized. Oregon did not even waive the out-of-state tuition fees for her, which meant that her family had to pay about $60,000 a year for her to go to Oregon. This steep tuition cost meant she could no longer afford to go to Oregon after her freshman year and, instead, had to transfer to the University of Texas at San Antonio. Transferring set Jade back a year because of requirements at the University of Texas, so she will have to take an extra year of classes.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

284.    She did not want to leave her school, her friends, and her sport, but she financially had no feasible alternative. Had she been given the financial aid she was promised, she would have stayed at Oregon and would be completing her college education one year sooner.

### *Rowing Plaintiffs*

285.    The rowing Plaintiffs bring a claim against Oregon for failing to provide equal opportunities for athletic participation.

286.    Oregon is not providing intercollegiate level participation opportunities for female students in numbers substantially proportional to their respective undergraduate enrollments.

287.    Despite failing to provide substantially proportionate athletic participation opportunities to women, Oregon refuses to add varsity women's teams for which there is interest, ability, and competition available.

288.    For decades, Oregon has known that interest, ability, and competition are available for varsity women's teams that it is not currently sponsoring, including a varsity women's rowing team.

289.    Each rowing Plaintiff who is a current club student-athlete has the interest and ability to participate in rowing as a varsity student-athlete if Oregon gave women substantially proportional opportunities to participate in varsity athletics.

290.    Each rowing Plaintiff was harmed by Oregon's failure to offer female students proportional opportunities to participate in varsity athletics. In particular, each rowing Plaintiff was denied the opportunity to compete for an athletic participation slot on an equal basis with her male counterparts and treated as a second-class citizen, which had stigmatizing effects.

291.    By not creating a women's varsity rowing team, Oregon has deprived each rowing Plaintiffs of the opportunity to be a Division I varsity athlete.

292.     Oregon's decision also impacts each rowing Plaintiffs' professional future, as many employers and graduate schools look favorably upon varsity student-athletes because of the rigor and dedication it takes to play at the highest level.

<u>Plaintiff Elise Haverland</u>

293.     Elise Haverland is currently a junior at Oregon, double majoring in Journalism and Media Studies.

294.     Elise was and is a member of the club rowing team for the 2021–22, 2022–23, and 2023–24 seasons.

295.     Elise started rowing in her first year of high school and fell in love with the sport. She fell in love with the close-knit communities that the sport creates. She believes a rowing team is truly a family because you are invested in each other's success. She enjoys the challenge of the sport with hours of practice and teammate loyalty culminating in a perfect minute or two in competition. When the boat is gliding underneath her and she feels the power of every stroke, she remembers why she rows.

296.     Elise specifically sought out rowing in college so that she could continue to have that community of willful, strong, and invested people surrounding her.

297.     Elise chose Oregon because of the good journalism program, the beautiful outdoors surrounding the campus, the opportunity to challenge herself, and the opportunity to join the rowing team. From Oregon's social media and website, Elise believed that Oregon had a tight-knit team that she wanted to join.

298.     While Elise has been on the team, the rowing team has placed first in the team's boat class at the Head of the Lake competition in Seattle in 2021 and, in the team's boat classes, the women placed seventh at the American Collegiate Rowing Association National Championship

Regatta in 2022 ("ACRAs"), placed eighth at the ACRAs in 2022, and placed seventh in the grand finals at the ACRAs in 2023.

299.    Last year, Elise received the Coach's Award for her dedication to the Oregon club rowing team. In the 2023-24 season, she is the women's team captain.

300.    For support, Elise looks to the alumni board to provide fundraising and other aid for the team.

301.    If the women's club rowing team became a varsity sport, Elise knows the additional resources would allow the team to focus on reaching its full athletic potential. She would no longer have to pay club team dues, which would remove a large financial strain. The rowing team would also benefit from a personal trainer who could help identify and prevent potential injuries before they happened and aid in attaining full recovery when injuries did arise. The team would also thrive from use of Oregon's varsity athletics program's facilities, nutritionist, university-paid varsity-level coaching staff, recruiting, and the myriad other benefits Oregon provides to its varsity male student-athletes.

<u>Plaintiff River Ribeiro</u>

302.    River Ribeiro is currently a sophomore at Oregon, majoring in Biology.

303.    River was and is a member of the club rowing team for the 2022–23 and 2023–24 seasons.

304.    River enjoys rowing because it is a true team sport, where everyone must work together and be completely in sync to perform well. She also enjoys how every rower in the boat has a role and there is not one rower that is more important than the other.

305.    River chose to attend Oregon because it is her home state and close to her family.

306.    While River was on the club rowing team, the team placed second at Covered Bridge Regatta, a collegiate event that draws over forty teams, and secured a spot in the grand finals at the club national championship regatta.

307.    If the women's club rowing team became a varsity sport, River knows the additional resources would allow the team to focus on reaching its full athletic potential. She would no longer have to pay club team dues, she would not have to pay for her own travel for competition, and the team would have better equipment and coaching.

<u>Plaintiff Sophia Schmitz</u>

308.    Sophia Schmitz is currently a sophomore at Oregon, majoring in Biology.

309.    Sophia was and is a member of the club rowing team for the 2022-23 and 2023-24 seasons.

310.    Sophia started rowing in high school. Sophia had played soccer for many years and, following an injury, she was told that rowing was a good form of rehabilitation. Sophia fell in love with rowing and started rowing on a club team her freshman year in high school.

311.    Sophia rowed as a novice in her first year of high school and was then on varsity for her remaining three years. She practiced for three hours every day after school, even in the winter.

312.    She loves that rowing pushes her both mentally and physically—and that she gets to be outside, on the water.

313.    Sophia and her teammates on Oregon's club team practice every day, except Sunday, during the entirety of the school year.

314.    Even though University of Oregon's rowing team is not a varsity team, they often compete against other school's varsity teams.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

315.    Instead of being financially supported by the university, Sophia and her teammates have to pay dues to cover the costs of rowing for Oregon and must pay for their own coaching, travel, gear, and medical services.

<u>Plaintiff Sydney Weddle</u>

316.    Sydney Weddle is currently a sophomore at Oregon, majoring in Human Physiology.

317.    Sydney was and is a member of the club rowing team for the 2022–23 and 2023–24 seasons.

318.    Sydney loves rowing because it has taught her that she can do hard things. She appreciates that the time, effort, and energy she puts into her sport pays off in the end when she achieves the result she wants, wins a race, or even makes it through a difficult workout. After hard practices, the feeling of extreme bliss after a race with her close teammates is incredibly rewarding. She also loves rowing because there is no better feeling than being on the crystal-clear, still water at sunrise and being more productive than most of her peers by 8 a.m.

319.    Sydney chose to attend Oregon because of the strong academics, as well as the ability to try out for the club rowing team.

320.    While Sydney was on the rowing team, the team placed seventh at the ACRAs in 2023. Sydney has also recorded the fastest novice 4k time in program history, and recorded the sixth fastest 2k time in program history.

321.    Sydney feels neglected by Oregon because the women's club rowing team is offered little support from Oregon.

<u>Plaintiff Claire Daley</u>

322.    Claire Daley is currently a junior at Oregon, double majoring in Global Studies and Planning, Public Policy, and Management.

323.    Claire was and is a member of the club rowing team for the 2022–23 and 2023–24 seasons.

324.    Claire loves rowing because it pushes her to work hard and teaches her how to overcome mental barriers. For Claire, there is no other feeling like being out on the peaceful, glassy water of Dexter Lake at 6 a.m. with her best friends—the clicking of the oarlocks in sync as she moves across the water, finding the "swing," and putting all of her concentration into perfecting the stroke, working as one in accord with the boat.

325.    Claire enjoys the sense of accomplishment that comes with winning a race when the entire team leaves it all out on the water—after working hard, enduring brutal workouts, and pushing through long morning hours with blistery hands. Claire believes rowing is one of the most challenging sports out there, both physically and mentally. She enjoys the challenge, high competition, community, and the sense of reward that comes after all the hard work.

326.    Claire chose Oregon because of the location, the strong academics, the highly-experienced professors, the large alumni base, the welcoming community, and the great athletic programs, which she knew she wanted to get involved in.

327.    While Claire was on the rowing team, the team placed at the club national championship regatta in spring 2023 and placed second at the Covered Bridge Regatta in spring 2023.

328.    At the club national championship regatta, Claire was in the stroke seat, which sets the pace of the boat.

329.    Because it is a club sport, Oregon essentially ignores the women's rowing team. Claire has to work two jobs on campus to be able to afford the club team dues to play her sport. She knows that, if it was a varsity sport, the women's rowing team members would have access to a nutritionist who could teach the women how to properly fuel their bodies before a race, a highly qualified coaching staff, medical staff and trainers, and the numerous other benefits Oregon provides to its men's varsity teams.

<u>Plaintiff Anna Maria Knight</u>

330.    Anna Maria "Maria" Knight is currently a junior at Oregon, majoring in Human Physiology and minoring in Psychology and Business.

331.    Maria was and is a member of the club rowing team for the 2022-23 and 2023-24 seasons.

332.    Maria is a member of the National Guard and was on mission in the year after her first semester at Oregon.

333.    She returned to Oregon with enough credits to continue as a junior in the 2023-24 academic year and this is therefore in her second year on the rowing team.

334.    Maria had never rowed before she attended Oregon but, after just one season, she was hooked.

335.    She loves the intensity and discipline required in rowing—the early mornings on the water and the many hours of conditioning and weightlifting.

336.    She also loves the team. She has found the team to be incredibly close and supportive, which she attributes to the fact that, in rowing, you can't win alone.

337.    Maria was named to the American Collegiate Rowing Association 2023 All-Academic Second Team, which recognizes collegiate rowers who maintain a GPA of 3.5 or higher.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

338.    Maria has dedicated hundreds of hours both on and off the water to the club rowing team.

339.    She and her teammates also have to pay dues to be on the team, which requires many on the team to have part-time jobs. Some former members of the team could not continue to row because they could not afford to work, go to classes, and attend all practices and competitions.

### *Defendant*

340.    The University of Oregon is a state educational institution.

341.    Defendant Oregon is a recipient of federal funds and is required to comply with Title IX and all its implementing regulations.

342.    Defendant Oregon holds itself out as a university committed to providing top-quality intercollegiate sports programs. The university uses this distinction as part of its efforts to recruit top student-athletes and coaching staff.

343.    Under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and the regulations adopted pursuant to 34 C.F.R. Part 106, Defendant Oregon must provide equality of opportunity for women and men in every program Oregon offers, including equal treatment and benefits to Oregon's female and male varsity student-athletes, equal athletic financial aid to Oregon's female and male varsity student-athletes, and equal opportunities for female and male student-athletes to participate in varsity intercollegiate athletics.

### FACTUAL ALLEGATIONS

### TITLE IX BARS OREGON FROM DISCRIMINATING AGAINST ITS FEMALE STUDENT-ATHLETES ON THE BASIS OF THEIR SEX.

344.    Oregon sponsors (a) men's varsity baseball, basketball, cross country, football, golf, tennis, indoor track and field, and outdoor track and field and (b) women's varsity acrobatics and

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

tumbling, basketball, beach volleyball, cross country, golf, lacrosse, soccer, softball, tennis, indoor track and field, outdoor track and field, and volleyball.[2]

345.    Oregon is a member of the NCAA and participates in the Pacific-12 ("Pac-12") conference. Oregon participates in Division I athletics, the highest level of intercollegiate competition.

346.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

347.    When schools segregate their varsity athletic programs on the basis of sex, as Oregon does, violations of Title IX in those programs constitute intentional sex discrimination. *See Neal v. Board of Trustees of the Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999).

348.    Applying Title IX to intercollegiate athletics, the U.S. Department of Education (DOE) adopted regulations requiring educational institutions receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

349.    The regulations, codified at 34 C.F.R. Part 106 (the "Regulations"), are enforced by DOE's Office of Civil Rights (OCR).

350.    In 1979, OCR issued a policy interpretation of Title IX and the Regulations as applied to intercollegiate athletics at 44 Fed. Reg. at 71,413 (Dec. 11, 1979) (the "OCR Policy Interpretation").

---

[2] "Volleyball" as it is used in college athletics refers to indoor volleyball played in a gym on a hardwood court and "beach volleyball" refers to outdoor volleyball played on sand. These are two distinct women's sports teams. Volleyball is played with a team of six women on the court at a time and beach volleyball is played in pairs, with the same two women on the sand court for the entire match.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

351.    The OCR Policy Interpretation sets forth three areas of compliance under Title IX for intercollegiate athletics: (1) equal treatment and benefits, (2) equal athletic financial assistance, and (3) effective accommodation of student's athletic interest and ability.

### Title IX's Equal Athletic Treatment and Benefits Requirements

352.    Title IX's requirements for equal treatment and benefits are codified at 34 C.F.R. § 106.41(c). The Regulations identify nine non-exclusive areas in which recipients must provide equal treatment and benefits to female and male student-athletes:

- The provision of equipment and supplies;
- Scheduling of games and practice time;
- Travel and per diem allowance;
- Opportunity to receive coaching and academic tutoring;
- Assignment and compensation of coaches and tutors;
- Provision of locker rooms, practice, and competitive facilities;
- Provision of medical and training services;
- Provision of housing and dining facilities and services; and
- Publicity.

353.    The items listed above are not exhaustive and do not include every area in which a school must provide equal treatment and benefits to its female and male student-athletes.

354.    For example, since the NCAA suspended its restrictions on NIL activities in response to the United States Supreme Court holding in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), male and female student-athletes have received a wide array of publicity and other treatment and benefits to increase their NIL opportunities and income. To the extent that schools are involved in helping student-athletes develop, identify, arrange, or receive NIL-related training, opportunities, or income, Title IX's equal treatment and benefits requirements apply to those activities, opportunities, and income, too.

355.    Additionally, "[e]qual efforts to recruit male and female athletes are required under Title IX." *Oliver v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d, 1093, 1110-11 (S.D. Cal. 2012) (citing Policy Interpretations, 44 Fed. Reg. at 71,417).

356.    "Although recruiting is not listed as a factor under 34 C.F.R. section 106.41(c), the Policy Interpretations do identify this area as significant." *Barrett v. W. Chester Univ. of Pennsylvania of State Sys. of Higher Educ.*, No. CIV.A. 03-CV-4978, 2003 WL 22803477 (D. R.I. 1992) (identifying recruiting dollars as a "target area" under the Policy considerations and finding a disparity in Brown University's allocation of those funds).

357.    In addition, a school's "failure to provide necessary funds for teams for one sex" may also be indicative of sex discrimination. 34 C.F.R. §106.41(c).

358.    As relevant here, the OCR Policy Interpretation states:

> The Policy—The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulations by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effect of any difference is negligible.

44 Fed. Reg. at 71,415.

### Title IX's Equal Athletic Financial Aid Requirements

359.    Title IX's requirements for equal athletic financial aid have been in existence since 1979.

360.    As OCR explained in 1998: "With regard to athletic financial assistance, the regulations promulgated under Title IX provide that, when a college or university awards athletic scholarships, these scholarship awards must be granted to 'members of each sex in proportion to

the number of students of each sex participating in intercollegiate athletics.' 34 C.F.R 106.37(c)."

Office for Civil Rights, U.S. Dept. of Ed., *Dear Colleague Letter* at 2 (July 23, 1998).

361.    The regulation cited by OCR, 34 C.F.R. §106.37 (c), provides:

(1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

362.    The OCR Policy Interpretation states, among other things, its interpretation of the

athletic financial aid provision quoted above:

The Policy - The Department will examine compliance with this provision of the regulation primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors…

Application of the Policy - This section does not require a proportionate number of scholarships for men and women or individual scholarships of equal dollar value. It does mean that the total amount of scholarship aid made available to men and women must be substantially proportionate to their participation rates.

44 Fed. Reg. at 71,415. [3]

---

[3] Title IX and EADA permit universities to count student-athletes that participate in more than one varsity sport as multiple participants—referred to as duplicate count—for the purposes of determining the number of participants of each gender (e.g., a student-athlete that competes in cross country, indoor track and field and outdoor track and field counts as three "participants" under Title IX). Universities provide both duplicated and unduplicated counts, other areas of Title

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

363.    On July 23, 1998, OCR discussed and clarified how it interpreted and would enforce Title IX's athletic financial aid requirements:

> With regard to athletic financial assistance, the regulations promulgated under Title IX provide that, when a college or university awards athletic scholarships, these scholarships awards must be granted to "members of each sex in proportion to the number of students of each sex participating in …intercollegiate athletics." 34 C.F.R 106.37(c)…

> It is important to note that it is not enough for a college or university merely to assert a nondiscriminatory justification. Instead, it will be required to demonstrate that its asserted rationale is in fact reasonable and does not reflect underlying discrimination…

> If any unexplained disparity in the scholarship budget for athletes of either gender is 1% or less for the entire budget for athletic scholarships, there will be a strong presumption that such a disparity is reasonable and based on legitimate and nondiscriminatory factors. Conversely, there will be a strong presumption that an unexplained disparity of more than 1% is in violation of the "substantially proportionate" requirement.

OCR, U.S. DOE, *Dear Colleague Letter* at 2-4 (July 23, 1998).[4]

364.    Because Title IX and its implementing Regulations are federal law, NCAA and conference rules cannot justify violations of them.

365.    The Title IX Regulations state: "The obligation to comply with this part is not obviated or alleviated by any rule or regulation of any organization . . . or association which would render any applicant or student ineligible to participate or limit the eligibility or participation of

---

IX compliance rely on the unduplicated number of student-athletes. Plaintiffs will use the terms duplicated and unduplicated count in this Complaint for clarity.

[4] The OCR's Title IX Investigator's Manual states that the unduplicated participation count should be used in this analysis. *See, e.g.*, Investigator's Manual, https://eric.ed.gov/?id=ED400763, at 21 (stating that "[p]articipants who participate on more than one team are to be counted only once" in assessing financial-aid claims).

any applicant or student, on the basis of sex, in any education program or activity operated by a recipient and which receives Federal financial assistance." 34 C.F.R. 106.6(c).

366.    As a result, if Oregon chose to sponsor women's and men's varsity athletic teams with NCAA or conference scholarship limits that allowed Oregon to award its male student-athletes far more athletic financial aid than its female student-athletes—and then did so—Oregon would be violating Title IX.

367.    Any NCAA or conference limits would not justify Oregon's violation of the law.

**Title IX's Equal Athletic Participation Opportunities Requirements**

368.    The OCR Policy Interpretation established a "three-part test" for demonstrating compliance with Title IX's requirement to effectively accommodate female students' athletic interests and abilities—commonly referred to as providing equal athletic participation opportunities.

369.    A university must meet at least one of the prongs in the three-part test:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Federal Register at 71,418.

370.    Every federal court of appeals that has considered the three-part test's validity—including the Ninth Circuit—has upheld it. *See, e.g.*, *Mansourian v. Regents of Univ. of California*,

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

602 F.3d 957, 961 (9th Cir. 2010); *Equity in Athletics v. Dep't of Educ.*, 504 F. Supp. 88, 102–05 (W.D. Va. 2007), *aff'd* 2008 WL 4104235 (4th Cir. 2008); *McCormick v. School Dist. Mamaroneck*, 370 F.3d 273, 288 (2d Cir. 2004); *Chalenor v. Univ. of N.D.*, 292 F.3d 1042, 1046–47 (8th Cir. 2002).

371.    "As a general rule, there is substantial proportionality if the number of additional participants . . . required for exact proportionality would not be sufficient to sustain a viable team." *Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 865 (9th Cir. 2014) (quoting 1996 Clarification at 4); *see also Balow v. Michigan State Univ.*, 24 F.4th 1051, 1057 (6th Cir. 2022), *reh'g denied*, No. 21-1183, 2022 WL 1072866 (6th Cir. Mar. 31, 2022), *and cert. denied*, 143 S. Ct. 525 (2022) (defining substantially proportionality participation opportunities as "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team.").

## OREGON HAS BEEN AND IS DISCRIMINATING AGAINST ITS FEMALE STUDENT-ATHLETES ON THE BASIS OF THEIR SEX.

372.    Oregon has discriminated and is discriminating against its female students and varsity student-athletes by depriving them of equal treatment and benefits, equal athletic financial aid, and equal opportunities to participate in violation of Title IX.

373.    The beach volleyball Plaintiffs allege that Oregon has failed to provide its female varsity student-athletes with equal treatment and equal athletic financial aid.

374.    The rowing Plaintiffs allege that Oregon has failed to provide equal opportunities for athletic participation.

375.    The information regarding athletic participation and athletic financial aid data summarized in the paragraphs below was obtained from publicly available EADA data.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

**Oregon's Violations of Title IX's Equal Treatment and Benefits Requirements**

376.    Oregon fails to provide athletic treatment and benefits to its female student-athletes equal to those it provides its male varsity student-athletes and, accordingly, intentionally discriminates against its female varsity student-athletes in violation of Title IX.

377.    Oregon added the women's varsity beach volleyball team in the 2015-16 academic year. Since that time, women have been between 47% and 50% of Oregon's varsity athletic participants. Also, during that same time, the men's football team have been an average of 37% of the total male varsity athletic participants.

378.    According to its most recent publicly available EADA data for 2021-22, women were just over 49% of the varsity athletes at Oregon, but the school spent only 25% of its total athletic expenditures on them and only 15% of its recruiting dollars on them.

379.    Oregon is providing its male student-athletes with far better treatment and benefits than its female student-athletes program-wide.

380.    The differences in treatment and benefits Oregon provides to it male and female student-athletes program-wide are reviewed in detail below. These differences are made especially clear by focusing on the treatment and benefits provided to the male student-athletes on the football team and the female student-athletes on the women's beach volleyball team, which are often noted below.

381.    The treatment and benefits provided to the men on the football team are especially relevant and highlighted because those men, more than *one-third* of Oregon's male student-athletes, receive incredibly exorbitant treatment and benefits—treatment and benefits far superior to those provided to *any* female student-athletes at Oregon.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

382.    The treatment and benefits provided to the women on the beach volleyball team are especially relevant and highlighted because those women receive incredibly bad treatment and benefits—treatment and benefits far inferior to those provided to *any* male student-athletes at Oregon.

383.    The differences in treatment and benefits are program-wide, in area after area.

### *Provision of Equipment and Supplies*

384.    Oregon provides its male student-athletes better equipment and supplies than it provides its female student-athletes.

385.    In college athletics, equipment often refers to sport-specific implements, like baseball bats, lacrosse sticks, balls, nets, and other items that are needed to play the sport. Supplies are often referred to as "gear" and include uniforms, shoes, travel clothes, bags, practice clothing, cold weather attire, and other things that are given to the student-athletes to facilitate their participation. Oregon provides more and superior equipment and supplies to the men on its men's teams than it provides to the women on its women's teams.

386.    For example, the men on Oregon baseball team receive several sets of uniforms, including matching practice shirts from Nike, so they can feel part of a cohesive team; at least one glove per year, with each player allowed to customize the leather, color, and monogramming; cold weather gear; and multiple pairs of shoes that players can also customize. Oregon men's baseball players are allowed to keep their equipment at the end of the season.

387.    As another example, the men on Oregon's football team receive new gear four to six times each season, including six unique football helmets for their twelve games, six jerseys, six pairs of pants, multiple pairs of cleats and socks, four pairs of sweatsuits, pads, and arm sleeves. Oregon men's football players are allowed to keep their equipment at the end of the season.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

388.    In addition, members of the men's football team have exclusive access to an equipment room where players can receive an unlimited supply of extra equipment or gear upon request. For example, if a player forgot a sweatshirt on a cold day, needs a jacket, or scuffed a shoe, he can obtain brand new equipment simply by visiting the football-only equipment room.

389.    Non-scholarship football athletes are given the same equipment and gear and access to the equipment room as scholarship football athletes.

390.    The football equipment room includes an "athlete fitting room" (pictured below) where each player has a personal appointment during the pre-season to be measured and sized for shoes, pants, jerseys, pads, and all other equipment. This room includes a throne and was based upon a tailor shop in a popular movie franchise, the Kingsman.







391.    Oregon offers male student-athletes high-quality gear that fits well, is personalized

and tailored to the athlete, and is sport-appropriate. And it goes out of its way to ensure men have

whatever additional gear, resources, or supplies the player desires.

392.    Meanwhile, the Oregon women's beach volleyball team is provided all their athletic gear once at the beginning of the school year (often referred to as a "gear drop") and does not receive new or additional gear throughout the season. The gear given at the beginning of the year is often used, does not fit because Oregon makes no effort to ensure that the gear is obtained in the players' sizes, and is not personalized.

393.    Beach volleyball players have also received used gear from other teams, including the women's golf team and indoor volleyball team.

394.    Beach volleyball players receive far less and much lower quality equipment and supplies than their male counterparts. And much of the equipment and supplies they receive must be returned so that it can be used by the next year's beach volleyball players.

395.    For example, the beach volleyball players' gear drop includes three t-shirts, two sweatshirts, one thermal sweatshirt, two pairs of leggings, a raincoat, a pair of sunglasses that have to be returned, one pair of shoes, and one backpack. Players receive two uniform jerseys, which have to be returned at the end of the season to be used for the next season. Although men's teams receive new uniforms each year and often multiple new uniforms each year, the beach volleyball team has not received new uniforms in years.

396.    In prior years, such as the 2019–20 season, the beach volleyball team was not given its own uniform spandex shorts and had to borrow this critical part of their uniform bottoms from the indoor volleyball team. Men's varsity teams do not have to borrow uniforms from another team.

397.    The shoes given to the beach volleyball team are the incorrect type for the training undertaken by beach volleyball players. The women receive running shoes, which are not used for beach volleyball and are not appropriate for the weightlifting training the team members require.

398.    In addition, the shorts provided to the beach volleyball players are not the correct type or fit, which causes discomfort to players. Although the female student-athletes have repeatedly requested different shorts, Oregon has ignored these requests and continues to provide gear that does not fit properly.

399.    Beach volleyball players have to purchase their own sand socks, shorts, pants, sports bras, winter jackets, and additional practice shirts because players are not given enough gear to cover each day of practice in a week. The sand socks that players receive are not high enough quality to keep the players' feet warm when the temperature is near thirty degrees during practices.

400.    Some beach volleyball players were provided worn rain gear with holes, which Oregon also refused to replace. This rain gear also had to be returned at the end of the season. As a result, beach volleyball players are forced to supply their own rain gear.

401.    The Nike sunglasses provided to the beach volleyball players were not polarized and did not provide the vision protection or sight required for playing in reflected sunlight off the sand. The players also were not provided with any visors or hats for sun protection every year.

402.    Oregon requires that all gear worn by the beach volleyball players be Nike brand, even when the players have to purchase their own gear. If the beach volleyball players wore gear with a different logo to practices, they were told they were not allowed to wear it.

403.    Beach volleyball players were also forced to wear shirts and sweatshirts that were the wrong size or men's shirts that did not fit properly because Oregon would not collect players' measurements before the season.

404.    The returning beach volleyball players have to give freshmen and new teammates used spandex shorts and sports bras because the freshmen players are not supplied with those items.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

405.     Oregon provides female student-athletes low-quality gear that does not fit, is not personalized or tailored—either to the athlete personally or even to the sport she is playing—and is not sport-appropriate. And it offers female student-athletes gear of far less quantity, even as it extends them supplies of vastly inferior quality.

406.     In addition, while male student-athletes have a particular set of gear that stays with them (*e.g.*, the same practice gear is washed by the university and returned to the specific athlete), female student-athletes do not. For example, when the team manager washes the beach volleyball team's uniforms after tournaments, proper care is not taken to ensure that each player is returned their same pair of spandex shorts, even though they are designed to be worn without undergarments. Instead, the spandex shorts are mixed in the washer and given back out at random. Since sharing spandex equates to sharing underwear, this practice is unsanitary.

407.     Beyond supplies, the men on the men's teams are also provided with equipment of superior quality to the equipment and supplies that Oregon provides to the women on its women's teams.

408.     For example, when the NCAA changed the rules for beach volleyballs, Oregon did not bother ordering new volleyballs that would be compliant with the rules until the players complained and requested new regulation volleyballs.

409.     In contrast, men's teams receive state-of-the-art equipment. For example, Oregon leased that latest JUGS machine (which replicates a football being passed to a receiver without the need of a quarterback) for $50,000 a year.

410.     Female student-athletes also must re-use equipment and supplies for a number of years. Male student-athletes get new equipment and supplies far more frequently.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

*Scheduling of Games and Practice Time*

411.    Oregon provides its male student-athletes with better scheduling of games and practice times than it provides its female student-athletes.

412.    When men and women use the same facility, such as the weight room, men on Oregon's men's teams are given priority for scheduling practice time and weight room training.

413.    Oregon requires women on its women's teams, such as women's beach volleyball, to coordinate and schedule their practices, weightlifting, and meals around the men on the men's teams.

414.    For example, Oregon gives the men on its football team priority scheduling over all women on the women's teams for practices, weightlifting, and meals, even when football is not in its competitive season.

415.    Oregon's varsity men's teams have full schedules against other Division I universities. In contrast, for example, Oregon scheduled only the minimum number of beach volleyball competitions needed to qualify as a Division I sport. Several beach volleyball competitions are scheduled against Corban University, an NAIA team that does not have the same level of competition as a Division I team.

416.    The beach volleyball team has also had competition weekends canceled due to Oregon's failure to ensure the team's NCAA eligibility paperwork had been submitted on time and the team had less than the maximum number of competitions allowed on its schedule due to Oregon's low budget for the team, which constrained how many times the team could travel for games.

417.    When Covid-19 protocols were in place, the restrictions were strictly enforced for the women's varsity teams, but not for varsity men's teams. For example, during practice in the

weight room, the female varsity student-athletes were required to wear masks for the entire duration of the practice, while the mask mandate was not enforced for male varsity student-athletes—even if they were in the weight room at the same time as the female student-athletes.

### *Travel and Per Diem Allowances*

418.    Oregon provides its male student-athletes with better travel benefits and per diem allowances than its female student-athletes.

419.    Oregon provides men on its football team with a private chartered plane for travel to all but one away game, when the team travels to nearby Oregon State. It does not provide that same benefit to the women on any of the women's teams.

420.    The university also provides funding for the men on other men's teams to fly to away competitions, while the women on the women's teams are required to mostly travel by car or bus to competitions, even to competitions that are more than seven hours away.

421.    On their flights, the men on the football team are seated with an empty seat in between each player. In contrast, the women's beach volleyball team members have to squeeze into vans, where they often have to keep luggage on their laps for the hours-long trips. When the beach volleyball team does fly for competitions, they fly commercial on early morning flights and are not compensated for their gas when they drive themselves to and from the airport.

422.    The beach volleyball team's coach had to drive a van to away games on more than one occasion. This practice results in a lower level of coaching, as the coach is tired from driving and unable to prepare in the hours leading up to competition. Beach volleyball players are also asked to take a driving test to be able to drive the team van if necessary. Oregon does not require the head coach of its men's teams to drive to away games or have players take driving tests to drive team vans.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

423.    In 2021, due to the absence of coaching staff, the beach volleyball players had to make their own travel itineraries, contact hotels for confirmations, organize the van for travel, and organize spring break practices. Male student-athletes did not have to handle these travel details on their own. Oregon did it for them.

424.    Oregon provides the men on its men's teams with more money and resources for away travel than the women on its women's teams.

425.    For example, the women's beach volleyball team per diem was so little that most players had to pay out of pocket for their meals, whereas the men on the men's football team received catered meals *and* a per diem, even though a per diem was not needed or used by many men on the football team.

426.    The women's beach volleyball team have to worry about the availability of their next meal, and even access to water, when traveling. On at least one occasion, the women's beach volleyball team was not provided food or water at an all-day beach volleyball tournament, other than a snack bag with four or five small items. Parents of the players had to bring food and water for the team.

427.    Because Oregon does not provide the beach volleyball team with food during all-day tournaments, sometimes the coaches are left with no alternative but to leave the tournament in the middle to get food, leaving some players to compete without a coach. Women on the team have even had to ask fans in the stands to toss them down water bottles so they could have water in the middle of a match.

428.    When concerns over the scarcity of food and water at an all-day tournament were brought up to Jody Sykes, Oregon's Senior Associate Athletic Director and Chief Compliance

Officer, she told the beach volleyball players that they should have asked for more food in their snack bags provided by the nutritionist.

429.    Meanwhile, coaches informed the beach volleyball players that they would need to leave the tournament and buy their own food—and instructed the women not to ask their parents to provide meals.

430.    Because the beach volleyball players were given only $25 for food for an entire day, the players had to eat unhealthy fast food, because it was the cheapest option. On the last day of the tournament, the players' parents secretly purchased sandwiches and had them delivered to the courts, so the players could eat a healthy meal in the middle of the tournament without being reprimanded by their coach for getting parents' help for meals.

431.    At another event, beach volleyball players were not provided with water during competition and had to take water from other teams' water jugs. The players noticed that every other school at the tournament had a table with food and drinks that was replenished throughout the day—every team, that is, except Oregon.

432.    After the all-day tournament that began at 7:00 a.m., the coaches drove the team back to Oregon, arriving around 11 p.m. The team members had to change out of their uniforms right on the sand courts and players were not able to take a shower before driving back to Oregon. When the players did get back to Oregon, they had to pay for an Uber home unless they paid for parking in a public ramp near their locker room.

433.    When the women's beach volleyball team was required to stay on campus during spring break for practices and competition, the players were not provided with any per diem or food.

434.    Oregon pays for the men on the men's football team to stay at a hotel the night before all home competitions. This benefit helps the team focus, keep out distractions, plan, and prepare for competition. It also builds camaraderie and cohesion among teammates.

435.    Oregon does not pay for female student-athletes on any women's team to stay at a hotel the night before any home competition.

436.    The women on the beach volleyball team do not have the option to stay in hotel rooms, even for many of their away tournaments. Instead, they have been hosted by players' families, often sleeping in cramped and shared quarters or on air mattresses. If the beach volleyball team members are lucky enough to receive hotel rooms, they are often required to sleep up to four to a room, including with student team managers, and the hotels are low quality or in unsafe areas. For example, at one tournament, a member of the women's beach volleyball team contracted a life-threatening case of MRSA after being bitten by bugs in her hotel room.

437.    When hotels are provided, they are often not next to or close to the tournament beach venues, so players must walk long distances or drive to and from the tournament in the van for up to forty minutes, which causes a significant competitive disadvantage.

*Opportunity to Receive Coaching and Academic Tutoring*

438.    Oregon provides its male student-athletes with better opportunities to receive coaching and academic tutors than its female student-athletes.

439.    Oregon gives the male student-athletes on its men's varsity teams, particularly the men's football team, priority access to academic resources, such as tutoring and individualized mental health counseling.

440.    For example, in the past, the assistant coach for women's beach volleyball has been absent during an entire pre-season while the head coach did not show up to any practice, with the

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

exception of two practices before the Pac-12 South championships. When the coaches did not attend practices, the senior players would have to run practice.

*Assignment and Compensation of Coaches and Tutors*

441.    Oregon provides the coaches of its male student-athletes with better compensation than the coaches of its female student-athletes.

442.    In the past two decades, Oregon has paid the head coaches of its women's teams significantly less than the coaches of its men's teams.

**Table A. Oregon Head Coaches Salary EADA Data**

| Year | Men's Team Average Annual Salary per Head Coach | # of Men's Team Head Coaches | Women's Team Average Annual Salary per Head Coach | # of Women's Team Head Coaches |
|---|---|---|---|---|
| 2003-04 | $378,636 | 6 | $100,615 | 7 |
| 2004-05 | $241,416 | 6 | $75,921 | 8 |
| 2005-06 | $335,088 | 6 | $101,569 | 8 |
| 2006-07 | $385,546 | 6 | $138,535 | 8 |
| 2007-08 | $454,205 | 6 | $132,572 | 8 |
| 2008-09 | $515,395 | 6 | $129,105 | 8 |
| 2009-10 | $733,355 | 6 | $198,825 | 8 |
| 2010-11 | $940,559 | 6 | $181,446 | 9 |
| 2011-12 | $990,192 | 6 | $191,463 | 9 |
| 2012-13 | $1,009,712 | 6 | $195,755 | 9 |
| 2013-14 | $852,158 | 6 | $187,098 | 10 |
| 2014-15 | $988,296 | 6 | $172,329 | 10 |
| 2015-16 | $949,389 | 6 | $171,454 | 10 |
| 2016-17 | $1,196,535 | 6 | $190,785 | 10 |
| 2017-18 | $1,046,922 | 6 | $207,813 | 10 |
| 2018-19 | $1,063,164 | 6 | $198,974 | 10 |
| 2019-20 | $1,077,792 | 6 | $216,148 | 10 |
| 2020-21 | $1,183,777 | 6 | $185,343 | 10 |
| 2021-22 | $1,531,610 | 6 | $256,204 | 10 |

443.    While some fluctuation in compensation is to be expected between sports, on average, Oregon pays the head coaches of its men's teams more than six times what it pays the head coaches of its women's teams and has done so for almost twenty years.[5]

444.    This unequal compensation hinders Oregon's ability to attract and retain high-quality coaching staffs for its women's teams.

445.    It also causes a higher rate of turnover in women's coaching staffs, which negatively affects the women on the teams.

446.    For example, in 2019, the women's softball coach was paid $237,500 with $90,000 in performance bonuses. When Texas offered the softball coach a starting salary of $505,000, Oregon stated that it "wasn't in a position to match" the offer.

447.    Even though the men's teams' average salary for coaches was $1,077,792, and the softball coach had just taken the team to back-to-back College World Series appearances and a Pac-12 championship, Oregon would not match the offer from Texas. As a result, Oregon let the women's softball coach take the offer at Texas without making a matching offer. No comparable treatment of any coach of a men's team at Oregon ever took place.

448.    The unequal compensation for head coaches also results in men's varsity teams acquiring highly experienced head coaches while the women's varsity teams do not. For example, in the past, the beach volleyball head coach was also the indoor volleyball coach. When Oregon finally hired a separate head coach for beach volleyball, Oregon selected an individual with no Division I beach volleyball head coaching experience.

---

[5] Oregon only reports average salaries for all head coaches combined through EADA.

449. The same disparity exists for the assistant coaches of the men's versus women's teams at Oregon.

**Table B. Oregon Assistant Coaches Salary EADA Data**

| Year | Men's Team Average Annual Salary per Assistant Coach | # of Men's Teams' Assistant Coaches | Women's Team Average Annual Salary per Assistant Coach | # of Women's Teams' Assistant Coaches |
|---|---|---|---|---|
| 2003-04 | $106,228 | 22 | $57,680 | 15 |
| 2004-05 | $75,904 | 20 | $37,789 | 17 |
| 2005-06 | $94,806 | 21 | $39,337 | 16 |
| 2006-07 | $128,675 | 21 | $55,580 | 18 |
| 2007-08 | $139,342 | 21 | $51,290 | 18 |
| 2008-09 | $169,770 | 21 | $58,336 | 18 |
| 2009-10 | $207,390 | 21 | $63,461 | 18 |
| 2010-11 | $210,526 | 21 | $64,352 | 19 |
| 2011-12 | $215,249 | 21 | $66,553 | 19 |
| 2012-13 | $278,778 | 20 | $69,546 | 18 |
| 2013-14 | $260,575 | 21 | $75,166 | 19 |
| 2014-15 | $255,620 | 21 | $80,729 | 19 |
| 2015-16 | $258,519 | 21 | $74,369 | 19 |
| 2016-17 | $272,725 | 21 | $86,322 | 19 |
| 2017-18 | $303,829 | 22 | $84,774 | 19 |
| 2018-19 | $323,093 | 22 | $84,805 | 20 |
| 2019-20 | $299,496 | 22 | $80,006 | 21 |
| 2020-21 | $294,355 | 22 | $70,545 | 20 |
| 2021-22 | $403,172 | 22 | $87,155 | 21 |

450. This unequal compensation hinders Oregon's ability to attract and retain high-quality assistant coaching staffs for its women's teams.

451. It also causes a higher rate of turnover in women's coaching staffs, which negatively affects the women on the teams.

452.    This unequal compensation—for both head and assistant coaches—also impresses upon the female student-athletes that their teams are not valued as highly as the men's teams by Oregon.

453.    Coaches for men's varsity sports at Oregon are also given more amenities as part of their job. For example, the coaches for the Oregon men's football team have their own private offices and conference rooms in the football facility. Pictured below are the football head coach's office and the coach's war room.





454.    The men's football coaches also have their own hot tub located in the football facility (pictured below).



455.    No coach of any women's team at Oregon is provided with comparable amenities.

*Provision of Locker Rooms, Practice, and Competitive Facilities*

456.    Oregon provides its male student-athletes with better locker rooms and facilities than its female student-athletes.

457.    The Oregon men's baseball team has a $20,000,000 facility that includes: an expansive stadium with two beer gardens for fans featuring local beers (pictured below); additional temporary seating for fans as needed; outdoor and indoor training facilities with state-of-the-art equipment for players; and a locker room with individualized lockers and a lounge with a pool table, televisions, and video-game consoles for players.



458.    The Oregon men's football team's main facility has six floors.

459.    The men's football main facility includes a media facility for coaches and players, in which the walls are covered in football-quality leather (pictured below).



460.    It also includes a player's lounge equipped with multiple big-screen televisions, video-game consoles, pool tables, ping pong tables, foosball tables made in Spain with hand-painted kickers resembling the Oregon team and their rivals from around the Pac-12, and vending machines that dispense free snacks (pictured below).



*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint





461.   The football facility includes an expansive and luxurious locker room, with personalized lockers for each player. In the picture below, the image of the back of the football player is the door to the student-athlete's locker, which has the man's name and player number on the outside. Oregon provides a locker for every member of the men's football team.



462.    The locker room also includes a barber shop that is exclusively for football players

and football staff.



463.    The locker room also includes a player-exclusive shoe wall and gear room where football players receive top-of-the-line Nike shoes and other gear exclusive to the football team.





464.    The gear room has a separate room that only houses Oregon's ever-expanding array of football helmets.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint



465.    The team members also have a weight room in the facility that is solely for their

use, with hundreds of pieces of equipment emblazoned with Oregon's logo.





466.    The football facility has a 150-seat theater, which doubles as a team theater for movies and sporting events (*e.g.*, UFC fights and boxing matches) with seats upholstered in Ferrari leather (pictured below).



467.    In addition, the football facility also includes practice fields right next to the main football facility, a sports science team to assist players with improving their skills, and multiple position-specific meeting rooms.

468.    No female student-athletes are provided with locker rooms, practice, or competitive facilities that are remotely close in quality to those provided to the male student-athletes on the men's football team.

469.    In their facilities, the men's football team members receive three meals a day, Monday through Saturday, and one to two meals on Sunday. The men's football team members also have access to a Moocho App, where they are given money for food on campus, which amounts to approximately $75 per week. The picture below shows the football team's fuel station, with free unlimited healthy snacks in its facility.



470.    In contrast, the women's beach volleyball team receives breakfast throughout the week and does not have access to the Moocho App at all. The women's beach volleyball team

shares a fuel station with all other student-athletes. No women's team receives food equal to the men's football team. Most receive food in quantities and quality that are nowhere near to what the football team receives.

471.    The facilities Oregon provides for its women's teams are vastly inferior to those provided to its men's teams.

472.    The most glaring example is the women's beach volleyball team. The women's beach volleyball team does not have its own facilities. It does not have a dedicated locker room with individual lockers for every team member, nor does it have a dedicated practice and competition court.

473.    Instead, the team must use Amazon Park, a public park with grossly inadequate facilities, to practice and host competitions (pictured below). Student-athletes sometimes have to rake the sand to remove animal feces and drug paraphernalia before the court can be used.



474.     On a yearly basis, the entire beach volleyball team is required to do a "court clean-up" with the City of Eugene. The student-athletes are given wheelbarrows, shovels, and rakes to dig up the sand that has migrated to outer areas of the courts. The women shovel and level the sand in the middle of the courts. Some members are given gloves, while others are not. The clean-up is done during the team's designated practice time and takes up the entire two-hour practice.

475.     At Amazon Park, to prevent drug users and unhoused people from living in the bathroom facilities, the toilet stalls do not have doors or toilet paper (pictured below). The team has to bring its own toilet paper to practice and, because beach volleyball players practice without footwear, they must take time to put shoes on before using the restroom or enter with their bare feet, which is a health hazard.



476.     Players often feel unsafe to use the bathroom facilities, as there are often vagrants inside or around the restroom building. The student-athletes have witnessed these vagrants injecting intravenous drugs or using crack cocaine.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

477.    Adding to the players' concerns of safety, on November 28, 2023, the members of the women's varsity volleyball team were unable to practice because, sadly and disturbingly, a deceased person was discovered near Amazon Park and the police closed off the players' access to the sand courts.

478.    For safety reasons, the student-athletes sometimes have to use the facilities with male coaches posted outside, which is embarrassing and uncomfortable for some of the young women. The beach volleyball women requested a portable toilet to have a semi-private bathroom. Oregon provided this portable toilet for two months before removing it.

479.    A creek runs parallel to a walking path that is adjacent to Amazon Park. Unhoused individuals often lay in the path or overgrowth along the creek. There is a chain-link fence that runs along the creek, which is perpendicular to the back end of the sand courts. Along the fence line, there is often human feces. When volleyballs are hit off the court during practice they are stopped by the fences, and often roll into the fecal matter. There are no sanitation or disinfection sources available at Amazon Park to clean balls or hands on site. When the balls go over the fence, the coaches instruct the players to jump the fence to get the balls, which can be dangerous.

480.    The beach volleyball players are not provided with water during their practices at Amazon Park.

481.    Players also have no place to wash the sand off their feet after practice before getting into their cars.

482.    Also, when the beach volleyball team does not have access to its locker room because a visiting team from another varsity sport is using the teams' locker room in the Matthew Knight Arena athletic facility, the women also lose access to post-practice recovery because they

are not allowed to enter the athletic training rooms in the facility with sand on their bodies or feet and often, by the time the women are able to go home and shower, the training rooms have closed.

483.    Amazon Park does not offer proper storage for the beach volleyball team's equipment. For example, during inclement weather, the players have to put their belongings in a shed for public equipment, and the equipment gets wet because the shed is not rain-proof.

484.     During one winter break, the team's volleyballs were eaten by rats. When the local high school softball team is in season, it has priority over the shed, so the beach volleyball team then must use a closet in a cinderblock restroom building about 100 yards from the courts.

485.    Amazon Park is often wet and muddy in the winter and spring. The volleyballs become heavier from taking on water, which increases the players' susceptibility to injuries. Several players suffered shoulder or other injuries from using these volleyballs, some even requiring surgery.

486.    The volleyball nets at Amazon Park sag and are not the regulation height. Since the volleyball players practice on these nets, the players believed they were clearing the net when they actually were not. In addition, the umpires at home matches have to adjust the height of the nets, causing delays in tournament start times.

487.    There are no official Oregon nets, lines, or antennas on the two courts, when those are typically found on NCAA beach volleyball competition courts. Nor does Oregon do any type of branding on the courts during tournaments.

488.    The blue canvas lines that are placed on the borders of the court are not even, so one side of the court is wider than the other and the line placement means the courts are not the NCAA official width or distance for beach volleyball.

489.    The beach volleyball players requested a whiteboard to aid in practices. Oregon told the players that they may be able to get a used whiteboard, but none was ever provided.

490.    The women's beach volleyball team lacks adequate seating for fans and spectators. There is a single, small bench beside the two beach volleyball courts but one of the boards on the seating area is missing and there are nails protruding from the wood (pictured below).



491.    Beach volleyball members often have weight training before practice on the sand courts. Because the sand courts are more than a ten-minute drive from the weight room in the Casanova Athletic Building, the women either have to leave weightlifting early or get to practice late. Oregon does not allow the team members to lift weights after practice because they do not have access to showers or proper locker rooms to wash off the sand.

492.    Unlike the male student-athletes on all of Oregon's men's teams, because the beach volleyball team members have to use a public park as its facility, they have to move practices and schedule around other activities at Amazon Park. For example, in recent years, the team's Monday practice was moved because Bushnell University reserved the court on those days before Oregon

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

did. In addition, the beach volleyball team currently cannot practice in the mornings because another school reserved the courts before Oregon.

493.    The lights at Amazon Park come on late, well after dark in the evenings. Because of this, the beach volleyball team has to practice in the dark in January, February, and March.

494.    The Oregon women's beach volleyball team only has access to lockers that are also utilized by visiting teams (pictured below). The players cannot leave personal belongings in the lockers, nor do they have personalized lockers. In fact, the visiting teams are given better treatment than the beach volleyball players because the visiting teams receive temporary name plates on the lockers as an opposing team.



495.    These lockers are also two miles away from Amazon Park, and players must pay for parking when they go to their own locker room.

*Provision of Medical and Training Services*

496.    Oregon provides its male student-athletes with better medical and training services than its female student-athletes.

497.    The men on Oregon's football team have four or five full-time staff members devoted to providing them with athletic training services. They also have trainers that attend every practice and game and have access to physicians and sports medicine physical therapists whenever it is needed. Several other men's teams—including men's basketball—similarly have continuous access to trainers and medical staff.

498.    Women on some of the women's teams at Oregon often have to share athletic trainers with men's teams. When they do, these athletic trainers are present at every practice and competition for the men's teams, but not at every practice and competition for the women's teams, even if that means they are present at a men's practice instead of a women's team's competition.

499.    The women on the women's teams at Oregon are frequently required to wait hours for an athletic trainer or are ignored by the athletic trainers. When the women's beach volleyball team had blood tests taken in the fall, the players did not find out their test results until June, after the season was over. One female student-athlete's test results showed that she was anemic, which required treatment she did not learn was needed until months later.

500.    Often, players on the women's teams have to seek outside medical assistance and rehabilitation services—all of which is paid for by the student-athletes out-of-pocket.

501.    When athletic trainers do not attend beach volleyball competitions, the women have to bring a rolling suitcase with medicine and medical equipment to competitions and student-athletes have to treat each other. When necessary, the female student-athletes gathered to watch YouTube tutorial videos on how to apply elastic sports tape for injuries. Other women on the team

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

had family members assist with pain management and injuries while at competitions. Oregon does not require male student-athletes to provide medical care to each other, as the men's teams have trainers at competitions.

502.    Athletic trainers never attend women's beach volleyball practices.

503.    During women's beach volleyball practices, student-athletes often experience injuries, which can be serious and require immediate medical attention.

504.    For example, at one beach volleyball practice, a student-athlete suffered a concussion. Since there were no athletic trainers on-site, another student-athlete had to leave practice to drive her injured teammate to the emergency room.

505.    As another example, at a different beach volleyball practice, a student-athlete dislocated her shoulder. Again, another student-athlete had to leave practice to drive her injured teammate to a medical provider. The women had to call an Oregon athletic trainer for instruction on which medical facility would be most appropriate to provide medical attention for a dislocated shoulder. Once the players reached the medical facility, it was closing, so the medical providers sent the injured student-athlete home without resetting her shoulder or otherwise treating her injury.

506.    At yet another beach volleyball practice, a student-athlete dislocated her knee. Since trainers are not present at practices, the student-athlete had to wait over thirty minutes for the trainer to arrive and treat her injury.

507.    In addition, when beach volleyball players are recovering from an injury sustained from their sport, Oregon does not provide them access to proper athletic training staff or care. For one student-athlete, Oregon's staff told her she was clear to play when her primary physician told her she should not be playing and that doing so could cause permanent damage.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

508.    Beach volleyball players were also not provided any mental health resources or support services during their time on the beach volleyball team. Some players needed these services because of the strain that Covid-19 restrictions placed on them, such as being unable to visit family members.

*Publicity*

509.    Oregon provides its male student-athletes with better publicity than its female student-athletes.

510.    Oregon generally provides more publicity for the men on the men's varsity teams than it provides for the women on women's varsity teams.

511.    Oregon posts more regularly and more information on its website and Oregon's official social media accounts about the men on its varsity men's teams than the women on its varsity women's teams.

512.    As noted above, it also devotes an entire customized media space to the men's football team. No women's team receives similar treatment.

513.    The women's beach volleyball team did not have its own social media accounts until the fall of 2019 and, even then, the assistant coach was the only one with access to post from the account.

514.    Oregon provides two to three paid, full-time photographers to attend practices and games for the men's football team. The women on the beach volleyball team are not provided with a photographer at practices and are rarely provided with a photographer at competitions, even when competing at conference championships.

515.    Oregon's lack of publicity support hinders the women's teams' fundraising efforts and reduces the teams' visibility on campus.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

516.    Additionally, Oregon does not permit the varsity beach volleyball team to fundraise or receive any fundraising money brought into the athletic department through the "Women in Flight" program.

517.    "Women in Flight" is an Oregon athletic department program that "aims to raise awareness and financial support to achieve and maintain excellence across all Oregon women's athletic programs." (https://goducks.com/sports/2023/2/22/about-women-in-flight.aspx).

518.    However, because there are no student-athletes receiving athletic financial aid on the beach volleyball team, the team is not eligible under Oregon's rules to receive any of the money raised through the program.

519.    In 2022, the Women in Flight program raised $15 million, and Oregon did not allocate *any* of the funds raised to the women's varsity beach volleyball team, despite the university's repeated promises to the women recruited to the team over the years.

520.    Oregon provides its male and female student-athletes with a wide array of publicity and other treatments and benefits to increase their NIL-related training, opportunities, and income, both directly and by working with and through its NIL collective, Division Street, https://www.on3.com/nil/collectives/division-street-4/, and Opendorse, the Oregon Ducks NIL Marketplace, https://opendorse.com/oregon-ducks.

521.    Through these actions, Oregon provides its male student-athletes with much greater NIL-related training, opportunities, and income than its female student-athletes.

522.    The men's football team members are given so much publicity and NIL support that Oregon's quarterback, running back, and wide receiver are listed in *On3*'s NIL 100 list as, respectively, the 8th, 28th, and 76th highest NIL recipients in the country. https://www.on3.com/nil/rankings/player/nil-100/ (visited on 11/27/23).

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

523.    Oregon's female student-athletes are given so much less publicity and NIL support that no female student-athlete receives anywhere near the amounts mentioned on that list.

524.    This is so even though, or perhaps because, Division Street is, according to *On3*, the third most ambitious NIL collective in the nation. https://www.on3.com/nil/news/on3-top-20-most-ambitious-nil-collectives-year-2-tennessee-texas-am-oregon/. *On3*'s report says, "Oregon has figured out how to best use Division Street… [Phil] Knight's name was trending on Twitter by noon ET of December's National Signing Day. And as one agent pointed out, 'No head coach in the country is more aggressive about NIL than [Oregon football head coach] Dan Lanning.'"

525.    It is also so because Oregon's male student-athletes get better treatment and benefits, opportunities, and income through Opendorse, launched by Oregon on March 3, 2022, as "the Official NIL Marketplace of the Oregon Ducks, the first licensed school marketplace in college sports," with Oregon Athletic Director Rob Mullins saying, "Our new and innovative partnership with Opendorse allows University of Oregon student-athletes to continue to maximize opportunities        related        to        their        name,        image,        and        likeness." https://goducks.com/news/2022/3/3/general-university-of-oregon-launches-first-licensed-school-nil-marketplace-in-college-athletics.aspx.

*Recruiting*

526.    Oregon provides its male student-athletes with better funding and support for recruiting than its female student-athletes.

527.    For almost twenty years, Oregon has spent far more money recruiting (through travel, meals, special treatment, etc.) its male student-athletes than its female student-athletes:

**Table C. Oregon Recruiting Expenses EADA Data.**

| Year | Male Student-Athletes (Unduplicated Count) | Female Student-Athletes (Unduplicated Count) | % of Female Student-Athletes | Recruiting Expenses on Males | Recruiting Expenses on Females | % of Recruiting Spent on Females | Recruiting Dollars per Male Student-Athlete | Recruiting Dollars per Female Student-Athlete |
|---|---|---|---|---|---|---|---|---|
| 2003-04 | 246 | 153 | 38.35% | $1,216,128.00 | $261,165.00 | 17.68% | $4,943.61 | $1,706.96 |
| 2004-05 | 257 | 168 | 39.53% | $624,772.00 | $207,411.00 | 24.92% | $2,431.02 | $1,234.59 |
| 2005-06 | 253 | 155 | 37.99% | $711,527.00 | $276,786.00 | 28.01% | $2,812.36 | $1,785.72 |
| 2006-07 | 238 | 163 | 40.65% | $781,116.00 | $296,150.00 | 27.49% | $3,282.00 | $1,816.87 |
| 2007-08 | 218 | 167 | 43.38% | $903,462.00 | $237,915.00 | 20.84% | $4,144.32 | $1,424.64 |
| 2008-09 | 238 | 168 | 41.38% | $948,085.00 | $305,618.00 | 24.38% | $3,983.55 | $1,819.15 |
| 2009-10 | 242 | 170 | 41.26% | $844,235.00 | $275,496.00 | 24.60% | $3,488.57 | $1,620.56 |
| 2010-11 | 249 | 165 | 39.86% | $922,653.00 | $313,315.00 | 25.35% | $3,705.43 | $1,898.88 |
| 2011-12 | 249 | 216 | 46.45% | $1,023,635.00 | $316,965.00 | 23.64% | $4,110.98 | $1,467.43 |
| 2012-13 | 243 | 219 | 47.40% | $1,061,588.00 | $318,297.00 | 23.07% | $4,368.67 | $1,453.41 |
| 2013-14 | 245 | 233 | 48.74% | $1,149,928.00 | $378,020.00 | 24.74% | $4,693.58 | $1,622.40 |
| 2014-15 | 245 | 229 | 48.31% | $1,110,417.00 | $403,665.00 | 26.66% | $4,532.31 | $1,762.73 |
| 2015-16 | 239 | 215 | 47.36% | $1,178,077.00 | $407,619.00 | 25.71% | $4,929.19 | $1,895.90 |
| 2016-17 | 229 | 214 | 48.31% | $1,331,813.00 | $400,340.00 | 23.11% | $5,815.78 | $1,870.75 |
| 2017-18 | 219 | 226 | 50.79% | $1,460,773.00 | $418,128.00 | 22.25% | $6,670.20 | $1,850.12 |
| 2018-19 | 235 | 212 | 47.43% | $1,718,454.00 | $565,980.00 | 24.78% | $7,312.57 | $2,669.72 |
| 2019-20 | 237 | 237 | 50.00% | $1,043,236.00 | $375,071.00 | 26.44% | $4,401.84 | $1,582.58 |
| 2020-21 | 256 | 244 | 48.80% | $547,779.00 | $108,995.00 | 16.60% | $2,139.76 | $446.70 |
| 2021-22 | 255 | 249 | 49.40% | $2,191,459.00 | $389,324.00 | 15.09% | $8,593.96 | $1,563.55 |

528.    In 2019–20, using the university's unduplicated counts, 50% of Oregon's student-athletes were females. But Oregon spent only 26.44% of its $1,148,304 in recruiting dollars on them. On average, Oregon spent only $1,582.58 on each recruited female student-athlete and $4,401.84 on each recruited male-student athlete.

529.    In 2020–21, females were 48.80% of Oregon's student-athletes. But Oregon spent only 16.60% of its $656,744 in recruiting dollars on them. On average, Oregon spent only $446.70 to recruit each female student-athlete and $2,139.76 to recruit each male student-athlete.

530.    In 2021–22, females were 49.04% of Oregon's total student-athletes. But Oregon spent only 15.09% of its $2,580,783 in recruiting dollars on them. On average, Oregon spent only

$1,563.55 on each recruited each female student-athlete and $8,593.96 on each recruited male student athlete.

531.    Similar data for 2022-23 and 2023-24 is not yet publicly available.

### Oregon's Violation of Title IX's Athletic Financial Aid Requirements

532.    Oregon offers and provides its male student-athletes more athletic financial aid than its female student-athletes.

533.    Oregon has not provided and does not provide athletic financial aid to its female varsity student-athletes in proportion to their athletic participation rate and, accordingly, intentionally discriminates against its female varsity student-athletes on the basis of their sex in violation of Title IX.

534.    For almost a decade, Oregon has deprived its female student-athletes of athletic financial aid dollars in proportion to their participation rates in Oregon athletics.

535.    Unduplicated participation counts are used for calculating athletic financial aid proportions.

**Table D. Oregon Athletic Financial Aid EADA Data.**

| Year | Male Student-Athletes | Female Student-Athletes | % of Female | Athletic Financial Aid Awarded to Males | Athletic Financial Aid Awarded to Females | % of Aid to Females | Amount of Aid Oregon Deprived Female Student Athletes (keeping aid to males constant) |
|------|------|------|------|------|------|------|------|
| 2013-14 | 245 | 233 | 0.487448 | $4,811,611 | $4,303,163 | 47.21% | $272,777 |
| 2014-15 | 245 | 229 | 48.31% | $5,456,738 | $4,544,285 | 45.44% | $556,095 |
| 2015-16 | 239 | 215 | 47.36% | $6,157,803 | $5,104,555 | 45.32% | $434,891 |
| 2016-17 | 229 | 214 | 48.31% | $5,958,582 | $5,267,978 | 46.92% | $300,304 |
| 2017-18 | 219 | 226 | 50.79% | $6,326,499 | $5,474,961 | 46.39% | $1,053,755 |
| 2018-19 | 235 | 212 | 47.43% | $6,492,181 | $5,359,904 | 45.22% | $496,872 |
| 2019-20 | 237 | 237 | 50.00% | $7,092,856 | $5,850,755 | 45.20% | $1,242,101 |
| 2020-21 | 256 | 244 | 48.80% | $7,275,874 | $6,047,542 | 45.39% | $887,275 |
| 2021-22 | 255 | 249 | 49.40% | $6,991,677 | $5,994,697 | 46.16% | $832,470 |

536.     Oregon has already paid the unequal athletic financial aid listed in Table D to its male and female student-athletes. The amounts listed in the last column of Table D are the money that Oregon needs to pay its female students-athletes to provide them with funds proportional to those that it already paid to its male student-athletes each year.[6]

537.     So, according to Oregon's EADA numbers, the amount owed to women for 2017-18, without interest, is $1,053,755 or $4,662.63 per female student-athlete.[7]

---

[6] The U.S. Department of Education has not published EADA data for the 2022-23 or 2023-24 academic year, which is still ongoing. As a result, the most recent publicly available information concerns the 2021-22 academic year.

[7] This figure is calculated by multiplying the amount of aid Oregon provided to men (*i.e.*, $6,326,499) by the ratio of women in the athletics program (*i.e.*, 0.5079), then dividing by the ratio of men in the athletics program (*i.e.*, 0.4921), and, finally, subtracting the amount of aid Oregon actually awarded to women (*i.e.*, $5,474,961). (($6,326,499 x 0.5079) ÷ 0.4921) – $5,474,961= $1,053,755. And there were 226 women (unduplicated) participating in Oregon's athletics program. $1,053,755 ÷ 226 = $4,662.63.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

538.    The amount owed to women for 2018–19, without interest, is $496,872 or $2,343.74 per female student-athlete.

539.    The amount owed to women for 2019–20, without interest, is $1,242,101 or $5,240.93 per female student-athlete.

540.    The amount owed to women for 2020–21, without interest, is $887,275 or $3,636.37 per female student-athlete.

541.    The amount owed to women for 2021–22, without interest, is $832,470 or $3,343.25 per female student-athlete.

542.    For the five most recent academic years for which information is publicly available, Oregon's female student-athletes should receive over $4.5 million to recover amounts proportional to those awarded to Oregon's male student-athletes.

543.    Similar, or greater, unequal and disproportionate allocations of athletic financial aid to varsity female student-athletes at Oregon likely took place in 2022-23, are taking place in the current academic year, and will continue in the future if they are not stopped, with similar calculations required to determine the amount of money Oregon's female student-athletes should be paid to receive proportional amounts.

544.    Oregon has not asserted or attempted to demonstrate any justification for its failure to provide female student-athletes with equal athletic financial aid that does not reflect underlying discrimination—and Plaintiffs are not aware of any.

545.    If financial aid were distributed in accordance with Title IX, rather than in violation of it, female student-athletes who received no or partial scholarships in each of these years would have received additional aid.

546.    For example, the beach volleyball Plaintiffs received no financial aid for their participation in a varsity sport. In fact, the women's beach volleyball team at Oregon is the only varsity team at a Power-Five institution that did not award any athletic financial aid to its student-athletes in the 2021-22 academic year.

547.    During recruitment efforts, several beach volleyball Plaintiffs were promised that scholarships would be forthcoming, which led them to commit to Oregon. These promises have continuously gone unfulfilled. If Oregon had complied with Title IX, these female student-athletes would have received financial aid.

548.    Likewise, if Oregon had complied with Title IX's requirements when disbursing financial aid to student-athletes, the average aid to male and female participants would have been approximately equivalent, rather than skewed sharply in favor of males.

**<u>Oregon's Violation of Title IX's Equal Participation Opportunities Requirements</u>**

549.    Oregon has not and does not comply with any part of the three-part test for participation. Accordingly, it does not effectively accommodate female student-athletes' interests and abilities.

550.    First, Oregon does not provide "intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments."

551.    For example, the most recent publicly available data—EADA data from 2021–22—shows Oregon's undergraduate population was 55.79% female, but female student-athletes made up only 49.21% of Oregon's varsity athletics program.

552.    The data from 2020–21 shows Oregon's undergraduate population was 55.79% female, but female student-athletes made up only 48.25% of Oregon's varsity athletics program.

553.    Since at least 2003, Oregon has not provided intercollegiate level participation opportunities for male and female students in numbers substantial proportionate to their respective enrollments.

**Table E. EADA Athletic Participation Data and Participation Gap Calculations (using duplicated student athlete count as required by the OCR Policy Interpretation).**

| Year | Male Undergrad | Female Undergrad | % of Female Undergrad | Male Student Athletes | Female Student Athletes | Percentage of Female SA | Participation Gap % | Female Participation Gap |
|------|------|------|------|------|------|------|------|------|
| 2003 | 6742 | 7710 | 53.35% | 263 | 162 | 38.12% | 15.23% | 139 |
| 2004 | 7016 | 7875 | 52.88% | 284 | 185 | 39.45% | 13.44% | 134 |
| 2005 | 7086 | 7910 | 52.75% | 323 | 199 | 38.12% | 14.62% | 162 |
| 2006 | 7064 | 7885 | 52.75% | 244 | 163 | 40.05% | 12.70% | 109 |
| 2007 | 7188 | 7868 | 52.26% | 222 | 167 | 42.93% | 9.33% | 76 |
| 2008 | 7923 | 8184 | 50.81% | 239 | 168 | 41.28% | 9.53% | 79 |
| 2009 | 8392 | 8550 | 50.47% | 242 | 170 | 41.26% | 9.20% | 77 |
| 2010 | 8769 | 9029 | 50.73% | 340 | 259 | 43.24% | 7.49% | 91 |
| 2011 | 9072 | 9638 | 51.51% | 334 | 273 | 44.98% | 6.54% | 82 |
| 2012 | 8986 | 9834 | 52.25% | 303 | 283 | 48.29% | 3.96% | 49 |
| 2013 | 8972 | 9900 | 52.46% | 310 | 317 | 50.56% | 1.90% | 25 |
| 2014 | 8838 | 9816 | 52.62% | 310 | 301 | 49.26% | 3.36% | 43 |
| 2015 | 8696 | 9908 | 53.26% | 289 | 283 | 49.48% | 3.78% | 46 |
| 2016 | 8472 | 9837 | 53.73% | 279 | 282 | 50.27% | 3.46% | 42 |
| 2017 | 8221 | 9567 | 53.78% | 272 | 290 | 51.60% | 2.18% | 27 |
| 2018 | 8054 | 9486 | 54.08% | 285 | 278 | 49.38% | 4.70% | 58 |
| 2019 | 7938 | 9475 | 54.41% | 252 | 264 | 51.16% | 3.25% | 37 |
| 2020 | 7262 | 9132 | 55.70% | 325 | 303 | 48.25% | 7.45% | 106 |
| 2021 | 7589 | 9576 | 55.79% | 322 | 312 | 49.21% | 6.58% | 94 |

554.    EADA's rules for counting student-athletes do not match Title IX's counting requirements exactly and can systematically allow for the overcounting of female athletes and underreporting of the female participation gap. For example, EADA permits universities to count male practice players who practice with women's teams as female athletes. Obviously,

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

opportunities afforded to male practice players cannot create equal opportunities for female student-athletes. Title IX does not permit this type of counting.

555.    Consistent with this example, in the 2021-22 academic year, Oregon's EADA participation data states there were twenty-four women on the varsity women's basketball team. However, only thirteen of those participants were female student-athletes; the other eleven were male practice players.

556.    While EADA data does not provide perfect participation counts for Title IX, it is a useful starting point for assessing proportionality. The data in Table F shows Oregon does not meet prong one of the three-part test. Indeed, Oregon has been out of compliance with prong one since at least 2003.

557.    Given the number of males participating on Oregon's men's varsity teams, Oregon would need to add at least ninety-four women to its athletic program to render women's participation opportunities proportional.

558.    Ninety-four women is larger than the average size of any NCAA sponsored women's Division I varsity athletic team. A participation gap of ninety-four women could support several women's varsity teams at Oregon.

559.    Oregon does not meet the second part of the three-part test either. It cannot show a history and continuing practice of program expansion, which is demonstrably responsive to the developing interest and abilities of the members of that sex.

560.    Oregon dropped women's swimming and women's gymnastics in 1986. It added women's soccer in 1996, women's lacrosse in 2004, and women's acrobatics and tumbling in 2008.

561.    But Oregon has not added a new women's team since 2014, when it added beach volleyball, a team that—as discussed above—it hardly supports.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

562.    While Oregon has added four women's sports since the mid-1990s, it cannot demonstrate a history and *continuing practice* of expanding opportunities for the underrepresented sex. The number of female participants has remained relatively stagnant over the last decade. For example, in 2013, there were 317 female participants, and in 2021, there were 312 female participants.

563.    The numbers show that Oregon does not have a continued practice or policy of program expansion for female student-athletes.

564.    Finally, Oregon cannot satisfy the third part of the three-part test: that the interests and abilities of the female athletes are fully and effectively accommodated by the present program.

565.    In at least the past five years, Oregon has done nothing to assess the interest and ability of its female students.

566.    Oregon does not send out regular surveys to incoming and current students to assist the university in gauging athletic interest and ability.

567.    Oregon does not sponsor a women's varsity team in bowling, equestrian, fencing, gymnastics, ice hockey, rifle, rowing, rugby, skiing, squash, swimming and diving, water polo, or wrestling, all of which are NCAA sponsored Division I sports.

568.    However, Oregon is well aware that there are women's club sports on campus including equestrian, rowing, rugby, skiing, swimming and diving, and water polo, meaning there are female students interested in participating in these sports and they are doing so even though they must self-fund their club team.

569.    Additionally, the Pac-12 sponsors varsity women's gymnastics, rowing, swimming and diving, and water polo. The Big 10, the conference Oregon will be joining in the 2024-25 academic year, also sponsors varsity women's gymnastics, rowing, and swimming and diving,

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

meaning there is competition available for these women's sports within the geographic region in which Oregon's other varsity teams compete. Further, wrestling is one of the fastest growing high school sports for women. (https://nwcaonline.com/sports/2023/4/3/womens-wrestling-facts-resources.aspx).

570.    Oregon has known for decades that interest, ability, and competition is available for a women's rowing team at the school.

571.    Women on the club rowing team have asked Oregon to elevate their sport to varsity status, but these requests have been ignored.

572.    The women's rowing team has the ability to be a varsity sport, as the team has placed well in several competitions. Of course, if it offered women's rowing as a varsity sport, Oregon could also recruit some of the nation's best high school athletes to compete on the team.

573.    Competition is available for a varsity women's rowing team. Nearby Oregon State University, University of Washington, and Washington State University all have competitive women's varsity rowing teams.

574.    Club sport participation from Oregon's student body, conference participation data, high school athletic participation numbers and college athletic participation data from across the country, and other relevant information, demonstrate that there is interest, ability, and competition available for Oregon to add female varsity teams, close or eliminate its ninety-plus female athletic participation gap, and comply with Title IX.

## **CLASS ALLEGATIONS**

575.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3), the beach volleyball Plaintiffs bring this action on behalf of themselves and a class of all those similarly

situated, and the rowing Plaintiffs bring this action on behalf of themselves and a class of all those similarly situated.

576.    For the equal treatment claim, the beach volleyball Plaintiffs currently participating in varsity athletics at Oregon seek to represent a class for declaratory and injunctive relief under Rule 23(b)(2) of all current and future female students who participate or will participate in intercollegiate varsity athletics at Oregon and a class for damages under Rule 23(b)(3) of all current and former female students since the statute of limitations began to run who participated or will participate in intercollegiate varsity athletics at Oregon.

577.    For the equal athletic financial aid claim, the beach volleyball Plaintiffs seek to represent a class for declaratory and injunctive relief under Rule 23(b)(2) of all current and future female students who participate or will participate in intercollegiate varsity athletics at Oregon and do not receive all of the athletic financial aid they could have received and a class for damages under Rule 23(b)(3) of all current and former female students who participate or participated in intercollegiate varsity athletics at Oregon since the statute of limitations began to run and did not receive all of the athletic financial aid they could have received.

578.    For the equal opportunities to participate claim, the rowing Plaintiffs seek to represent a class for declaratory and injunctive relief under Rule 23(b)(2) of all present and future female students at Oregon who are being deprived of the opportunity to participate on women's varsity intercollegiate athletic teams that Oregon does not currently offer.

579.    Plaintiffs reserve the right to revise or amend the above class definitions based on facts learned in discovery.

580.    *Numerosity.* The proposed equal treatment and equal athletic financial aid classes meet the "numerosity" requirement of Rule 23(a)(1) because over 300 female student-athletes

participate in varsity athletics at Oregon annually and have done so for years. In 2021-22, there were 312 female student-athletes. Joinder of them all is impracticable.

581.    The proposed equal participation class meets the "numerosity" requirement because, to achieve substantial proportionality—unless it eliminates participation opportunities for men, which Plaintiffs do not want it to do—Oregon must add participation opportunities for over ninety women to its varsity intercollegiate athletic program. The class includes female students who are considering attending Oregon, the identity of whom are unknown at this time.

582.    The proposed classes also meet that requirement because joinder of all class members and all persons harmed by Defendant's past and ongoing sex discrimination in Oregon's varsity athletic program is impracticable.

583.    The proposed classes are known to exist, but the number of female student-athletes and potential student-athletes will change during this litigation because of the nature of college enrollment and athletic participation. The number of female student-athletes harmed by Defendant's discrimination will grow as each outgoing class of students graduates and each incoming class of students starts attending Oregon.

584.    The exact number of female student-athletes who have been, are being, and will be harmed by Defendant's conduct, while numerous, is unknown, making joinder impracticable for that reason, too.

585.    *Commonality and Predominance.* Plaintiffs satisfy the "commonality" requirement of Rule 23(a)(2) and the "predominance" requirement of Rule 23(b)(3) because there are questions of law and fact in common to the proposed classes that predominate over any questions affecting only individual members, making a class action superior to other available methods for fairly and efficiently adjudicating the controversy. These questions include whether Defendant has violated

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

and is violating Title IX (a) by depriving female varsity student-athletes at Oregon of equal benefits and treatment and, if so, what remedies they are entitled to as a result; (b) by failing to provide female varsity student-athletes at Oregon with equal athletic financial aid, and, if so, what remedies the female varsity student-athletes are entitled to as a result; and (c) by failing to provide current and potential future female students with equal opportunities to participate in varsity athletics and, if so, what remedies those females are entitled to as a result.

586.    Because Title IX requires comparison of the sex-segregated men's and women's athletic programs, the Title IX issues in this action are inherently class-based.

587.    *Typicality.* Plaintiffs satisfy the "typicality" requirement of Rule 23(a)(3) because their claims are typical of those of the proposed classes. Beach volleyball Plaintiffs, like all female student-athletes at Oregon, are all being denied equal treatment and benefits and financial aid because of Defendant's ongoing sex discrimination. Rowing Plaintiffs, like all female students who wish to participate in varsity sports, are being denied equal opportunities to participate in Oregon's varsity athletics program because of Defendant's ongoing sex discrimination.

588.    Plaintiffs all want to end Oregon's continuing violation of Title IX and secure appropriate remedies for themselves and the members of the proposed classes.

589.    In addition, Plaintiffs, like all members of the proposed classes, have been, are being, or will be harmed by the ongoing sex discrimination in Oregon's varsity athletics program.

590.    *Adequacy.* Plaintiffs are members of the proposed classes and will fairly and adequately represent the interests of the class as required by Rule 23(a)(4). They each intend to prosecute this action vigorously to secure fair and adequate monetary and/or equitable relief, as appropriate, for the classes. There is no conflict between the interests of Plaintiffs and the class members.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

591.    Plaintiffs have retained counsel who have had significant experience and success prosecuting Title IX class actions against universities and will adequately represent the class. Their counsel have devoted substantial time to identifying and investigating the potential claims in this action, have developed detailed knowledge of the facts and the applicable law, have no conflicts with Plaintiffs or the putative classes, and have sufficient resources to commit to representing the putative classes.

592.    *Rule 23(b)(2) Certification: Defendant's Common Conduct*. Plaintiffs satisfy the requirement for certification of their claims under Rule 23(b)(2) because Defendant is acting or refusing to act on grounds that apply generally to the classes—by denying female varsity student-athletes equal treatment and benefits and proportional athletic financial aid, and by denying female students at Oregon equal opportunities to participate in varsity intercollegiate athletics, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the classes as a whole.

593.    Plaintiffs are seeking equitable relief under Rule 23(b)(2) because they have no adequate remedy at law to prevent Defendant from violating Title IX in the future by depriving Oregon's female varsity student-athletes of equal treatment and benefits and equal athletic financial and by depriving Oregon's female students of equal opportunities to participate.

594.    *Rule 23(b)(3) Certification: Superiority.* Plaintiffs satisfy the requirement for certification of their claims for damages under Rule 23(b)(3) because class certification would be superior to other available methods for the fair and efficient adjudication of this controversy. Here, it would be impractical and economically infeasible for class members to seek redress individually. Proof and resolution of their claims require class-wide evidence and findings. No other litigation

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

concerning this controversy has already begun by other class members and litigation of these claims in this forum is desirable.

## COUNT I
### TITLE IX
### UNEQUAL TREATMENT AND BENEFITS

595.    The beach volleyball Plaintiffs reallege the above paragraphs as if fully set forth herein.

596.    The beach volleyball Plaintiffs, on behalf of themselves and those similarly situated, bring these claims as a class action as set forth under the Class Allegations and on behalf of the class defined above.

597.    Oregon provides its varsity student-athletes with numerous types of treatment and benefits, including but not limited to equipment, supplies, uniforms, locker rooms, scheduling for competitions, transportation and accommodations for travel, per diem for travel, coaching, tutoring and academic support services, practice and competition facilities, medical and training services, weight training and conditioning services, housing and dining services, sports information and publicity services, recruiting, video support, NIL support and other services.

598.    Under Title IX, Oregon must provide this treatment and these benefits equally to its male and female varsity student-athletes. On a program-wide basis, it must provide female varsity student-athletes with benefits that are comparable to those it provides to its male varsity student-athletes.

599.    Defendant fails to provide female varsity student-athletes with treatment and benefits equal to those they provide to male varsity student-athletes. This failure constitutes sex discrimination in violation of Title IX.

600.    Oregon has not provided equal treatment and benefits (or the resources and budgets necessary to provide equal treatment and benefits) to its female varsity student-athletes.

601.    Defendant fails to provide equal treatment and benefits to its female student-athletes in some or all the categories set forth in the Regulations and the Policy Interpretation, including but not limited to:

- The provision of equipment, uniforms, and supplies;
- Scheduling of games and practice time;
- Travel, transportation, and per diem allowance;
- Opportunity to receive coaching and academic tutoring;
- Provision of locker rooms, practice, and competitive facilities;
- Provision of medical and training services;
- Provision of housing and dining facilities and services;
- Publicity & sports information services;
- Administrative support;
- Recruiting resources and support;
- Name, Image, Likeness support; and
- Resources necessary to provide any of the foregoing benefits or to provide the female athletes with a genuine Division I athletic experience.

602.    Female varsity student-athletes, including the beach volleyball Plaintiffs, are harmed by Oregon's failure to provide its female varsity student-athletes with equal treatment and benefits. Such harm includes lost educational opportunities, lost competitive advantages, less quality in participation opportunities, being subjected to sex discrimination, and the degrading and stigmatizing effects of that treatment.

603.    Accordingly, the beach volleyball Plaintiffs and all members of the equal treatment class are entitled to the relief requested herein.

## COUNT II
## TITLE IX
## UNEQUAL ATHLETIC FINANCIAL AID

604.    The beach volleyball Plaintiffs reallege the above paragraphs as if fully set forth herein.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

605.    The beach volleyball Plaintiffs, on behalf of themselves and those similarly situated, bring this claim as a class action as set forth under the Class Allegations.

606.    Oregon provides athletic financial aid to some of its male and female varsity student-athletes.

607.    Under Title IX and 34 C.F.R. § 106.37, as interpreted by OCR, Oregon must provide athletic financial aid to its female and male student-athletes in proportion to the number of students of each sex participating in intercollegiate athletics.

608.    Oregon has not provided and does not provide athletic financial aid to its female and male student-athletes in proportion to the number of students of each sex participating in intercollegiate athletics.

609.    Female varsity student-athletes, including the beach volleyball Plaintiffs, are harmed by Defendant's failure to provide Oregon's female varsity student-athletes with equal athletic financial aid. Such harm includes lost educational opportunities, lost financial assistance, and lost quality in participation opportunities, in addition to the harm of being subjected to sex discrimination and its stigmatizing effects.

610.    Accordingly, the beach volleyball Plaintiffs and all members of the equal athletic financial aid class are entitled to the relief requested herein.

## COUNT III
### TITLE IX
### UNEQUAL PARTICIPATION OPPORTUNITIES

611.    The rowing Plaintiffs reallege the above paragraphs as if fully set forth herein.

612.    The rowing Plaintiffs, on behalf of themselves and those similarly situated, bring this claim as a class action as set forth in the Class Allegations.

613.    Defendant determines the number of athletic participation opportunities that Oregon will provide to male and female students by choosing which teams it will sponsor for each sex and deciding how many athletes Oregon will allow to participate on each team.

614.    Defendant fails to provide female students an equal opportunity to participate in varsity intercollegiate athletics in violation of Title IX and 34 C.F.R. §106.41(c)(1).

615.    As alleged above, Defendant fails to comply with each part of the three-part test to demonstrate compliance with the requirements of Title IX.

616.    Defendant does not provide female students with varsity intercollegiate athletic participation opportunities in a number substantially proportionate to female undergraduate enrollment.

617.    Defendant cannot show a history or continuing process of program expansion for women.

618.    Female students at Oregon and incoming students have unmet athletic interest and ability as shown by participation in club sports at the student's own cost in sports that are currently sponsored by the Pac-12 and Big 10 conferences. In particular, the rowing Plaintiffs have the interest, ability, and competition available to participate in women's varsity rowing at Oregon. Current female participants in other club sports also have the interest, ability, and competition available to participate in varsity sports. High school students and students interested in transferring to Oregon (the source of Defendant's incoming, prospective, and future students) also have the interest and ability to participate in women's varsity sports for which competition is available. Competition exists in sports such as rowing and other sports identified in this Complaint, because they are a major NCAA sport and Oregon has offered club play in these sports for many years.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

619.    As a result of Defendant's discriminatory actions, female students at Oregon, including the rowing Plaintiffs, have been denied and/or are being denied their right to receive equal opportunities to participate in varsity intercollegiate athletics free of sex discrimination.

620.    These female students have been and are being denied the educational, economic, physical, psychological, and social benefits of athletic participation. They also have been and are being treated as second-class citizens, which has stigmatizing effects.

621.    As such, the rowing Plaintiffs and all members of the equal athletic participation class are entitled to the relief requested herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

A.    Certify this case as a class action for each claim as discussed above.

B.    Appoint appropriate Plaintiffs as representatives of the classes, and appoint Plaintiffs' counsel as class counsel;

C.    Enter an order declaring that Oregon is discriminating against its current female varsity student-athletes on the basis of their sex by depriving them of equal treatment and benefits, equal athletic financial aid, and equal opportunities to participate in intercollegiate athletics in violation of Title IX and the Regulations promulgated thereunder;

D.    Issue a permanent injunction barring Oregon from discriminating against its female student-athletes on the basis of their sex by (a) denying female varsity student-athletes of equal treatment and benefits in Oregon's intercollegiate athletics program, (b) depriving female varsity student-athletes of equal athletic financial aid, and (c) depriving female students of equal opportunities to participate in varsity intercollegiate athletics.

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint

E.      Award compensatory damages, nominal damages, and other monetary relief as permitted by law to Plaintiffs and all class members;

F.      Maintain jurisdiction over this action to monitor Oregon's compliance with the Court's orders;

G.      Award Plaintiffs their reasonable attorneys' fees and expenses; and

H.      Order such other and future relief as the Court deems appropriate.

Dated: December 1, 2023

Respectfully submitted,

*s/Jennifer J. Middleton*
Jennifer J. Middleton, OSB No. 071510
jmiddleton@justicelawyers.com
JOHNSON JOHNSON LUCAS & MIDDLETON PC
975 Oak Street, Suite 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882

Arthur H. Bryant (pro hac vice)
BAILEY & GLASSER, LLP
1999 Harrison Street, Suite 660
Oakland, CA 94612
Tel.: (510) 272-8000
E-mail: abryant@baileyglasser.com

Lori Bullock (pro hac vice)
BAILEY & GLASSER, LLP
309 E. 5th Street, Suite 202B
Des Moines, IA 50309
Tel.: 515.416.9051
E-mail: lbullock@baileyglasser.com

Joshua I. Hammack (pro hac vice)
BAILEY & GLASSER, LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
E-mail: jhammack@baileyglasser.com

*Schroeder, et al. v. Univ. of Oregon*
Class Action Complaint