Stephen F. English, OSB No. 730843
SEnglish@perkinscoie.com
Sarah J. Crooks, OSB No. 971512
SCrooks@perkinscoie.com
Adrianna Simonelli, OSB No. 222481
ASimonelli@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: +1.503.727.2000
Facsimile:  +1.503.727.2222

*Attorneys for Defendant University of Oregon*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| ASHLEY SCHROEDER, KENDALL CLARK, HALLI FIELDS, NATASHA GEORGE, JOSIE GRIFFITHS, JADE BERNAL, DAHLIA MCALLISTER, PRESLEY MCCASKILL, ABIGAIL PLEVIN, VALERIE PETERSON, ELLA TYUS, SIULOLOVAO FOLAU, ALEX LAITA, BATIA ROTSHTEIN, ZOE ALMANZA, BEATRICE WETTON, MIA LOPEZ, DELANEY HOPEN, CARLY WALLACE, SAVANNAH SIEGRIST, ANASTASIA LIMA, MADELYN LAFOLLETTE, ALEXANDRA HADEN, JOSIE COLE, ALAINA THOMAS, VIVIAN DONOVAN, ELISE HAVERLAND, RIVER RIBEIRO, SOPHIA SCHMITZ, SYDNEY WEDDLE, CLAIRE DALEY and ANNA MARIA KNIGHT, Individually and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF OREGON,<br><br>Defendant. | Case No. 6:23-CV-01806-MC<br><br>**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS FOR COUNT I**<br><br>**Oral Argument: February 26, 2025, 10:00 a.m.** |

REPLY ISO DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS

169931515.11

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## I.    INTRODUCTION

Plaintiffs' Opposition to Defendant's Motion for Judgment of the Pleadings for Count I ("Opposition") makes clear they are not alleging any individual female Plaintiff was treated differently than any similarly-situated male athlete because of her sex. Rather, they are attempting to allege a "program-wide disparity," namely, that the football team receives disproportionately more funding than all other sports (including all other men's sports) and, because nothing comparable to men's football exists in women's sports, this program-wide disparity has a disparate effect on female athletes.

But such a theory, and the generalized data and conclusory allegations on which Plaintiffs rely, does not state a claim for an *intentional* violation of Title IX. The fact that the football program costs (and generates) more money than any other sport is true at every school with a Division I football team. That is not discrimination based on sex. Even the Office of Civil Rights (OCR) guidance on which Plaintiffs heavily rely for their program-wide approach explains that "[s]ome aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities," and such differences "will occur in programs offering football." *See* Title IX of the Education Amendments of 1972: A Policy Interpretation, 44 Fed. Reg. 71,415–16 (Dec. 11, 1979).

Plaintiffs' pleading burden is more. They must allege facts from which this Court can infer they were treated differently *on account of their sex*. They fail to do so. Accordingly, the Court should grant the University's Motion for Judgment on the Pleadings, ECF 26, on Plaintiffs' claim for unequal treatment and benefits.

## II.    LEGAL STANDARD

When Federal Rule of Civil Procedure ("Rule") 12(c) is used to raise the defense of failure to state a claim, the motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6). *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). To state a claim for relief, the non-moving party must allege sufficient facts that, if accepted as true,

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1. 503. 727. 2000
Fax:  +1. 503. 727. 2222

"'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Conclusory allegations without more are insufficient to defeat a motion for judgment on the pleadings. *McGlinchy*, 845 F.2d at 810.

Contrary to Plaintiffs' assertions, the University did not only rely upon its Answer for support for its arguments in its Motion. Pls.' Opp'n to Def.'s Mot. for J. on the Pleadings for Count I at 11–12 (Nov. 7, 2024), ECF 44. The University relies primarily on the Complaint and merely pointed the Court to a few citations from the Answer. *See id.* at 7–8, 10–12. Here, in reply the University relies only on the Complaint to demonstrate that judgment on the pleadings should be granted on Count I.

## III.   ARGUMENT

### A.   Plaintiffs' Comparison of Beach Volleyball to Football Fails to State a Claim.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has held that private rights of action under Title IX require a showing of *intentional discrimination*. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (emphasis added); *see also Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (private rights of action under Title IX do not encompass claims of disparate impact because they lack the

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1. 503. 727. 2000
Fax:  +1. 503. 727. 2222

requisite intent).[1]

The University's Motion sets forth various ways a plaintiff in a Title IX proceeding may allege intentional discrimination through direct or indirect evidence. *See* Def.'s Mot. for J. on the Pleadings for Count I at 8–11 (July 3, 2024), ECF 26 ("Mot."). Plaintiffs' Opposition reveals they have met none of these.

The gravamen of Plaintiffs' Complaint is that women's beach volleyball is treated worse than men's football—a comparison that cannot give rise to a plausible inference of sex discrimination. The Complaint recognizes that beach volleyball and football are entirely different sports and not representative of other sports at the University. *See, e.g.*, Compl. ¶ 381(stating that football comprises one-third of Oregon's male student-athletes).

Plaintiffs have not identified a single disparate treatment case alleging a comparison to football that moved beyond the pleading stage. Moreover, their Opposition does not even seek to distinguish the numerous cases cited in the University's Motion that intentional discrimination cannot be inferred from a comparison between priority and non-priority sports given the significant, inherent differences between the sports. *See* Mot. at 10–11 (citing *Murphy v. Northside Indep. Sch. Dist.*, No. SA-22-CV-00123, 2023 WL 3232614, at *6 (W.D. Tex. May 3, 2023), *aff'd*, No. 23-50369, 2024 WL 1554057 (5th Cir. Apr. 10, 2024); *Cano v. Harlandale Indep. Sch. Dist.*, No. SA-19-CV-01296, 2020 WL 7385843, at *4 (W.D. Tex. Dec. 16, 2020); *Coontz v. Katy Indep. Sch. Dist.*, No. 98-20188, 1998 WL 698904, at *6 (5th Cir. Sept. 14, 1998). Nor do Plaintiffs meaningfully distinguish the district court opinion in *Balow v. Mich. State Univ.*, 21-cv-44, 2021 WL 4316771 (W.D. Mich. Sept. 22, 2021), discussed in more detail below. The reasoning in these myriad cases is clear: football operates in a separate market and is highly unique with respect to the size and needs of the team, and therefore the Court cannot infer

---

[1]    Although *Sandoval* addressed Title VI, the Supreme Court observed that Congress modeled Title IX after Title VI of the Civil Rights Act of 1964 and intended to create comparable remedies—therefore, parallel analysis applies to Title IX and Title VI private rights of action. *Sandoval*, 532 U.S. at 280.

3-    REPLY ISO DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1. 503. 727. 2000
Fax:  +1. 503. 727. 2222

169931515.11

from a comparison to football alone that differential treatment of other female *and male sports* is on account of sex.

In an effort to address this shortcoming, Plaintiffs argue they do not need to identify a control group beyond the male and female athletic programs as a whole. *See* ECF 44 at 11. But this contention is belied by the very cases on which Plaintiffs rely, all of which made a comparison between similar sports. *See, e.g.*, *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004) (comparing the soccer schedules of female and male athletes to raise the inference of sex discrimination); *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 914–15 (7th Cir. 2012) (comparing the number of basketball games played by female and male athletes in primetime spots); *Clemons ex rel. T.W. v. Shelby Cnty. Bd. of Educ.*, 818 F. App'x 453, 463 (6th Cir. 2020) (comparing tryouts of female and male tennis players); *Working v. Lake Oswego Sch. Dist.*, No. 16-CV-00581, 2017 WL 2954363, at *5 (D. Or. June 29, 2017) (noting the allegations in the complaint "focus primary on the disparities between the women's softball team and men's baseball team"), *report and recommendation adopted*, No. 16-CV-0581, 2017 WL 3083256 (D. Or. July 19, 2017).[2] Taken collectively, these cases require that a plaintiff demonstrate differential treatment with respect to similarly-situated teams, and only upon making that showing does the court examine program-wide benefits and opportunities to determine if the sport-specific differences were offset by comparable advantages to that sex in another area—*i.e.*, if the program-wide offsets defeat any inference of intentional discrimination. *See, e.g.*, *Parker*, 667 F.3d at 922 (observing the scheduling between similar sports showed a negative impact on one sex, and then defendants did not point to any areas in which female athletes receive comparably better treatment than male athletes to serve as an

---

[2] Plaintiffs mischaracterize the *Working* case in their Opposition (at 11–12), suggesting that there was not a control group. It is clear the allegations compared men's baseball to women's softball and then went on to make other program-wide comparisons that would have affected all female athletes, and was not simply a comparison to football like Plaintiffs' Complaint is here.

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

offset, and thus the court proceeds to determine "the sport-specific disparity is substantial enough to deny equal athletic opportunity").

Plaintiffs' other argument, that they need not allege discriminatory intent in cases involving sex-segregated athletic programs, also misses the mark. *See* ECF 44 at 12 & n.3, 13. Title IX liability focuses on the University's actions, not the decision of the NCAA to segregate sports by sex. Thus, it is the University's actions, as applied to the various teams, that must be motivated by sex. *See, e.g.*, *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 968 (9th Cir. 2010) (holding that a school may act with the necessary intent, at least to meet the *Gebser* knowledge and opportunity to cure requirements, where the school eliminates teams or decreases roster spots, which actions then represent the "official policy of the recipient entity" to deny females *equal participation opportunities*). Plaintiffs have not made this showing; they do not, for example, plausibly allege any official policy of the institution that targeted female athletes with the effect of denying them athletic opportunity. Rather, the pleadings show that athletic funding and other resource decisions are highly individualized depending on the needs of the sport. Moreover, to the extent there are any official athletic policies (like *Alston* payments), they are all applied equally to both sexes.[3] *Cf. City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (observing disparate treatment claims must "pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different'").

---

[3] As an example of what type of allegation would be sufficient to state a claim, in *Pederson v. Louisiana State University*, 213 F.3d 858 (5th Cir. 2000), the court held intentional discrimination could be inferred "[i]f an institution makes a decision not to provide equal athletic opportunities for its female students because of paternalism and stereotypical assumptions about their interests and abilities, that institution intended to treat women differently because of their sex." *Id.* at 880; *see also id.* at 882 ("The proper test is not whether it knew of or is responsible for the actions of others, but is whether Appellees intended to treat women differently on the basis of their sex by providing them unequal athletic opportunity . . . . Our review of the record convinces us that an intent to discriminate, albeit one motivated by chauvinist notions as opposed to one fueled by enmity, drove LSU's decisions regarding athletic opportunities for its female students."). No such allegations about the University's motives exist here.

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

In this regard, *Iqbal* is analogous. In that case, the plaintiff alleged that certain U.S. officials had a policy of holding detainees and exposing them to harsh conditions on account of their religion, race, or national origin. *Iqbal*, 556 U.S. at 669. The Court held that Rule 8(a)'s pleading standard requires more than an "unadorned, the defendant-unlawfully-harmed-me accusation," *id.* at 678, and that plaintiff had not "nudged his claims of invidious discrimination across the line from conceivable to plausible" where the bare assertions that the petitioners adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group "are conclusory and not entitled to be assumed true." *Id.* at 681. The Court noted that the September 11 detainees may have all shared a race, religion and ethnicity, but petitioner had not plausibly alleged the defendants *purposefully* detained them because of their race, religion or national origin, given more likely explanations, as required to show discrimination. *Id.* Similarly, although Plaintiffs here happen to all be female, they have alleged no facts plausibly showing the University treated them differently, or adopted a policy that treated them differently, because of their sex or gender.

Stated differently, if the University's beach volleyball team had been a men's beach volleyball team it would have received the same treatment as the women's beach volleyball team. Nowhere in their Complaint or any other pleading do Plaintiffs dispute that. Nor could they, because no facts exist that support such a claim. Instead, Plaintiffs' allegations are based on a comparison between teams (football and beach volleyball) that are not similarly situated and therefore not reasonably comparable. Accordingly, in light of *Iqbal*'s "common sense" requirement, 556 U.S. at 679, Plaintiffs do not allege facts that allow a reasonable inference of intentional discrimination based on sex.

Finally, Plaintiffs' complaint also contains no non-conclusory allegations of a program-wide disparity attributable to sex. As discussed in the Motion and the above sections of this Reply, the factual allegations in the Complaint concern only the comparison of football and volleyball. Plaintiffs have not alleged with any of the particularity required by Rule 8(a) that any

other female athletes were treated dissimilarly from any other male athletes on account of their sex – the allegations simply *conclude* that. By way of comparison, the particularized allegations in the Complaint all pertain to beach volleyball and football, *e.g.*, that football players have exclusive access to an equipment room (¶ 388), that football gets preferred scheduling (¶ 414), that football gets chartered flights (¶ 419). Taken together, these facts do not plausibly suggest a policy or practice that has caused a system-wide disparity on account of sex reaching all sports and not just football and beach volleyball.

      **B.**    **Because Plaintiffs' Arguments Are Nearly Identical to Those Made and Rejected in *Balow*, this Court Should Grant the University's Motion.**

      The district court in *Balow*[4]—when it denied the plaintiffs' motion to amend and granted the university's motion to dismiss on the treatment and benefit claim—explained that "neither the statute nor the regulations call for identical programs for male and female athletes" and that focusing on just "a few differences between a handful of 'priority' teams at [the university] and other teams," including differences in the locker rooms, facilities, and staffing, does "not permit the Court to infer more than the mere possibility of sex discrimination." *Balow*, 2021 WL 4316771, at *8–9 (internal citation omitted).

      The allegations in *Balow* are strikingly similar to those here. *Compare* Compl. ¶ 465 ("The [football] team members also have a weight room in the facility that is solely for their use, with hundreds of pieces of equipment emblazoned with Oregon's logo.") *with Balow*, 2021 WL 4316771, at *8 ("[T]he football team, the men's and women's basketball teams, and the men's ice hockey team, have their own locker rooms and . . . facilities for weight training."); *compare* Compl. ¶ 462 ("The [football] locker room also includes a barber shop that is exclusively for football players and football staff.") *with Balow*, 2021 WL 4316771, at *8 ("[M]embers of the men's football team [have] . . . an on-site barber."); *compare* Compl. ¶ 469 ("The picture below

---

    [4]     Puzzlingly, in their Opposition, Plaintiffs include a discussion of *Balow*, and the equal *athletic participation* opportunities claim in that case. ECF 44 at 20. The University moves here against the equal *treatment and benefits* claims so any argument based on a claim from *Balow* unrelated to this Motion is irrelevant.

7-   REPLY ISO DEFENDANT'S MOTION FOR
      JUDGMENT ON THE PLEADINGS

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

169931515.11

shows the football team's fuel station, with free unlimited healthy snacks in its facility.") *with Balow*, 2021 WL 4316771, at *8 ("[M]embers of the men's football team [have] . . . an on-site 'nutritionist' who makes smoothies . . . ."); *compare* Compl. ¶ 513 ("The women's beach volleyball team did not have its own social media accounts until the fall of 2019 and, even then, the assistant coach was the only one with access to post from the account.") *with Balow*, 2021 WL 4316771, at *8 (stating men's football receives a "staff member dedicated solely to the team's social media presence"); *compare* Compl. ¶ 419 ("Oregon provides men on its football team with a private chartered plane for travel to all but one away game, when the team travels to nearby Oregon State.") *with Balow*, 2021 WL 4316771, at *8 ("In addition, the football and basketball teams are permitted to fly to nearly every away competition while other women's teams must take buses for the vast majority of away games.") (cleaned up). Plaintiffs' Complaint suffers from the same deficiencies as those in *Balow*.

Plaintiffs' contention that they include other sports in the Complaint are easily disproven. There are two references to the treatment the men's baseball team receives, Compl. ¶¶ 386, 457, one reference to the treatment of men's basketball, *id.* ¶ 497, and one reference to women's golf, *id.* ¶ 393, in all of the 621-paragraph Complaint. In *Balow*, there were even more extensive references to other sports at the university, but the court *still* found the plaintiffs' allegations insufficient. 2021 WL 4316771, at * 8 (discussing football, men's and women's basketball, and men's ice hockey). Not only did the court find the allegations insufficient and grant the motion to dismiss, the *Balow* court also denied the plaintiffs' motion to amend. *Id.* at *9.

Plaintiffs cannot fairly argue that they are not relying on a comparison between football and beach volleyball. The Complaint is replete with allegations regarding the benefits afforded to the football team, including 16 photos—whose origin is unknown—purporting to show the University's football facilities. Compl. ¶¶ 387–90, 409, 414, 419, 421, 453–54, 458–67, 512, 514. And Plaintiffs describe the allegedly singularly poor treatment received by beach volleyball. *Id.* ¶¶ 392–404, 406, 422–23, 425–33, 436, 440, 448, 470, 472–95, 499, 501–08, 513. By

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

contrast, there are only a total of six references to teams other than beach volleyball and football. *See id.* ¶¶ 386, 457 (referencing men's baseball); ¶ 497 (referencing men's basketball); ¶ 393 (referencing women's golf); ¶¶ 446–47 (referencing women's softball).[5]

C.    **A Program-Wide Disparity in Funding Is Not Sufficient to State a Claim.**

Plaintiffs' reliance on the University's public Equity in Athletics Disclosure Act (EADA) data to attempt to show a program-wide disparity in funding does not cure their pleading deficiencies. ECF 44 at 6, 10, 14–16.

Courts have routinely held that gross-statistical disparities alone will rarely satisfy the intent requirement. Rather, the factors that must be considered in determining whether there is evidence of intent or purpose to discriminate include the historical background of the decision, the sequence of events leading up to the decision, and any relevant legislative or administrative history. *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977)).[6]

The Title IX regulations also undercut the claim Plaintiffs plead, stating that "[u]nequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section." 34 C.F.R. § 106.41(c). The 1979 Policy Interpretation takes a similar approach, explaining that statistical analysis is relevant only to the question whether an institution is entitled to a presumption of compliance. *See* 44 Fed. Reg. at 71,414 (explaining that even if there were disparities in per capita expenditures, and even if an institution fails to provide "compelling justifications" for such disparities, that "such a failure would only have deprived an institution of

---

[5]    The citations to the Complaint in footnotes 6 through 12 of the Opposition are conclusory, and the underlying paragraphs in the Complaint demonstrate that the reference to "male student-athletes" or "men's teams" is exclusively referring to the men's football team. Thus, these paragraphs suffer from the same shortcoming discussed throughout this Reply, and Plaintiffs have not met their pleading burden. *See Balow*, 2021 WL 4316771, at *8–9.

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

the benefit *of the presumption* that it was in compliance with the law. The Department would still have had the burden of demonstrating that the institution was actually engaged in unlawful discrimination") (emphasis added).[7] Thus, under these cases and guidance, a Plaintiff must still allege unlawful discrimination (*i.e.*, intentional discrimination based on sex), separate and apart from a statistical disparity.

Plaintiffs' attempt to show intentional discrimination based on a system-wide disparity fails for the additional reason that Plaintiffs do not contend with the obvious, non-discriminatory reasons for the alleged disparity. As far back as 1979, OCR has made clear that universities can account for differences in "certain sports—notably football and men's basketball—[that] traditionally draw large crowds" without running afoul of Title IX so long as the university bases its decisions on "sex-neutral criteria (e.g., facilities used, projected attendance, and staffing needs)." 44 Fed. Reg. at 71,416; *see also id.* at 71,415–16 (noting football is unlikely to be comparable to other sports given the size of its facility, "maintenance" and "upkeep" of the facility, "rates of injury," etc.); *id.* at 71,419 (observing that "the unique size and cost of football programs [must be] taken into account"). OCR echoed this view two decades later when advising universities that they will not be liable for differences in funding allocations if they can identify "legitimate, nondiscriminatory reasons for the disproportionate allocation." *See* Dr. Mary Frances O'Shea, National Coordinator for Title IX Athletics, *Dear Colleague Letter: Bowling Green State University*, Office for Civ. Rights, U.S. Dep't of Educ. (July 23, 1998), http://www2.ed.gov/about/offices/list/ocr/docs/bowlgrn.html. The message is loud and clear. The "intentional discrimination" that Title IX prohibits does not include differential treatment that is justified by reasonable, non-discriminatory factors – such as differences in the type of sports at issue. Plaintiffs do not state a cognizable claim for relief given these considerations because they

---

[7]    For this reason, OCR deliberately removed a per capita expenditure test from the final guidance, because the test had created an "assumption that failure to provide compelling justifications for disparities in per capita expenditures would have automatically resulted in a finding of noncompliance," and this was "a serious misunderstanding." 44 Fed. Reg. at 71,414.

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

do not allege facts that show any program-wide funding disparities are not attributable to football's unique attributes or other legitimate sex-neutral reasons.

The Ninth Circuit's Title IX case law sounds a similar tune. When evaluating Title IX claims, the Ninth Circuit has applied the "familiar" Title VII framework under which defendants can defeat claims by showing there is a non-discriminatory reason for the challenged action. *See Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012). Thus, in *Austin v. University of Oregon*, 925 F.3d 1133 (9th Cir. 2019), the Ninth Circuit affirmed this Court's dismissal of a Title IX claim under Rule 12(b)(6), holding that a plaintiff must allege "sufficient, nonconclusory allegations plausibly linking" the alleged wrongful conduct by the university—in *Austin*, disciplinary action against a male student—"to discrimination on the basis of sex." *Id.* at 1138. The Ninth Circuit reasoned that, without "any basis to discern that the administration or outcomes of the disciplinary proceedings were flawed due to" sex, these allegations amounted to only a "recitation of facts without [a] plausible connection" to sex discrimination and, thus, failed to state a Title IX claim. *Id.*; *see also Doe v. Cummins*, 662 F. App'x 437, 453–54 (6th Cir. 2016) (granting motion to dismiss for failure to state a Title IX claim where, given the array of possible factors contributing to the gender makeup of the data presented, "[i]t would be unreasonable . . . to infer that the gender disparity in [the University's] sexual misconduct cases is the result of gender bias, as opposed to . . . other, more innocent causes"); *Rossley v. Drake Univ.*, 979 F.3d 1184, 1195 (8th Cir. 2020) ("[E]ven assuming that all of the cases involved males, the data does not demonstrate gender bias."), *cert. denied*, --- S. Ct. ----, 2021 WL 1072323 (2021).

Plaintiffs would prefer that the Court assume the worst intentions. But the Federal Rules of Civil Procedure require more than assumptions. By relying on generalized data at the highest level of abstraction—and overlooking obvious non-discriminatory justifications for the differences it alleges—Plaintiffs' claim that the University engaged in intentional discrimination on the basis of sex fails to cross "the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

For these reasons, Plaintiffs fail to plead a viable Title IX discrimination claim, and their claims must be dismissed.

**D.      Plaintiffs Fail to State a Claim with Respect to Third-Party NIL.**

The Court should also reject Plaintiffs' Name, Image, and Likeness (NIL) theory because it is based on third-party NIL deals.

In their Opposition, Plaintiffs clarify that they "do not allege that NIL contracts between sponsors and students themselves violate Title IX." ECF 44 at 23. That makes good sense. The University does not control NIL contracts awarded by these separate entities, and it cannot be held liable for these independent actions of third parties.

However, Plaintiffs' Opposition then argues that NIL deals are still relevant to their claim because, in their telling, unequal publicity provided by the University affects the value of NIL deals that players can receive. *Id.* But this is both conclusory and too speculative to state a plausible claim for relief. For starters, Plaintiffs have not alleged facts that show that male student-athletes at the University generally receive more NIL deals than female student-athletes, and if they do, that is based on publicity that the University provides males but not females. All Plaintiffs say on this score is that three football players appear on a list of the 100 "highest NIL recipients in the country" and that "no female student-athlete receives anywhere near the amounts mentioned on that list." Compl. ¶¶ 522–23. But even if that is true, Plaintiffs plead no facts tying that to alleged gender-driven disparities in the University's publicity efforts: *i.e.*, that the University's publicity efforts caused that result. Nor can such a causal connection be inferred. The University's social media posts are a drop in the ocean that is the larger media frenzy and broader social context surrounding college football, and it blinks reality to say that the University's tweets about its teams or particular student-athletes move private NIL markets. Common sense surely shows that that market is dictated by what media companies show on television, which in turn is dictated by what the television-watching public wants to watch. "[I]n the absence of specific allegations and evidence, the asserted link here is hypothetical, tenuous,

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

and not plausible." *One Fair Wage, Inc. v. Darden Rests. Inc.*, 687 F. Supp. 3d 881, 891 (N.D. Cal. 2023).

In addition, the Complaint itself contradicts Plaintiffs' conclusory assertion that the University provides disproportionate NIL support to male athletes. In Plaintiffs' own words, "Oregon provides its male *and female* student-athletes with a wide array of publicity and other treatments and benefits to increase their NIL-related training, opportunities and income . . . ." Compl. ¶ 520 (emphasis added). The press release cited in the Complaint on the launching of Oregon's "Opendorse" platform to facilitate NIL deals proves this point, as it announced that the platform can be used by "all" student-athletes regardless of their team and gender. *See id.* ¶ 525. But Plaintiffs then leap to the conclusion that "[t]hrough these actions, Oregon provides its male student-athletes with much greater NIL-related training, opportunities, and income than its female student-athletes." *Id.* ¶ 521. That is not merely conclusory; it is a non sequitur. No plausible inference supports Plaintiffs' argument. Plaintiffs never explain how the alleged "actions" that support *all* student-athletes is evidence that the University provides greater support for male student-athletes. And, to state the obvious, the University cannot be found liable under Title IX for providing resources to all students on an equal basis.

Because Plaintiffs acknowledge that the University is not responsible for the decisions of independent NIL collectives and have not plausibly alleged that the University's own actions caused any disparities in the NIL market, the Court should find that Plaintiffs' claims regarding NIL deals are specious and dismiss them from this case.

//

//

//

//

//

13- REPLY ISO DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS

**Perkins Coie LLP**
1120 N. W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1. 503. 727. 2000
Fax: +1. 503. 727. 2222

## CONCLUSION

Accordingly, the University respectfully asks that the Court grant Defendant's Motion for Judgment on the Pleadings on Count I for the reasons given above.

DATED:  January 31, 2025.

**PERKINS COIE LLP**

By:/s/ *Stephen F. English*
    Stephen F. English, OSB No. 730843
    SEnglish@perkinscoie.com
    Sarah J. Crooks, OSB No. 971512
    SCrooks@perkinscoie.com
    Adrianna Simonelli, OSB No. 222481
    ASimonelli@perkinscoie.com
    1120 N.W. Couch Street, Tenth Floor
    Portland, Oregon 97209-4128
    Telephone: +1.503.727.2000

*Attorneys for Defendant University of Oregon*