IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ASHLEY SCHROEDER, KENDALL CLARK, HALLI FIELDS, NATASHA GEORGE, JOSIE GRIFFITHS, JADE BERNAL, DAHLIA MCALLISTER, PRESLEY MCCASKILL, ABIGAIL PLEVIN, VALERIE PETERSON, ELLA TYUS, SIULOLOVAO FOLAU, ALEX LAITA, BATIA ROTHSTEIN, ZOE ALMANZA, BEATRICE WETTON, MIA LOPEZ, DELANEY HOPEN, CARLY WALLACE, SAVANNAH SIEGRIST, ANASTASIA LIMA, MADELYN LAFOLLETTE, ALEXANDRA HADEN, JOSIE COLE, ALAINA THOMAS, VIVIAN DONOVAN, ELISE HAVERLAND, RIVER RIBEIRO, SOPHIA SCHMITZ, SYDNEY WEDDLE, CLAIRE DALEY, and ANNA MARIA KNIGHT, individually and on behalf of all those similarly situated, | Case No. 6:23-CV-01556-MC  **OPINION AND ORDER** |

       Plaintiffs,

   v.

UNIVERSITY OF OREGON,

       Defendant.

_____

MCSHANE, Judge:

Plaintiffs are current and former female student-athletes at Defendant University of Oregon ("UO" or "Oregon"). Plaintiffs allege that UO violated Title IX by providing them unequal treatment and benefits, unequal financial aid, and unequal participation opportunities compared to male student-athletes. Before the Court are Defendant's Motion to Dismiss, Motion for Judgment on the Pleadings,

and Motion for Partial Summary Judgment. For the reasons discussed below, Defendant's Motion to Dismiss, ECF No. 27, is GRANTED in part and DENIED in part, Defendant's Motion for Judgment on the Pleadings, ECF No. 26, is DENIED, and Defendant's Motion for Partial Summary Judgment, ECF No. 25, is DENIED.

## **BACKGROUND**

## **I.**    **Legal Background**

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The statute was passed in "response to significant concerns about discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999). "Title IX was enacted to 'provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice[.]'" *Id.* (internal citation omitted).

The Department of Education ("DOE") promulgated regulations to detail Title IX's mandates. The regulations were motivated by "'the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs[.]'" *Id.* at 767 (internal citation omitted). "The drafters of these regulations recognized a situation that Congress well understood: Male athletes had been given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field." *Id.*

As they relate here, DOE's regulations outline two broad requirements for universities that receive federal funds: first, they must "provide equal athletic opportunity for members of both sexes"

in intercollegiate athletics; and second, they must "provide reasonable opportunities" for athletic scholarships "in proportion to the number of students of each sex[.]" 34 C.F.R. §§ 106.41(c), 106.37(c)(1). The first requirement, that universities provide equal athletic opportunity, looks to a non-exhaustive list of factors to determine compliance:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
> (2) The provision of equipment and supplies;
> (3) Scheduling of games and practice time;
> (4) Travel and per diem allowance;
> (5) Opportunity to receive coaching and academic tutoring;
> (6) Assignment and compensation of coaches and tutors;
> (7) Provision of locker rooms, practice and competitive facilities;
> (8) Provision of medical and training facilities and services;
> (9) Provision of housing and dining facilities and services;
> (10) Publicity.

34 C.F.R. § 106.41(c). Those factors break down the requirement of "equal athletic opportunity" into two sub-requirements: effective accommodation and equal treatment. *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 964 (9th Cir. 2010). Effective accommodation requirements derive from 34 C.F.R. § 106.41(c)(1), the institution's selection of sports to accommodate both sexes' interest and abilities, while equal treatment claims consider factors (2)–(10). "Effective accommodation claims thus concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." *Mansourian*, 602 F.3d at 965. Both components are necessary to ensure effective enforcement of Title IX: "[I]f schools could meet Title IX's requirements by creating a sufficient number of female athletic programs that are substantially inferior to their male counterparts' programs, Title IX's enforcement scheme would ring hollow." *Parker v. Franklin Cnty. Comm. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012).

DOE's Office of Civil Rights ("OCR") also published a Policy Interpretation that elaborated on the above standards. Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed. Reg. 71413 ("Policy Interpretation"). The Policy Interpretation assists courts in interpreting and applying the regulations. *See Mansourian*, 602 F.3d at 965. The Policy Interpretation makes clear that three possible claims lie under Title IX: (1) failure to provide financial aid "on a substantially proportional basis to the number of male and female" student-athletes; (2) failure to provide "equivalent treatment, benefits, and opportunities" to male and female student-athletes; and (3) failure to "equally effectively accommodate[]" the "athletic interests and abilities of male and female students[.]" Policy Interpretation, 44 Fed. Reg. 71414.

## II.    Factual Background & Allegations

Defendant University of Oregon is a state educational institution that receives federal funds and is subject to the requirements of Title IX. Class Action Compl. 53, ECF No. 1 ("Compl."). UO is a member of the National Collegiate Athletic Association ("NCAA") and participates in Division I athletics, the highest level of intercollegiate athletic competition. *Id.* at 54. The University sponsors eight men's varsity teams—baseball, basketball, cross country, football, golf, tennis, indoor track and field, and outdoor track and field—and twelve women's varsity teams—acrobatics and tumbling, basketball, beach volleyball, cross country, golf, lacrosse, soccer, softball, tennis, indoor track and field, outdoor track and field, and (indoor) volleyball. *Id.* at 53–54. UO is also home to several women's club sports teams, including equestrian, rowing, rugby, skiing, swimming and diving, and water polo. *Id.* at 104. Those teams are funded by the athletes themselves, not by UO. *Id.*

Plaintiffs are comprised of two groups: (1) 26 current and former female student-athletes on UO's varsity beach volleyball team ("Beach Volleyball Plaintiffs" or "Plaintiffs"), and (2) six current female student-athletes on UO's club rowing team ("Rowing Plaintiffs"). Plaintiffs filed their Class

Action Complaint on December 1, 2023, bringing three claims against UO and seeking to represent a class of all similarly situated female athletes. *Id.* at 105–06.

In Count I, the Beach Volleyball Plaintiffs allege that UO "fails to provide athletic treatment and benefits to its female student-athletes equal to those it provides its male varsity student-athletes, and, accordingly, intentionally discriminates against its female student-athletes in violation of Title IX." *Id.* at 61.

In Count II, the Beach Volleyball Plaintiffs allege that UO "offers and provides its male student-athletes more athletic financial aid than its female student-athletes." *Id.* at 98. Plaintiffs allege that UO provides no athletic financial aid to the varsity beach volleyball team and provides significantly less aid to female student-athletes than male student-athletes overall. *Id.* at 98–101.

In Count III, the Rowing Plaintiffs allege that UO is "depriving them and all present and future female students at Oregon of equal opportunities to participate in varsity athletics." *Id.* at 4. The Rowing Plaintiffs are participants on a club team who wish to participate on a varsity team but have been hindered by UO's refusal to fund a varsity rowing team. Those Plaintiffs focus on UO's alleged failure to provide "intercollegiate level participation opportunities for male and female students in numbers substantially proportionate to their respective enrollments." *Id.* at 101. Those Plaintiffs also allege that Oregon knows there is interest and ability available to field additional varsity teams but has failed to do so, in violation of Title IX. *Id.* at 104–05. The Rowing Plaintiffs allege that this failure has led to a female varsity athletic program that is significantly smaller than the male program. *Id.* at 103.

UO brings three Motions in response to Plaintiffs' allegations. First, UO moves to dismiss the Beach Volleyball Plaintiffs' claims for lack of subject matter jurisdiction, arguing that Plaintiffs lack standing. Second, UO moves for a judgment on the pleadings, arguing that the Beach Volleyball

Plaintiffs fail to state a claim for unequal treatment and benefits. Third, UO moves for partial summary judgment on statute of limitations grounds. The Court considers each in turn.

## DISCUSSION

## I.    Defendant's Motion to Dismiss for Lack of Jurisdiction

UO first argues that the Beach Volleyball Plaintiffs lack standing to seek damages for Count II, their unequal financial aid claim. Second, UO argues that several Beach Volleyball Plaintiffs who graduated from or left UO prior to filing the Complaint lack standing to pursue equitable relief on both their unequal treatment and financial aid claims. Third, UO argues that claims for equitable relief by Plaintiffs who graduated or left UO are moot.

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the subject matter jurisdiction of a federal court. Where, as here, no evidence has been submitted in support of the motion to dismiss, the motion constitutes a facial challenge that looks to whether the allegations in the complaint are sufficient to establish federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). The Court assumes the allegations to be true and draws all reasonable inferences in Plaintiffs' favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

## a.    Whether Plaintiffs Have Standing to Seek Damages for Count II

UO argues that Plaintiffs do not have standing to seek damages for Count II, their unequal financial aid claim. Plaintiffs have the burden of establishing Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To do so, Plaintiffs must allege (1) they suffered an "injury in fact," (2) the injury is traceable to defendant's challenged conduct, and (3) the injury is likely to be "redressed by a favorable decision." *Id.* (internal quotation marks and citations omitted). At the pleading stage, Plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks and citation omitted).

Plaintiffs must establish standing for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

       i. **<u>Injury in Fact</u>**

Plaintiffs have successfully satisfied prong one, alleging that UO denied them the equal opportunity to compete for financial aid. Plaintiffs have the burden of establishing an "injury in fact" that is "concrete and particularized." *Lujan*, 504 U.S. at 560.

Here, Plaintiffs allege that UO provides disproportionate amounts of athletic financial aid to its male student-athletes by doling out hundreds of thousands more dollars to men than women each year. Compl. 99–100. Plaintiffs further allege that: (1) UO "gives no athletic financial aid (full or partial athletic scholarships) to the female student-athletes on the women's varsity beach volleyball team"; (2) members of the team "were ready and able to receive that athletic financial aid"; and (3) "the coach of the women's beach volleyball team would have awarded athletic financial aid to the members of the team if Oregon had not withheld it." Compl. 12. Most importantly, Plaintiffs assert that each of them "received a smaller financial aid award" because of UO's discrimination, and that "[t]he only impediment" to their financial aid awards was UO's decision to allocate "a disproportionately small pool [of financial aid] for female varsity student-athletes." Compl. 12–14.

Defendant argues that a finding of standing "would effectively require the Court to act as a de facto coach or athletic director . . . by allocating scholarship dollars to particular student-athletes or groups of student-athletes." Def.'s Mot. Dismiss 6. Not so. The Court does not purport to decide how many scholarship dollars each individual would have received but for the alleged discrimination, and Plaintiffs do not request that. The Court merely takes as true Plaintiffs' allegations that they were highly qualified competitive beach volleyball players who were ready and able to compete for and

receive financial aid that would have been awarded to them but for UO's discrimination. At the pleading stage, Plaintiffs have successfully alleged an injury in fact.

### ii. <u>Causation</u>

Defendant raises the same arguments with regard to causation, reasoning that because no Plaintiff can prove that she was guaranteed a scholarship, she cannot prove that Defendant's allegedly illegal conduct caused her injury. The same allegations that establish Plaintiffs' injury also establish that Defendant's alleged Title IX violations caused that injury: Plaintiffs were deprived of aid that should have been available, and the women's beach volleyball coach would have awarded members of the team financial aid if it were available. Taking Plaintiffs' allegations as true, they have successfully alleged causation.

### iii. <u>Redressability</u>

Finally, Defendant argues that Plaintiffs' alleged injury is not redressable. To establish redressability, Plaintiffs "must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020). "Redress need not be guaranteed, but it must be more than 'merely speculative.'" *Id.* (citation omitted).

On the first point, Defendant argues that because Plaintiffs have not established which among them would have received financial aid if it were available, their harm is not redressable. The Court recognizes that the "elementary principle of contract law that damages must be reasonably certain" applies here. *Matson Plastering Co., Inc. v. Plasterers & Shophands Local No. 66*, 852 F.2d 1200, 1203 (9th Cir. 1988); *Barnes v. Gorman*, 536 U.S. 181, 187 (2002) (noting that contract law principles apply to Title IX claims). UO is correct that a damages award may involve a consideration of how many scholarships would have been awarded if UO did not deprive women of the financial aid

opportunities required by Title IX. But that concern goes to the appropriate way to distribute damages if awarded, not whether this Court may award them. At this stage, the only question is whether Plaintiffs allege an injury that compensatory damages would redress, and Plaintiffs sufficiently allege a denial of scholarship funds that caused a pecuniary injury.

Turning to the second question, whether this Court can award the requested damages, Defendant contends that because no court has awarded damages for an unequal financial aid claim before, this Court is powerless to do so. Def.'s Mot. Dismiss 5. Defendant asks the Court to look to the statute to determine whether Congress intended to create a private remedy of this kind. *Id.*

Supreme Court precedent easily resolves this question. In *Franklin v. Gwinnett County Public Schools*, the Court held that "a damages remedy is available for an action brought to enforce Title IX." 503 U.S. 60, 76 (1992); *see also Barnes*, 536 U.S. at 187 ("[U]nder Title IX, which contains no express remedies, a recipient of federal funds is nevertheless subject to suit for compensatory damages, and injunction, forms of relief traditionally available in suits for breach of contract.") (citations omitted). Under *Franklin*, courts "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise," and "may use any available remedy to make good the wrong done." *Id.* at 66 (internal quotation marks and citation omitted). This is especially true here, because Title IX contains no private right of action. Accordingly, "it is hardly surprising that Congress also said nothing about the applicable remedies for an implied right of action." *Id.* at 71. "Indeed, properly understood, [Defendant's] position invites us to *abdicate* our historic judicial authority to award appropriate relief in cases brought in our court system." *Id.* at 74 (emphasis in original).

Defendant fails to distinguish *Franklin* as "far narrower than Plaintiffs claim it to be." Reply Supp. Def.'s Mot. Dismiss 9, ECF No. 71. The *Franklin* Court did not limit its holding to the facts of

that case. Rather, the Court answered the broad question of "what remedies are available in a suit brought pursuant to [Title IX's implied right of action]," by holding "that a damages remedy is available for an action brought to enforce Title IX." *Id.* at 65, 76. And as cited above, the Court reiterated that holding ten years later in *Barnes.*

In conclusion, Plaintiffs have successfully alleged an injury caused by Defendant that this Court can redress through a damages award, so Plaintiffs have standing to pursue their financial aid claim. Defendant's Motion to Dismiss is DENIED on this point.

### b.   Whether Former Student-Athletes Have Standing to Seek Equitable Relief

Next, UO argues that Plaintiffs who left or stopped playing varsity sports at UO prior to filing their Complaint lack standing to seek declaratory and injunctive relief for both their financial aid and unequal treatment claims.

Plaintiffs' claim for declaratory relief asks the Court to declare that UO is violating Title IX and discriminating against female varsity student-athletes through unequal treatment and disproportionate financial aid. Compl. 114. Plaintiffs also ask the Court to enjoin UO from violating Title IX in those ways. *Id.* In their equal treatment claim, Plaintiffs make clear that their request for declaratory and injunctive relief is only on behalf of "Plaintiffs *currently participating* in varsity athletics at Oregon," but they make no similar distinction in their financial aid claim. Compl. 106 (emphasis added).

Plaintiffs must allege standing for each claim and for each form of relief sought. *See Friends of the Earth*, 528 U.S. at 185. Standing for equitable relief exists only where there is an ongoing "case or controversy"; "[p]ast exposure to illegal conduct" is not enough. *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). To seek declaratory and injunctive relief, Plaintiffs must allege that they are currently being subjected to unlawful treatment or that there is a "sufficient likelihood" that they will be

subjected to unlawful treatment in the future. *Id.* at 102–11. In the class action context, only putative class members who were subjected to the allegedly unlawful treatment at the time of filing have standing to seek equitable relief. *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 623 (9th Cir. 2010), *rev'd on other grounds*, 564 U.S. 338 (2011). When evaluating standing, the Court "must look at the facts as they exist at the time the complaint was filed." *Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (internal quotation marks and citation omitted).

As an initial matter, the parties dispute who was a current student-athlete at the time of filing. Defendant submitted no evidence in support of its arguments, so Defendant's Motion is construed as a facial attack. The Court looks only to Plaintiffs' allegations, taking them as true. *Holy See*, 557 F.3d at 1073. Plaintiffs allege, and the parties do not dispute, that at least ten Plaintiffs were current students and members of the varsity beach volleyball team at the time they filed the Complaint. Those Plaintiffs—Schroeder, Clark, Fields, George, Griffiths, McAllister, McCaskill, Plevin, Peterson, and Folau—were being subjected to the allegedly unlawful treatment and were indisputably in a position to allege standing for prospective relief.

### i. **Injury in Fact**

Plaintiffs successfully allege an injury as to both their financial aid and unequal treatment claims. Plaintiffs' alleged injury as to their financial aid claim is discussed above.

In their unequal treatment claim, Plaintiffs allege that because UO treated them unequally, they had to purchase their own socks, shorts, pants, sports bras, winter jackets, practice shirts, and rain gear; schedule their practice and training times around men's teams; cancel competition weekends; receive less assistance from coaches, medical trainers, and academic tutors; purchase their own food and water; accept less publicity support; receive less recruiting support; lose educational opportunities and competitive advantage; suffer sex discrimination and its stigmatizing effects; and

other harms that Title IX was designed to prevent. Compl. 10, 66–98. Those allegations sufficiently state an injury.

### ii. __Causation__

The alleged causal link between UO's conduct and Plaintiffs' injury in their financial aid claim is discussed above. Plaintiffs also allege that UO's conduct caused their injuries in their unequal treatment claim. *See, e.g.*, Compl. 10 ("Oregon's failure to provide its female varsity student-athletes with equal benefits and resources harmed each beach volleyball Plaintiff by causing her to lose educational opportunities and competitive advantage . . .").

### iii. __Redressability__

Plaintiffs who were not varsity student-athletes at UO at the time of filing did not allege a risk of future harm that an injunction or declaratory judgment could redress, so those Plaintiffs do not have standing. *See Slayman*, 765 F.3d at 1047–48 ("Named plaintiffs who were not FedEx drivers at the time the complaint was filed lacked standing to seek injunctive or declaratory relief [against FedEx] because they 'would not stand to benefit from' such relief. However, any named plaintiff who was a FedEx driver at the time the complaint was filed did have standing to seek injunctive and declaratory relief.") (internal citations omitted). Plaintiffs Tyus, Laita, Rothstein, Almanza, Wetton, Lopez, Hopen, Wallace, Siegrist, Lima, LaFollette, Haden, Cole, Thomas, Donovan, and Bernal all allege that they were either not students or not varsity athletes at UO at the time of filing, so Defendant's Motion to Dismiss is GRANTED as to those Plaintiffs' claims for equitable relief.

On the other hand, Plaintiffs who were student-athletes when they filed their Complaint allege injuries that are redressable by equitable relief. Schroeder, Clark, Fields, George, Griffiths, McAllister, McCaskill, Plevin, Peterson, and Folau all allege that they were current student-athletes and subjected to the allegedly unlawful treatment in December 2023 when the Complaint was filed.

Declaring that UO is violating Title IX and enjoining the illegal conduct would remedy the harms that those Plaintiffs were facing. *See Dukes*, 603 F.3d at 623 ("Putative class members who were still Wal-Mart employees as of [the date of filing] *do* have standing to seek the injunctive and declaratory relief requested in the complaint."). Accordingly, Schroeder, Clark, Fields, George, Griffiths, McAllister, McCaskill, Plevin, Peterson, and Folau have standing to pursue equitable relief for each claim, and Defendant's Motion is DENIED as to those Plaintiffs. Whether those claims have and will continue to become moot as this litigation progresses is a different question, discussed next.

### c.  Whether Claims by Plaintiffs Who Left UO Are Moot

UO argues that the claims for injunctive relief by Plaintiffs who are no longer enrolled at UO must be dismissed as moot. Plaintiffs ask the Court to apply the "inherently transitory" exception to mootness.

As noted above, the Complaint alleges that ten Plaintiffs were current student-athletes at the time of filing in December 2023. Because Defendant submitted no evidence in support of its Motion, the Court takes Plaintiffs' allegations as true and makes reasonable inferences therefrom. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Looking at the Complaint, Plaintiffs Schroeder, Plevin, and Folau, who were seniors in December 2023, have likely graduated from UO and are no longer members of a UO varsity team. Seven other women who were sophomores and juniors are now likely juniors and seniors. The question before the Court is whether the claims for equitable relief by Plaintiffs who have graduated since December 1, 2023 are moot.

Mootness has been described as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc.*, 528 U.S. at 189. Evaluating mootness looks to how the "circumstances have changed since [the time of filing]." *Clark v. City of Lakewood*,

259 F.3d 996, 1012 (9th Cir. 2001). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102. "A plaintiff who cannot reasonably be expected to benefit from prospective relief ordered against the defendant has no claim for an injunction." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 852, 864 (9th Cir. 2017) (former employee's claim for an injunction against his employer was moot because he did not submit evidence that he planned to seek work with that employer again). "It is well-settled that once a student graduates, [s]he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy." *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000).

Applying those rules, Plaintiffs who are not current student-athletes at UO do not have live claims for injunctive relief because they would not benefit from an injunction ordering UO to correct its allegedly unlawful practices. Thus, because the Court infers that those who were seniors when the Complaint was filed in December 2023 (Schroeder, Plevin, and Folau) have graduated and no longer play varsity sports at UO, those Plaintiffs' claims for injunctive relief are moot and must be dismissed unless there is a viable exception to mootness. Similarly, the other Plaintiffs who are likely juniors and seniors now (Clark, Fields, George, Griffiths, McAllister, McCaskill, and Peterson) have claims that will likely become moot in the next year unless the Court applies an exception to mootness.

Generally, once a class is certified, "a controversy may exist between a named defendant and a member of the class . . . even though the claim of the named plaintiff has become moot." *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir. 2020) (citing *Sosna v. Iowa*, 419 U.S. 393, 402 (1975)) (internal quotations and alterations omitted). But at the time of certification, at least one named plaintiff must have a live claim to proceed. *Slayman*, 765 F.3d at 1048 (Where a "plaintiff's claim becomes moot before the district court certifies the class, the class action normally also becomes moot."). The

Supreme Court recognized that this requirement could sometimes bar legitimate, time-sensitive claims, and created an exception that "applies when the pace of litigation and the inherently transitory nature of the claims at issue conspire to make that requirement difficult to fulfill." *United States v. Sanchez-Gomez*, 585 U.S. 381, 388 (2018). Accordingly, "an inherently transitory, pre-certification class-action claim falls within the 'capable of repetition yet evading review' mootness exception if (1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the named plaintiffs could themselves suffer repeated harm or it is certain that other persons similarly situated will have the same complaint." *Belgau*, 975 F.3d at 949. (internal quotation marks and citations omitted). "The duration of a challenged action is too short where it is almost certain to run its course before either [the Ninth Circuit] or the Supreme Court can give the case full consideration." *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1019 (9th Cir. 2010) (three years is "too short") (internal quotation marks and citation omitted).

Defendant argues that this case does not qualify for the mootness exception and cites *Wallingford v. Bonta*, 82 F.4th 797 (9th Cir. 2023) in support of that argument. In *Wallingford*, plaintiffs' challenge to restrictions that were part of a three-year restraining order were moot and not subject to the "capable of repetition, yet evading review" exception. *Id.* at 801. But that case was not a class action, so the "inherently transitory" standard did not apply, and the court relied on the fact that there was no reasonable expectation that those plaintiffs would be subject to the same action. *Id.* Further, plaintiffs' "two-year delay in suing cut[] materially against them." *Id.* at 801–02 ("A party may not profit from the . . . exception where through his own failure to seek and obtain relief he has prevented an appellate court from reviewing the trial court's decision.") (internal quotation marks and citation omitted). The court also provided that "there is no bright-line rule" that applies in these circumstances. *Id.*

Defendant incorrectly assumes that Plaintiffs have four years to litigate this claim such that it falls outside the Ninth Circuit's holding in *Wallingford*. First, *Wallingford* explicitly stated that "there is no bright-line rule" that would bar claims that might endure more than three years. Second, the Ninth Circuit has previously held that three years is "too short," and did not disturb that holding in *Wallingford*, thus underscoring that this is a case-by-case analysis. *See Johnson*, 623 F.3d at 1019. And third, Defendant's contention that Plaintiffs have four years to litigate their claims assumes that Plaintiffs would know of their claims the day they stepped foot on campus, immediately contact an attorney, swiftly file a complaint that day, and endure four seasons of mistreatment to maintain a live claim against the university. Even so, the traditional school year starts in fall and ends in spring, so a plaintiff who filed her claim when she arrived in September would only have a live claim for three-and-a-half years until she graduated in May, or perhaps an even a shorter period, until her sports season ended. Further, as Plaintiffs note, to allege a program-wide Title IX claim, Plaintiffs must be aware not only of their own mistreatment, but of the treatment of various other sports teams on campus, many of which play in spring. These factors make it virtually impossible to file a claim on day one of university attendance, leading to an even shorter duration of these claims than Defendant suggests.

At any rate, Plaintiffs have established that the "inherently transitory" exception should apply to this case. In *Fisk v. Bd. of Trs. of Cal. State Univ.*, No. 22-cv-173, 2023 WL 6051381 (S.D. Cal. Sept. 15, 2023), the court applied the exception to a program-wide Title IX claim because of "the protracted nature of th[e] litigation, the complexity and novelty of the standing issues, and the finite duration of a student's college athletic career[.]" *Id.* at *12; *see also A.B. v. Haw. State Dep't of Educ.*, 334 F.R.D. 600, 605 (D. Haw. Dec. 31, 2019), *rev'd on other grounds,* 30 F.4th 828 (9th Cir. 2022) ("Given the necessarily finite duration of a high school student's time as a student-athlete, and the

potential for repetition of the claims from similarly situated students, under the particular circumstances of this case, these claims are inherently transitory."). The same factors counsel in favor of the exception here. Plaintiffs' time as UO students is necessarily finite, and their time as student-athletes even more so. Sixteen months have passed since Plaintiffs filed their Complaint, Defendant has resisted and delayed Plaintiffs' discovery efforts, and the Court has granted Defendant's motion to stay discovery while ruling on these Motions. *See* Decl. Jennifer Middleton Supp. Pls.' Opp. Def.'s Mot. Prot. Order, ECF No. 65 (noting Defendant's failure to comply with discovery deadlines, extensions to Plaintiffs' discovery requests, and little discovery produced so far); Minutes of Proceedings, ECF No. 78 (Court order staying discovery).

Several Plaintiffs' claims for injunctive relief have already become moot, and more are likely to become moot in the next two months, leaving only soon-to-be seniors as named Plaintiffs with live claims. At the parties' request, the Court has already once extended the deadline for Plaintiffs' Motion for Class Certification, which is currently due June 12, 2025 and will not be fully briefed until August 11, 2025. After the Court rules on certification, the parties will have mere months to secure a ruling from the Ninth Circuit before the remaining Plaintiffs' claims become moot, too. This is too short a period to allow full litigation. As a final consideration, there is a reasonable expectation that other female student-athletes at UO will suffer the same alleged harm if it is not stopped, so it makes sense to allow these claims to proceed. The Court finds that the "inherently transitory" exception to mootness applies to this case, and Plaintiffs' class-wide claims for injunctive relief may proceed despite Plaintiffs' graduation. Defendant's Motion to Dismiss is DENIED on this point.

## II.   **Defendant's Motion for Judgment on the Pleadings**

Defendant moves for a judgment on the pleadings under Fed. R. Civ. P. 12(c) as to Plaintiffs' unequal treatment claim, arguing that Plaintiffs' claim is improperly premised on a comparison of the

female beach volleyball team and the male football team. UO moves for a judgment on the pleadings under Fed. R. Civ. P. 12(c). The standard under Rule 12(c) is "functionally identical" to the standard under Rule 12(b)(6). *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). At this stage, the Court accepts Plaintiffs' allegations as true and grants relief only if no material issue of fact remains or the allegations fail to state a claim as a matter of law. *Fajardo v. Cnty. of L.A.*, 179 F.3d 698, 699 (9th Cir. 1999); *Doleman v. Meiji Mut. Life Ins. Co.,* 727 F.2d 1480, 1482 (9th Cir. 1984).

In their sprawling 115-page complaint, Plaintiffs' allegations of discrimination almost entirely hinge on a comparison between the women's beach volleyball team and the men's football team. Those comparisons are as undisputed as they are vast. They include the amount of money spent on coaching, recruitment, and scholarships; the quality of facilities, uniforms, and equipment; the funding of travel to competition; the amount of per diem allowances when competing; access to medical services and trainers; the level of publicity and attention given; and preferred scheduling of games and practice times.

The Court has no doubt that most athletic teams, when compared to the juggernaut that has become college football, would liken themselves to a forgotten stepsister. The roar of the crowds must give some pause to the cross-country runner as he navigates Pre's Trail in the shadows of Autzen Stadium during football season with little support other than his two legs and a text from his mom wishing him "good luck."

But such dramatic comparisons are not evidence of discriminatory intent based on gender. Indeed, by all accounts, the Plaintiffs here are poorly provisioned when compared to many of the women's teams. Nowhere in the Complaint is there a comparison of equivalent varsity sports: women's basketball versus men's basketball; women's softball versus men's softball; women's golf versus men's golf; women's track and field versus men's track and field; or women's tennis versus

men's tennis. And while there is no men's beach volleyball team for Plaintiffs to compare themselves to, they still need to show that the class they purport to represent is treated less favorably than similarly situated male student-athletes. They cannot do this by making broad and generalized statements unsupported by facts or by comparing themselves to the men's football program. As discussed below, the treatment of the football team is not irrelevant, but the Complaint makes a poor argument that Plaintiffs here are representative of a class of all female student-athletes at UO.

Although the Court agrees that Plaintiffs' Complaint relies too heavily on a comparison of the highest-funded male team with what appears to be the lowest-funded female team to make its case, Plaintiffs' allegations are vast enough that they contain sufficient material to put UO on notice of their program-wide claims.

Title IX demands "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." *Mansourian*, 602 F.3d at 964 (citation omitted). To allege a claim for unequal treatment, Plaintiffs "must demonstrate disparities in treatment based on an overall comparison of the male and female athletic programs, including 'whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole[.]'" *Working v. Lake Oswego Sch. Dist.*, No. 16-cv-00581, 2017 WL 2954363, at *2 (D. Or. June 29, 2017), *report and recommendation adopted*, 2017 WL 3083256 (D. Or. July 19, 2017). "[C]ompliance should not be measured by a 'sport-specific comparison' but rather by examining 'program-wide benefits and opportunities.'" *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004) (quoting Policy Interpretation, 44 Fed. Reg. 71422). "'[I]dentical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible.'" *Id.* (quoting Policy Interpretation, 44 Fed. Reg. 71415). Differences may be justified by

nondiscriminatory factors such as rules of play and nature of facilities required, so long as "sport-specific needs are met equivalently in both men's and women's programs." *Fisk*, 2022 WL 16577871, at \*8 (citing Policy Interpretation, 44 Fed. Reg. 71416). Put simply, the Court looks to whether a difference in any program component in 34 C.F.R. § 106.41(c) has a negative impact on one sex that is substantial enough to deny equal athletic opportunity. *Parker*, 667 F.3d at 922; *McCormick*, 370 F.3d at 293.

UO disputes Plaintiff's tactic of asserting that disparities exist on a program-wide basis through a comparison of the women's beach volleyball team to the men's football team. And the Court is skeptical of this apples-to-oranges approach. Plaintiffs include almost no factual details about other women's teams at UO and instead make mostly shallow allegations that men's teams are treated better than women's teams overall.

Defendant's argument raises two points for the Court to address: (1) whether the Beach Volleyball Plaintiffs can alone state a claim for program-wide unequal treatment, and (2) whether the alleged superstar treatment of the football players is a relevant consideration.

First, Title IX defendants frequently argue that women may not challenge an entire program without representation from or allegations about each women's sport, but Title IX does not so require. Every court to hear those arguments has rejected them. *See, e.g.*, *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022) (rejecting defendants' argument that plaintiffs who were swimmers, soccer players, and water polo players did not show "that all current female student athletes have been subjected to the alleged Title IX violations" because plaintiffs alleged "systemic discrimination" like a lack of facilities that "would necessarily apply to all current female student athletes"); *McCormick*, 370 F.3d at 296 (rejecting defendants' argument "that one difference in a single sport cannot amount to a Title IX violation") ("Neither the applicable statute, the regulations, nor the Policy

Interpretation suggest that the denial of equal athletic opportunity cannot result from a significant disparity in a single sport[.]"); *Working*, 2017 WL 2954363, at *2, *5 (rejecting defendant's arguments that softball, soccer, and volleyball players lacked "standing to base equal treatment claims on sports they do not play") ("There is no requirement that such a challenge include allegations for every disparity, in every sport, at every level, program wide."); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1100 (S.D. Cal. 2012), *aff'd*, 768 F.3d 843 (9th Cir. 2014) (finding program-wide Title IX violations based in part on evidence relating to tennis, field hockey, and golf teams where plaintiffs represented only the softball, basketball, and water polo teams). Although specific facts about other women's teams at UO would lend more credence to Plaintiffs' allegations, these cases demonstrate that at this stage, those facts are not necessary. And whether a single women's sport is representative of an entire class of women athletes at the University is still another hurdle for the future.

Second, the lavish treatment of the football players is not wholly irrelevant. The regulations prohibit universities that receive federal funds from "den[ying] the benefits of" being a college athlete to individuals based on sex. 34 C.F.R. § 106.41(a). Some of the benefits of being a college athlete are access to the weight room, publicity, travel expenses, dining hall privileges, and quality sports gear and equipment. DOE made clear that "football or other 'revenue producing' sports cannot be exempted from coverage of Title IX." Policy Interpretation, 44 Fed. Reg. 71421. Different sports teams may be treated differently, but each team's "sport-specific needs" should be "met equivalently." *Id.* at 71416. In some cases, legitimate, nondiscriminatory factors may justify larger expenditures for some teams. For example, football requires "expensive protective equipment" and traditionally generates large crowds, so "the costs of managing an athletic event" may be larger for football than other sports. *Id.* at 71416, 71422. But where a mens-only team is receiving preferential

benefits among student-athletes that are not related to the operational needs of the sport, Title IX does not turn a blind eye. *See, e.g.*, *Ollier*, 858 F. Supp. 2d at 1110–12 (finding Title IX violation based in part on evidence that the football team's access to an exclusive, high-quality locker room meant that "38.8% of male athletes had superior facilities as compared to 0% of female athletes"); *Fisk*, 2022 WL 16577871, at *9 (agreeing with plaintiffs "that a comparison to the football team is appropriate because if the football team is given a unique benefit that is not provided to any other team, then 'the men's program is, on balance, receiving unequal treatment and benefits'").

Plaintiffs allege that the football team comprises 37% of UO's men's varsity athletic program. Compl. 61. Title IX inherently requires a comparison of gender-segregated sports teams. Participation on UO's football team is only available to men, and that team, unlike any women's team, enjoys exclusive access to an equipment room and athlete fitting room; priority access for practices, weightlifting, and meals; private chartered flights; hotel rooms during home games; priority access to tutoring and mental health counseling; a six-floor facility with big-screen televisions, video-game consoles, pool tables, ping-pong tables, foosball tables, and vending machines with free snacks; an expansive locker room with personalized lockers; a private barber shop; a museum-style shoe wall and gear room; an exclusive football-only weight room; a 150-seat theater; and even a hot tub for its coaches. No female athlete can access these benefits no matter what sport they play or how well they perform. The University may submit evidence that there are nondiscriminatory factors to justify those benefits, or that women have access to some beneficial treatment that men do not. But those factors are not irrelevant to a claim for program-wide discrimination.

Turning to whether Plaintiffs have alleged program-wide disparities, Plaintiffs submit that UO does not meet the beach volleyball team's "sport-specific needs" in many ways, while funding benefits for the men's football team that it does not fund for any other women's team. Plaintiffs allege

that UO has not provided them with practice or competition facilities; necessary game day attire such as shorts, sports bras, and proper footwear; accessible locker rooms; food and water at competitions; medical care at practices and games; and even, at times, regulation volleyballs. And Plaintiffs do not merely allege that the football team is treated better; they allege that *all* men's teams are treated better.

Most importantly, Plaintiffs include allegations about the men's and women's programs overall that insulate their Complaint from dismissal. Plaintiffs allege that "Oregon provides more and superior equipment and supplies to the men on its men's teams than it provides to the women on its women's teams"; "When men and women use the same facility, such as the weight room, men on Oregon's men's teams are given priority for scheduling practice time and weight room training"; "Oregon provides its male student-athletes with better travel benefits and per diem allowances than its female student-athletes"; "Oregon provides its male student-athletes with better opportunities to receive coaching and academic tutors than its female student-athletes"; "[O]n average, Oregon pays the head coaches of its men's teams more than six times what it pays the head coaches of its women's teams and has done so for almost twenty years"; "Oregon provides its male student-athletes with better locker rooms and facilities than its female student-athletes"; "Oregon provides its male student-athletes with better medical and training services than its female student-athletes"; "Oregon posts more regularly and more information on its website and Oregon's official social media accounts about the men on its varsity men's teams than the women on its varsity women's teams"; and "Oregon provides its male student-athletes with better funding and support for recruiting than its female student-athletes." Compl. 62, 68, 69, 72, 74, 78, 92, 94, 96.

Despite Plaintiffs' otherwise heavy reliance on comparisons to the football team, these allegations are sufficient to state a claim for program-wide discrimination in violation of Title IX. Defendant's Motion for Judgment on the Pleadings is DENIED.

As a final matter relevant to this Motion, Plaintiffs allege that "Oregon's male student-athletes get better treatment and benefits, opportunities, and income through" UO's Name, Image, and Likeness ("NIL") marketplace. Compl. 96. Plaintiffs submit that "female student-athletes are given so much less publicity and NIL support" that they receive lower NIL contracts as a result. Defendant briefly argues that NIL opportunities are provided by third parties and thus inappropriate to consider in an unequal treatment claim against the University. But Plaintiffs do not challenge the third-party NIL contracts themselves; they merely allege that one of the ways Plaintiffs are harmed by UO's discrimination is by receiving less NIL-related training, opportunities, and income. Those ill effects are not irrelevant to Plaintiffs' claim.

### III.   Defendant's Motion for Summary Judgment

Finally, UO moves for summary judgment and requests dismissal of all claims that fall outside the statute of limitations. The parties dispute which statute of limitations applies and when it started running. The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court reviews evidence and draws inferences in the light most favorable to the nonmoving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (citation omitted). When the moving party has met its burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted) (emphasis in original). An issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). A fact is "material" if it could affect the outcome of the case. *Id.*

### a.   Which Statute of Limitations Applies

As a starting point, the Ninth Circuit has already "join[ed] every other federal circuit to consider this issue and h[e]ld that Title IX claims are subject to the applicable state statute of limitations for personal injury actions." *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1135–36 (9th Cir. 2006). This Court has also applied the two-year personal injury statute of limitations to Title IX claims in Oregon. *Samuelson v. Or. State Univ.*, 162 F. Supp. 3d 1123, 1134 (D. Or. 2016), *aff'd*, 725 Fed. App'x 598 (9th Cir. 2018) (citing Or. Rev. Stat. § 12.110(1)). The *Stanley* court followed the practice of borrowing state statute of limitations for personal injury claims for other civil rights actions under Title VI and 42 U.S.C. § 1983. 433 F.3d at 1134. The court noted that "[t]he essential inquiry for statute of limitations 'borrowing' is the nature of the harm alleged[.]" *Id.* at 1135. The court's primary focus appeared to be the comparison to other civil rights actions. *See id.* at 1134. The court appealed to "federal interests in uniformity, certainty, and the minimization of unnecessary litigation" to support "the use of a single statute of limitations within each state." *Id.* at 1135 (internal quotation marks and citations omitted).

Defendant cites *Stanley*'s reference to "the nature of the harm alleged" to argue that this Court should borrow the one-year statute of limitations from Oregon's statute prohibiting sex discrimination in schools, ORS § 659.860. Plaintiffs ask the Court to apply the six-year statute of limitations for breach of contract actions based on the Supreme Court's reasoning in *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212 (2022), which held that Spending Clause legislation such as Title IX affords remedies available under contract law.

Both parties' arguments are well taken. UO may be correct that the nature of the harm alleged in Plaintiff's Title IX claims is closer to the discrimination injuries protected by ORS § 659.860 than the injuries protected by Oregon's personal injury law. Nonetheless, the two-year personal injury statute of limitations in ORS §12.110 is most appropriate here. This follows binding precedent in

*Stanley* and is consistent with *Samuelson*, preserving the "federal interests in uniformity, certainty, and the minimization of unnecessary litigation[.]" *Stanley*, 433 F.3d at 1135 (internal quotation marks and citations omitted).

### b.   When the Statute of Limitations Started Running

The next question is when the two-year statute of limitations began running for each claim and each plaintiff. Plaintiffs filed their Complaint on December 1, 2023, so Plaintiffs' claims must not have accrued prior to December 2, 2021.

As the moving party, Defendant bears the burden of establishing that there is no genuine issue of material fact such that judgment is warranted against Plaintiffs' claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Defendant submitted no evidence in support of its Motion, so it is again construed as a facial attack under the Rule 12(b)(6) standard. The Court may dismiss claims on statute of limitations grounds "only when 'the running of the statute is apparent on the face of the complaint.'" *United States v. Page*, 116 F.4th 822, 829 (9th Cir. 2024).

The statute of limitations accrues "when a plaintiff knows or has reason to know of" her injury, and only when a plaintiff has "a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Stanley*, 433 F.3d at 1136 (internal quotation marks and citation omitted); *Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (internal quotation marks and citation omitted).

UO contends that the statute of limitations for each claim began running the day each Plaintiff stepped foot on campus because she was aware of her claims that day. Plaintiffs argue that it was impossible to know of their claims at that time because they would not have had sufficient knowledge to challenge the treatment and financial aid provided to all student-athletes. Plaintiffs also argue that each academic year constituted a discrete set of decisions by Oregon that subject it to liability

regardless of whether Plaintiffs were injured by similar conduct the year prior.

First, as to their unequal treatment claim, the question is when Plaintiffs knew or should have known that UO was discriminating against female student-athletes on a program-wide basis. An unequal treatment and benefits claim, like a hostile work environment claim, arises out of the "cumulative effect of individual acts," some of which "may not be actionable on [their] own." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (in the context of a hostile work environment claim). This means that "the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement." *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 739 (5th Cir. 2017). Other courts have applied this reasoning to Title IX claims as well, and the Ninth Circuit has recognized that the Title VII framework is analogous to Title IX. *See, e.g.*, *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 584 (5th Cir. 2020); *Ollier*, 768 F.3d at 868.

Thus, UO's argument that Plaintiffs' claims accrued they day they stepped on campus misses the mark. Plaintiffs' unequal treatment allegations are based on a pattern of conduct that pervades or pervaded their time as a student-athlete at UO. Making reasonable inferences in Plaintiffs' favor, that conduct may have been affected or even prescribed by funding decisions that were made anew before the start of each year. *See* Decl. Josie Cole 2, ECF No. 47 ("Every year, the details about how we were treated compared with men's teams changed."). This means that the only Plaintiffs whose claims are called into question at this stage are Thomas, Cole, Hopen, and Lopez, who Plaintiffs allege last played during the 2020–21 school year.

Defendant submitted no evidence that those Plaintiffs knew or should have known of their claims prior to December 2, 2021 and thus failed to carry its burden at summary judgment. Further,

some of Plaintiffs' allegations in their unequal treatment claim rely on data in UO's Equity in Athletics Disclosure Act ("EADA") data. *See* Compl. 7. Plaintiffs submitted evidence that UO's 2020–21 EADA Report shows a reporting date of December 17, 2021, meaning that Plaintiffs would not have had access to that information until that date. More importantly, Plaintiffs submitted evidence that the 2020–21 school year, during the height of the COVID-19 pandemic, was particularly isolating. *See* Decl. Josie Cole 2 ("We could not interact with any of the other teams or players because of the COVID isolation, so we were prevented from knowing what was happening on the men's teams."). On this record, the Court cannot say that Thomas, Cole, Hopen, and Lopez knew or should have known of their claims prior to December 2, 2021.

Second, as to Plaintiffs' financial aid claim, the question is when they knew or should have known that UO was discriminating against women in its athletic financial aid awards. The financial aid claim relies heavily, if not entirely, on information presented in UO's annual EADA report. Compl. 98–100. As noted above, the 2020–21 report was not available until December 17, 2021. Thus, a woman who received a smaller scholarship award when starting in fall of 2020 would not have had access to UO's scholarship data until December 17, 2021. There is no other evidence from which this Court can conclude that Thomas, Cole, Hopen, and Lopez knew or should have known of their financial aid injuries prior to December 2, 2021, so summary judgment against their claims is inappropriate at this time. *See Fisk*, 2022 WL 16577871, at *6 ("When Plaintiffs knew, or could have known, about their alleged injuries is a factual dispute inappropriate for consideration at the motion to dismiss stage.").

Finally, as to the Rowing Plaintiffs' unequal participation opportunities claim, the question is when the Rowing Plaintiffs knew or should have known that UO was not properly accommodating female student-athletes' interests and abilities. Defendant challenges only the timeliness of Plaintiff

Haverland, who joined the rowing team in 2021. There is no evidence that Haverland knew or should have known that UO was not properly accommodating female athletes' interests prior to December 2, 2021, so Defendant's Motion is denied as to that Plaintiff, too.

## CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss, ECF No. 27, is GRANTED in part and DENIED in part, Defendant's Motion for Judgment on the Pleadings, ECF No. 26, is DENIED, and Defendant's Motion for Partial Summary Judgment, ECF No. 25, is DENIED.


IT IS SO ORDERED.

DATED this 4th day of April, 2025.


       s/Michael J. McShane       
         Michael J. McShane
       United States District Judge