Jennifer J. Middleton (OSB No. 071510)
jmiddleton@justicelawyers.com
**JOHNSON JOHNSON LUCAS &**
**MIDDLETON PC**
975 Oak St., Ste. 1050
Eugene, OR 97401-3124
Tel: 541-484-2434

Arthur H. Bryant (*pro hac vice*)
arthur@arthurbryantlaw.com
**ARTHUR BRYANT LAW, P.C.**
1999 Harrison St., 18th Floor
Oakland, CA 94612-4700
Tel: 510-391-5454

Lori Bullock (*pro hac vice*)
lbullock@bullocklawpllc.com
**BULLOCK LAW PLLC**
309 E 5th Street, Suite 202B
Des Moines, Iowa 50309
Tel: 515-423-0051

Michael Rubin (*pro hac vice*)
Eve H. Cervantez (*pro hac vice*)
Matthew J. Murray (*pro hac vice*)
Robin S. Tholin (*pro hac vice*)
mrubin@altshulerberzon.com
ecervantez@altshulerberzon.com
mmurray@altshulerberzon.com
rtholin@altshulerberzon.com
**ALTSHULER BERZON LLP**
177 Post St., Ste. 300
San Francisco, CA 94108-4733
Tel: 415-421-7151

*Attorneys for Plaintiffs and the Proposed Classes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| ASHLEY SCHROEDER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF OREGON,<br><br>Defendant. | Case No.  6:23-cv-01806-MC<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>AUTHORIZED TO BE FILED UNDER SEAL<br><br>Request for Oral Argument |

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                          i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

L.R. 7-1 CERTIFICATION .................................................................................................... 1

MOTION................................................................................................................................. 1

LEGAL MEMORANDUM ..................................................................................................... 2

    INTRODUCTION ............................................................................................................. 2

      PLAINTIFFS' CLAIMS ................................................................................................. 4

      FACTS ............................................................................................................................ 8

        A.  Common evidence can establish that UO's centrally operated athletic department fails to ensure compliance with Title IX ............................................................. 8

        B.  Count I: Common evidence, including expert testimony, can establish that UO provides better treatment and benefits overall to male athletes than to female athletes ...................................................................................................... 10

        C.  Count II: Common evidence can establish that UO provides female athletes unequal athletic financial aid compared to male athletes ............................... 15

        D.  Count III: Common evidence can establish that UO does not provide female students equal opportunities to participate in varsity sports as compared to male students ....................................................................................................... 18

        E.  Common evidence can establish the extent to which the class was damaged .............. 22

        F.  Representative plaintiffs ................................................................................. 22

      PRIOR PROCEEDINGS ............................................................................................. 23

      ARGUMENT............................................................................................................... 23

        I.  Legal Standards for Class Certification ................................................................. 23

        II.  Plaintiffs Satisfy All the Rule 23(a) Requirements...................................................... 24

        III. The Injunctive Relief Classes Should Be Certified Under Rule 23(b)(2) ..................... 29

        IV. The Damages Classes Should Be Certified Under Rule 23(b)(3)................................. 30

      CONCLUSION............................................................................................................ 36

CERTIFICATE OF COMPLIANCE....................................................................................... 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Hawaii State Dep't of Educ.*,
   30 F.4th 828 (9th Cir. 2022) .................................................................6, 7, 25, 31

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...............................................................................................30

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...............................................................................................24

*Anders v. Cal. State Univ.*,
   2022 WL 3371600 (E.D. Cal. Aug. 16, 2022)........................................................26

*Anders v. Cal. State Univ.*,
   2024 WL 177332 (9th Cir. Jan. 17, 2024) .............................................................28

*Anders v. Cal. State Univ.*,
   2025 WL 755664 (E.D. Cal. Mar. 10, 2025) .............................................3, 6, 7, 30

*Biediger v. Quinnipiac Univ.*,
   2010 WL 2017773 (D. Conn. May 20, 2010)..........................................................3

*Biediger v. Quinnipiac Univ.*,
   691 F.3d 85 (2d Cir. 2012).....................................................................................18

*Brust v. Regents of the Univ. of Cal.*,
   2008 WL 11512299 (E.D. Cal. Oct. 24, 2008) ...................................................3, 8

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*,
   192 F.RD. 568 (W.D. Mich. 1999) .............................................................6, 25, 27

*Cohen v. Brown v. Univ.*,
   991 F.2d 888 (1st Cir. 1993).....................................................................................3

*Cummings v. Premier Rehab Keller, PLLC*,
   596 U.S. 212 (2022)...............................................................................................33

*Foltz v. Delaware State Univ.*,
   269 F.R.D. 419 (D. Del. 2010) ...................................................................... *passim*

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
   503 U.S. 60 (1992).................................................................................................30

*Hanney v. Epic Aircraft, LLC*,
2024 WL 2106210 (D. Or. May 10, 2024) ..............................................................25

*JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*,
823 F.3d 1006 (5th Cir. 2016) ..............................................................................33

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ..........................................................................26, 34

*Lazor v. Univ. of Connecticut*,
560 F.Supp.3d 674 (D. Conn. 2021)......................................................................19

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ........................................................................31, 34

*Mansourian v. Regents of Univ. of Cal.*,
602 F.3d 957 (9th Cir. 2010) ........................................................................5, 7, 20

*McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004).........................................................................5, 6, 35

*NCAA v. Alston*,
594 U.S. 69 (2021)................................................................................................15

*Noohi v. Johnson & Johnson Consumer Inc.*,
146 F.4th 854 (9th Cir. 2025) ........................................................................24, 31

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ................................................................24

*Ollier v. Sweetwater Union High Sch. Dist.*,
251 F.R.D. 564 (S.D. Cal. 2008) .......................................................................3, 6

*Ollier v. Sweetwater Union High Sch. Dist.*,
858 F.Supp.2d 1093 (S.D. Cal. 2012).....................................................................6

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ...............................................................................18

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
667 F.3d 910 (7th Cir. 2012) ..................................................................................5

*Paton v. N.M. Highlands Univ.*,
275 F.3d 1274 (10th Cir. 2002) .......................................................................3, 35

*Portz v. St. Cloud St. Univ.*,
297 F.Supp.3d 929 (D. Minn. 2018)............................................................... *passim*

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                           iv

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ...................................................................................34

*Rambus Inc. v. Hynix Semiconductor Inc.*,
   629 F.Supp.2d 979 (N.D. Cal. 2009) .......................................................................33

*Reichert v. Keefe Commissary Network, L.L.C.*,
   331 F.R.D. 541 (W.D. Wash. 2019) .........................................................................24

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ...................................................................................24

*Torres v. Mercer Canyons, Inc.*,
   835 F.3d 1125 (9th Cir. 2016) .................................................................................25

*Tyson Foods v. Bouaphakeo*,
   577 U.S. 442 (2016)..................................................................................................30

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) ..................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................24, 25, 26, 30

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) .................................................................................29

**Statutes**

20 U.S.C. §1681(a) ............................................................................................................4

**Rules and Regulations**

34 C.F.R. §106.37(c)......................................................................................................4, 6

34 C.F.R. §106.41(c)................................................................................... *passim*

44 Fed. Reg. 71,415 .......................................................................................................5,6

44 Fed. Reg. 71,416 ......................................................................................................6, 14

44 Fed. Reg. 71,418 ................................................................................................7, 19, 20

44 Fed. Reg. 71,422 .........................................................................................................5

F.R.C.P. 23................................................................................................... *passim*

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    v

**Other Authorities**

*Big Green Capture NCEA Single-Discipline National Championship*, April 19, 2025, https://dartmouthsports.com/news/2025/4/19/equestrian-big-green-capture-ncea-single-discipline-national-championship.aspx ...................................................19

NCAA, 2024 Division I Rowing Championships Participant Manual, p. 30, https://ncaaorg.s3.amazonaws.com/championships/sports/rowing/d1/2023-24D1WCR_ParticipantManualFinals.pdf..................................................................................19

U.S. DOE, Office of Civil Rights, Dear Colleague Letter (July 23, 1998) https://www.ed.gov/about/offices/list/ocr/docs/bowlgrn.html....................................................7

U.S. DOE, Office of Civil Rights, Dear Colleague Letter (April 20, 2010), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-20100420.pdf ...............................................................................................................................21

**L.R. 7-1 CERTIFICATION**

Plaintiffs' counsel personally conferred in good faith with counsel for Defendant by video conference about the subject of this motion. The issue could not be resolved.

**MOTION**

Plaintiffs seek certification of the following classes for injunctive relief (Rule 23(b)(2)) and damages (Rule 23(b)(3)) under Title IX of the Education Amendments of 1972 ("Title IX") on the three Counts alleged in their Complaint against Defendant University of Oregon ("UO"):

- Count I (failing to provide female varsity athletes equal treatment and benefits compared to male varsity athletes): a class for declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2) of all current and future female students who participate or will participate in intercollegiate varsity athletics at UO, and a class for damages under Rule 23(b)(3) of all current and former female students who participated or will participate in intercollegiate varsity athletics at UO at any time from the start of the 2020-21 academic year until the end of the 2025-26 academic year. *See* ECF 1 ("Compl.") ¶576.[1]

- Count II (failing to provide female varsity athletes equal athletic financial aid): a class for declaratory and injunctive relief under Rule 23(b)(2) of all current and future female students who participate or will participate in intercollegiate varsity athletics at UO and do not receive all athletic financial aid permissible under federal law, and a class for damages under Rule 23(b)(3) of all current and former female students who participated or participate in intercollegiate varsity athletics at UO and did or do not receive all athletic financial aid permissible under federal law at

---

[1] Plaintiffs maintain that the applicable statute of limitations is six years, but seek certification for a class beginning with the 2020-21 academic year pursuant to this Court's prior determination of the applicable statute of limitations and assessment of when it began running for plaintiffs' claims. ECF 83 at 24-29.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                1

any time from the start of the 2020-21 academic year until the end of the 2025-26 academic year. *See* Compl. ¶577.[2]

• Count III (failing to provide female students equal opportunities to participate in intercollegiate athletics): a class for declaratory and injunctive relief under Rule 23(b)(2) of all present and future female students at UO who are being deprived of the opportunity to participate on women's varsity intercollegiate athletic teams. *See* Compl. ¶578.

Plaintiffs move to appoint Ashley Schroeder, Batia Rotshtein, Natasha George, and Abigail Plevin as class representatives for all classes pursuing Counts I and II under Rules 23(b)(2) and 23(b)(3), and Carly Wallace as a class representative pursuing Counts I and II for the damages classes under Rule 23(b)(3). Plaintiffs move to appoint Elise Haverland, River Ribeiro, Sophia Schmitz, and Sydney Weddle as class representatives pursuing Count III for the class under Rule 23(b)(2).

Plaintiffs further move to appoint plaintiffs' counsel Altshuler Berzon LLP, Arthur Bryant Law PC, Bullock Law, PLLC, and Johnson Johnson Lucas & Middleton as class counsel for each class under Rule 23(g).

In support, plaintiffs rely on the accompanying declarations filed herewith; Rule 23; the facts and arguments below; and the files and record of this case.

## LEGAL MEMORANDUM

### INTRODUCTION

Title IX of the Education Amendments of 1972 ("Title IX") requires all educational

---

[2] This definition clarifies the language in the complaint, which includes students who do or did "not receive all of the athletic financial aid they could have received," that is, the full amount of aid that would have been permissible under federal law (regardless of any NCAA-imposed limits). Compl. ¶577.

institutions that receive federal funds, including the University of Oregon ("UO"), to provide their female and male student athletes equal treatment and benefits, and equal athletic financial aid, and to provide their female and male students equal opportunities to participate in varsity athletics. These requirements are inherently program-wide, comparing universities' women's and men's varsity intercollegiate athletic programs as a whole. Plaintiffs are current and former female UO students who allege that UO violated and is continuing to violate Title IX by depriving its female student-athletes, as a whole, of: (1) equal treatment and benefits and (2) equal athletic financial aid; and by depriving its female students, as a whole, of (3) equal opportunities to participate in varsity intercollegiate athletics.

Because Title IX sex discrimination claims for injunctive relief challenging inequality in intercollegiate athletics are necessarily classwide, courts routinely certify them under Rule 23(b)(2). *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 251 F.R.D. 564, 565 (S.D. Cal. 2008) ("*Ollier I*") (certifying treatment and benefits and participation claims); *Anders v. Cal. State Univ.* , 2025 WL 755664, at \*1 (E.D. Cal. Mar. 10, 2025) ("*Anders III*") (same); *Brust v. Regents of the Univ. of Cal.*, 2008 WL 11512299 (E.D. Cal. Oct. 24, 2008) (certifying participation claim); *Paton v. N.M. Highlands Univ.*, 275 F.3d 1274 (10th Cir. 2002) (athletic financial aid and treatment and benefits claims); *Cohen v. Brown v. Univ.*, 991 F.2d 888, 893 (1st Cir. 1993) (participation claim); *Portz v. St. Cloud St. Univ.*, 297 F.Supp.3d 929, 935 (D. Minn. 2018) (participation, athletic financial aid, and treatment and benefits claims); *Biediger v. Quinnipiac Univ.*, 2010 WL 2017773, at \*8-9 (D. Conn. May 20, 2010) (same). Moreover, because these claims and the evidence required to assess them are program-wide and not team-specific, courts commonly approve members of a single team as class representatives of all female students or athletes. *See e.g. Anders III*, 2025 WL 755664 at \*9 (certifying two members

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    3

of women's lacrosse team as representatives of class of female students); *Foltz v. Delaware State Univ.*, 269 F.R.D. 419, 423 (D. Del. 2010) (certifying members of equestrian team as representatives of class of all current and future female athletes).

For similar reasons, plaintiffs' Title IX damages claims for their unequal treatment and benefits and unequal athletic financial aid counts should be certified under Rule 23(b)(3). This Court has already determined that damages are available for these claims, ECF 83 at 8-10, so the questions relevant to certification of those retrospective relief claims under Rule 23(b)(3) are whether common questions predominate over any individual ones, and whether a class action is superior to litigating each class member's claim separately. Because these claims require classwide analysis—that is, a comparison of women's and men's athletic programs as a whole—predominance and superiority are easily satisfied. The relevant inquiry at this stage is not whether plaintiffs will succeed on the merits at trial, but whether plaintiffs' claims present common questions that can and should be resolved based on common evidence for the class as a whole. They unquestionably do.

## PLAINTIFFS' CLAIMS

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). The Department of Education's ("DOE") regulations interpret the statute as requiring funding recipients like UO to provide "reasonable opportunities for [athletic scholarship] awards for members of each sex in proportion to the number of students of each sex participating" in athletics, 34 C.F.R. §106.37(c), and to "provide equal athletic opportunity for members of both sexes," 34 C.F.R. §106.41(c). The equal athletic opportunity requirement includes two separate

components: "equal treatment ... in the schedules, equipment, coaching, and other factors affecting participants in athletics" (treatment and benefits), and equal "opportunity to participate in athletics" (participation). *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 (9th Cir. 2010).

Count I alleges that UO discriminates against its female varsity athletes by providing them unequal treatment and benefits compared to the treatment and benefits UO provides to its male varsity athletes. 34 C.F.R. §106.41(c)(2)-(10); Compl. ¶¶352-58 (summarizing applicable regulations and guidance). Title IX requires a university operating sex-segregated athletic teams to provide its male and female athletes "equal treatment," meaning "equivalence in the availability, quality and kinds of … athletic benefits and opportunities provided male and female athletes." *Mansourian*, 602 F.3d at 964 (citation omitted). As this Court has found, liability for an equal-treatment claim requires "an overall comparison of the male and female athletic programs" rather than an individual-by-individual, team-by-team, or sport-by-sport comparison. ECF 83 at 19 (quotation omitted). "[C]ompliance should not be measured by a 'sport-specific comparison' but rather by examining 'program-wide benefits and opportunities,'" *id.* (quoting *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004)), as "Title IX protects the individual as a student-athlete, not as a basketball player, or swimmer." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 919 (7th Cir. 2012) (quoting 44 Fed. Reg. at 71,422). Compliance is measured:

> by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the *overall effect of any differences is negligible.*

*Id.* (quoting 44 Fed. Reg. at 71,415) (emphasis added). The benefits and treatment factors that

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                            5

are considered in this analysis are listed in 34 C.F.R. §106.41(c)(2)-(10), and include "[t]he provision of equipment and supplies," "[t]ravel and per diem allowance," and "[p]rovision of locker rooms, practice and competitive facilities," among others. Aggregate disparities are unlawful unless they arise from "special demands associated with" different sports and only if those special demands "are met to an equivalent degree" for both sexes. 44 Fed. Reg. at 71,416. Additionally, a violation may be established by showing that the "disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity." *McCormick*, 370 F.3d at 292-93.

This program-wide, aggregate analysis is particularly well-suited to class treatment, as liability depends on "an overall comparison of the male and female athletic programs." *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F.Supp.2d 1093, 1110 (S.D. Cal. 2012) ("*Ollier II*"); *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022) (noting that "aspects of Plaintiffs'" unequal treatment claim "if proved, would necessarily apply to all current female student athletes"). Any individual plaintiff making a claim would need to rely on the same university-wide evidence. Courts thus routinely certify equal treatment and benefits class claims. *See, e.g.*, *Ollier I*, 251 F.R.D. at 565; *Anders III*, 2025 WL 755664, at *1; *Portz*, 297 F.Supp.3d 929; *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 192 F.RD. 568 (W.D. Mich. 1999).

Count II alleges that UO discriminates against its female varsity athletes by failing to grant athletic financial aid to "members of each sex in proportion to the number of students of each sex participating in … intercollegiate athletics." 34 C.F.R. §106.37(c); 44 Fed. Reg. at 71,415; Compl. ¶¶359-67. This claim, too, is inherently class-based, as it turns on the total amount of athletic-related financial assistance the university offers to men and women each year,

not on any specific individual's or team's financial aid package. There is "a strong presumption that an unexplained disparity of more than 1% is in violation of the 'substantially proportionate' requirement." U.S. DOE, Office of Civil Rights ("OCR"), Dear Colleague Letter (July 23, 1998) ("1998 OCR Guidance").[3] Here, the available data show disparities between 2.1% and 3.7% in the years at issue. *Infra* at 17. Plaintiffs' initial proof of this presumptively unlawful disparity and UO's efforts to demonstrate "legitimate, nondiscriminatory reasons for the disproportionate allocation" (1998 OCR Guidance, at 2) will rest on program-wide rather than individualized evidence. *See, e.g.*, *Portz*, 297 F.Supp.3d at 936.

Count III alleges that UO failed to provide female students equal athletic participation opportunities. 34 C.F.R. §106.41(c)(1); Compl. ¶¶368-71. Title IX requires covered universities to offer equal athletic participation opportunities for male and female students. 34 C.F.R. §106.41(c). The DOE's guidance "gives universities three options for demonstrating compliance with [this requirement of] Title IX: (1) showing substantial proportionality (the number of women in intercollegiate athletics is proportionate to their enrollment); (2) proving that the institution has a 'history and continuing practice of program expansion' for the underrepresented sex…; or (3) where the university cannot satisfy either of the first two options, establishing that it nonetheless 'fully and effectively accommodate[s]' the interests of women." *Mansourian*, 602 F.3d 957, 965 (quoting 44 Fed. Reg. 71,418). The Ninth Circuit has recognized that this test is likewise "framed in terms that examine the school's *overall* treatment of female athletic programs versus male athletic programs." *A.B.*, 30 F.4th at 837 (emphasis in original).

Courts regularly certify classes for participation claims analogous to plaintiffs' claim here, including where the named plaintiffs are members of a single team. *See, e.g.*, *Anders III*,

---

[3] Available at https://www.ed.gov/about/offices/list/ocr/docs/bowlgrn.html.

2025 WL 755664, at *1 (members of women's lacrosse team); *Foltz*, 269 F.R.D. at 426 (members of women's equestrian team); *see also Brust*, 2008 WL 11512299 (E.D. Cal. Oct. 24, 2008) (members of two club teams).

## FACTS

**A. Common evidence can establish that UO's centrally operated athletic department fails to ensure compliance with Title IX.**

UO has chosen to sponsor 20 sex-segregated varsity sports teams for men and women: (a) men's baseball, basketball, football, golf, tennis, outdoor track, indoor track, and cross country, and (b) women's acro and tumbling, basketball, golf, lacrosse, soccer, softball, tennis, volleyball, beach volleyball, indoor track, outdoor track, and cross country. Tholin Decl. Ex. C ("Johnson Depo.") 117:18-118:8; *see* Tholin Decl. Exs. O-S (NCAA Financial Reports).

UO's athletic department ("Department") sets institutional policy, distributes resources, and makes decisions affecting all men's and women's teams on a university-wide basis. The treatment and benefits varsity athletes receive depend on which team they play for and what budgets the Department provides to each team. Each year, the Department sends a template budget to each team and, following discussions with the coach, the Department "ultimately decide[s] on what the operating budgets are going to be." Tholin Decl. Ex. H ("Blood Depo.") 42:1-14; *see* Tholin Decl. Exs. J, L (Master Budget Plans). UO also centrally determines how much athletic financial aid to provide to male and female varsity athletes by deciding the number of scholarships the University will offer to each sex-segregated team. Tholin Decl. Ex. E ("Mullens Depo.") 141:11-143:18; *see also id.* Ex. G ("Sykes Depo.") 54:20-56:2; 134:1-17; 141:11-22; *infra* Facts section C.

Despite being aware of this lawsuit since 2023, many high-ranking UO personnel recently testified that UO's athletic department does not take *any* steps to assess program-wide

differences in treatment, benefits, financial aid, or participation opportunities that it provides to male and female varsity athletes. Athletic Director Rob Mullens testified that he did not ask anyone on staff, or outside it, to assess Title IX compliance for athletic financial aid. Mullens Depo 115:6-17; *see also id.* at 106:2-107:25 (prior to *House* settlement in 2024-25, he did not recall asking anyone to compare participation rates between men and women); Johnson Depo 153:14-19 (Q: "[I]n your role as the Title IX coordinator you never perform an assessment of whether or not the university is in compliance with Title IX as it pertains to athletic financial aid. Right? A. I do not perform that assessment."). Senior Associate Athletic Director and Chief Compliance Officer Jody Sykes, who also serves as sport administrator for women's golf and women's beach volleyball, testified that "I don't compare the women to the men, no," when it comes to the quality of equipment, gear, and other benefits provided for those sports. Sykes Depo 222:6; *see also id.* 210-11. Senior Associate Athletic Director and Chief Financial Officer Billy Blood testified that, although UO's software system could track and report on spending in different categories for men's teams compared to women's teams, he had never been asked to prepare such reports. Blood Depo. 72:22-73:10; *see also id.* 72:19-21 ("Have you had any training on gender equity in athletics? A. No.").

The Department has chosen to allocate responsibilities for determining treatment of different teams among different administrators in a way that limits the university's ability to compare treatment of men and women overall and makes it difficult for UO to analyze—and thus to prevent or remedy—Title IX violations. Each team's head coach reports directly to an assigned "sport administrator" who directly oversees a limited number of teams. *See* Mullens Depo. 54:1-14; Johnson Depo. 21:7-9; Sykes Depo. 34:19-21; 44:7-46:1. UO has delegated to individual sport administrators the responsibility for ensuring that their assigned teams are

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    9

"providing an equitable experience for their team and not doing anything that seemed unreasonable." Johnson Depo. 200:12-14. But those administrators do not have visibility into benefits provided to other teams and thus have no means of ensuring that UO treats women's and men's teams equitably overall.

Despite UO's failure to itself conduct the analysis necessary to evaluate whether its varsity sports program as a whole is in compliance with Title IX, the Department-wide evidence obtained by plaintiffs in discovery (which remains ongoing) will be sufficient to establish on a classwide basis that the significant disparities in the treatment and benefits, athletic financial aid, and participation opportunities that UO provides to women versus men violate Title IX.

**B.  Count I: Common evidence, including expert testimony, can establish that UO provides better treatment and benefits overall to male athletes than to female athletes.**

Classwide data documents UO's spending on, and treatment and benefits provided to, male varsity sports compared to female varsity sports, and that data can readily be analyzed by experts to determine whether UO's program as a whole provides equivalence in the availability, quality, and types of treatment and benefits offered to its female and male student athletes.

To analyze plaintiffs' equal treatment and benefits claim, determine whether or not treatment and benefits provided to male and female athletes are equivalent, and determine the extent to which, if at all, any differences in UO's treatment of male and female athletes are justified by legitimate sport-specific needs (as Title IX allows a defendant to establish), plaintiffs will rely on the expert testimony of Donna Lopiano, one of the country's foremost experts on gender equity and athletics. Lopiano has extensive experience, including as an athletics director, and is frequently called upon to conduct Title IX reviews of college athletic programs both in litigation and for institutions themselves as part of her consulting practice. Tholin Decl. Ex. A ("Lopiano Rep.") at 5-7. Lopiano has provided testimony to congressional committees, to

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                      10

administrative commissions, and in numerous Title IX cases over the last 25 years. Lopiano Rep. at 6.

Lopiano's analysis—based on UO's own documents and data, publicly available information, and an in-person visit and walk-through she will conduct of the applicable sports facilities—will evaluate at a category-by-category level (e.g., practice facilities; competition facilities; sports equipment, supplies, and instructional aids; practice apparel and competition uniforms; transportation, accommodation, and meals; etc.) the treatment and benefits provided by UO to its female and male varsity teams. This is the same methodology that universities apply when assessing their own Title IX compliance. Lopiano Rep. at 36-46; *see id.* at 36 ("Gender equity consultants … perform this task on a regular basis when they are retained by institutions to assist them in determining whether they are meeting Title IX's sex equity requirements…"). Lopiano's attached report describes her proposed methodology in detail. Lopiano Rep. Part VII & Ex. E. This includes, for example, the assessment of facilities. Lopiano will be able to "conduct an in-person facility walk-through accompanied by a photographer/videographer in order to personally observe the existence of benefits and treatment elements in addition to examining documents related to physical facilities, such as facility maps, records of renovations or new facilities, and blueprints" in order to determine the classification of each element of the facility category, and then compare the facilities provided to women's and men's teams on a classwide basis. Lopiano Rep. at 41-42.

UO has already produced extensive classwide data demonstrating that it allocates millions of dollars more to its male than female teams. That same data will enable the parties and their experts to determine the extent, if any, to which any portion of that disparity is justified by legitimate sports-specific requirements. In particular, the Department creates a budget

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                      11

spreadsheet for each team, starting with a template based on the prior year's budget, which sorts spending into categories such as "equipment," "team travel," "training," and "recruiting," and breaks those numbers out further in separate tabs. *E.g.* Tholin Decl. Exs. I, K; Blood Depo. 42:1-23. Those team spreadsheets are also incorporated into a total master budget for the Department each fiscal year. *E.g.* Tholin Decl. Exs. J, L.

In addition to each year's sports budgets, the Department tracks actual per-team spending as required for its NCAA reporting obligations. *See* Tholin Decl. Exs. O-S; Blood Depo. 146:5-16; 172:22-175:25. This data is also available on UO's systems and can be extracted and categorized by sport and expense category. *See* Tholin Decl. Ex. M; Blood Depo. 146:23-147:3 ("Q. Okay. So if I asked you to use this report to determine how much money the football team had spent on the training table category, would you be able to do that? A. Yes.").[4]

Plaintiffs' preliminary review of the classwide data produced thus far establishes significant program-wide differences in spending on men's and women's athletics, even after adjusting for differences in team size by considering expenditures on a per capita, or average per athlete, basis. For example, in 2023-24, UO spent $6,199 per capita on student-athlete meals for men compared to just $660 per capita on meals for female student-athletes;[5] $14,841 on per capita team travel expenses for men compared to $11,071 on per capita team travel expenses for women; and $8,073 on per capita recruiting expenses for men compared to only $1,940 on per

---

[4] Some data is broken out further. For example, UO keeps a nutrition log for athletics that tracks the expenses for meals the Department provides, broken out by sport. Blood Depo. 180:21-181:18. This data includes specific descriptions of many of the meals, for example one line item for one filet mignon at $1,250 "that the football program purchased … and were charged back for it in their training table budget." Blood Depo. 181:22-182:8.

[5] UO's records also include more detailed data that will allow for a program-wide analysis and comparison of the types of meals offered to male and female varsity athletes. *See*, *e.g.*, Blood Depo. 180:21-181:18.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    12

capita recruiting expenses for women. Tholin Decl. Ex. B ("Duffus Rep.") tbl. 9. Such disparities

exist even in comparable sports (although Title IX does not require such a comparison): for

instance, from 2020-21 to 2023-24, UO spent more than twice as much ($24 million more) on its

men's basketball program than its women's basketball program. Zyla Decl. ¶6 & Ex. B. UO's

planned budgets for each sport going forward also reflect this disparity in treatment of men and

women. For fiscal year 2026, the total budget for men's sports is $14.81 million compared to just

$4.25 million for women's sports. Tholin Decl. Ex. J.[6]

Common evidence, including Lopiano's expert testimony, will be able to demonstrate

that many of these disparities cannot be justified by nondiscriminatory sport-specific differences.

For example, UO spends significantly more on the head coaches of its male varsity teams than

on head coaches of its female varsity teams. Common evidence can demonstrate that this

difference cannot be justified by market salary differences, because UO spends more on male

team coaches than most other teams in the Big 10 and Pac 12, but less on female team coaches

than most other Big 10 and Pac 12 teams. Zyla Decl. ¶¶3-4 & Ex. A. The disparity at UO

between pay for men's and women's team coaches compared to the market is the highest among

schools in the Big 10 and Pac 12. *Id.* ¶4. These salary disparities have impacted UO's ability to

attract and retain talent for women's teams. Common evidence can demonstrate that coaches of

women's varsity teams have a significantly shorter tenure at UO and have less coaching

experience than UO's coaches of men's varsity teams—the average tenure for UO's head

coaches of men's varsity teams is more than twice as long as the average for women's team head

---

[6] For example, the FY 26 Budget includes an increase of $750,000 for team travel for the men's football team—more than the full budgets of every women's team except women's basketball—in part for the use of a second charter passenger plane for the team and equipment to travel to away games. Blood Depo 102:4-105:4; *see* Tholin Decl. Ex. J.

coaches. Zyla Decl. ¶5; *see* 44 Fed. Reg. at 71,416 (requiring "coaching of equivalent quality"). Coaching is, of course, a critical treatment and benefit provided to female and male athletes.

Common evidence will also be able to establish whether, as plaintiffs allege, "Oregon provides its male student-athletes better equipment and supplies than it provides its female student-athletes." Compl. ¶384. For a comprehensive assessment of equipment and gear, Lopiano would "access all equipment and apparel storage areas in addition to inventory and purchasing documentation" as well as review deposition testimony and other common evidence in the record. Lopiano Rep. at 42. UO tracks all equipment provided to members of the varsity teams.[7] That data demonstrates that UO provides male football players gear in quantities that far surpass what UO provides to every women's team, including new uniform jerseys, cleats, and helmets for almost every home game and eight sets of travel gear. Zyla Decl. ¶8. The disparities extend far beyond football. As just one example, an analysis of the quantity of equipment and gear UO provided to the men's and women's golf teams from 2021-22 to 2024-25 shows that each member of the men's team received new bags each season while the members of the women's team only received one bag; the men on average received eight golf gloves each year, while the women only received an average of five; and the men received thermals and running tights, which UO did not provide to the women. *See id.* This data reinforces the testimony of Jody Sykes, the sport administrator for women's golf and beach volleyball, who admitted she does nothing to ensure that the gear women on those teams receive is equitable to what men receive. Sykes Depo. 210:18-211:1.

Additional common evidence and data will be used to establish whether UO has provided—and is continuing to provide—unequal publicity to male and female athletes, and

---

[7] Thus far, UO has provided data for all teams except men's basketball and men's tennis.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                      14

whether these and other disparities in UO's support caused disparities in the values of name, image, and likeness ("NIL")-related contracts, treatment, and benefits that male and female athletes receive. *See* Compl. ¶¶509-25; 34 C.F.R. §106.41(c) (listing "publicity" as one benefit relevant to equal treatment claim under Title IX). Since July 1, 2021, after the Supreme Court's decision in *NCAA v. Alston*, 594 U.S. 69 (2021), student athletes have had the ability to earn money through NIL. The Department centrally tracks student-athlete NIL deals. Students were previously required to submit any NIL deals above $600 to Opendorse, including NIL deals secured through third-parties like Division Street. Mullens Depo. 126:5-24. Reports generated by that system "will reflect everything the student athlete disclosed to Opendorse." Sykes Depo 203:14-18.

As a result of the recent *House* settlement, the specific proof of NIL-related violations will change starting in 2025-26, but the evidence will still be classwide. Athletic Director Mullens testified that, due to the *House* settlement, "there's two separate pieces to NIL": "the cap management system," also called revenue sharing, and "the clearinghouse, which has now been labeled NIL Go." Mullens Depo. 129:17-23. Revenue sharing refers to payments made directly from UO to varsity athletes, while NIL Go records NIL deals with third parties. *See id.*; Sykes Depo. 40:15-20 (describing how NIL Go reporting works). The data demonstrating revenue sharing and third-party NIL deals will provide common, classwide evidence for adjudicating the 2025-26 NIL component of plaintiffs' equal treatment and benefits claim.

C. **Count II: Common evidence can establish that UO provides female athletes unequal athletic financial aid compared to male athletes.**

UO allocates athletic financial aid on a team-by-team, not athlete-by-athlete, basis. As the UO Student-Athlete Handbook 2024-2025 explains, "[e]ach varsity sport is provided an athletic scholarship budget within the guidelines of the NCAA Big Ten, and Athletic Department

budget." Tholin Decl. Ex. T at UO0125550. Mullens confirmed that, through 2024-25, UO told each team, "with the exception of beach volleyball," a maximum number of scholarships it could offer rather than a specific dollar amount, set at the NCAA limits. Mullens Depo. 141:11-143:18; Johnson Depo. 157:6-25. Mullens testified, though, that the Department did nothing to assess whether UO was providing equal athletic financial aid as required by Title IX. Mullens Depo. 115:1-17. For example, even though Title IX requires UO to provide substantially proportionate amounts of athletic financial aid to men and women, the Department has never considered adjusting the scholarships it awards to men's and women's teams (even within the NCAA's limits) to satisfy that statutory requirement. Mullens Depo. 112:1-114:25. Nor has it apparently considered changing its facially discriminatory summer aid policy to provide more aid to women, *see infra* at 17-18, or that if it increased the number of women's varsity teams, it could correspondingly increase the number of scholarships available to its women athletes, thereby achieving the required equality.

Additionally, UO did not award any scholarships to the women's beach volleyball team until 2024-25, when the Department "developed a plan to phase in" the six scholarships allowed for that team under the then-existing NCAA limit over three years, "so two, four, six." Sykes Depo. 183:16-21. This centralized decision was made for budgetary reasons. *Id.* 185:12-14.

In 2025-26, the *House* settlement changed the NCAA's approach to athletic scholarship and roster limits. Both before and after *House*, however, the amount of athletic scholarship money allocated to women as opposed to men is centrally determined by the Department, which decides how many scholarships are allocated to each of UO's sex-segregated teams. *See* Sykes Depo. 54:20-56:2.

UO's records provide common, classwide data that can be used to compute the

percentage of financial aid awarded to athletes on men's and women's teams. *See* Lopiano Rep. Part VI; Duffus Rep. tbl. 3. UO's records include NCAA reports with participation counts for each sport, as well as records of the amount of athletic financial aid awarded to men's and women's teams. Tholin Decl. Exs. O-S. A preliminary review of these records demonstrates that plaintiffs will be able to show that UO has favored men's teams over women's teams in the provision of athletic financial aid. Between 2020-21 and 2023-24, the annual disparity in financial aid awarded to male and female athletes ranged from 2.1% to 3.7%, representing a shortfall of hundreds of thousands of dollars in athletic financial aid provided to women each year. Duffus Rep. tbl. 3.[8]

Plaintiffs will also be able to establish on a classwide basis that UO's common summer financial aid policy treats male student athletes much better than female student athletes. UO grants summer aid to all players on its men's football, men's basketball, and women's basketball teams who are awarded athletic financial aid during the school year—103 men and only 12 women in 2023-24. Zyla Decl.¶7; Sykes Depo. 155:1-156:22; 160:20-161:2 (men's and women's basketball and football have summer aid automatically granted by the Department). By contrast, as a matter of policy, UO allows its other varsity athletes access to summer aid only if necessary to maintain their eligibility to compete in NCAA tournaments, or in other similarly narrow circumstances. Tholin Decl. Ex. F; Mullens Depo. 189:5-18; Sykes Depo. 163:15-164:8. This classwide policy can be used to show that UO provides over 38% of male athletes (football and basketball players) guaranteed summer aid, while less than 5% of female athletes benefit

---

[8] The NCAA report for 2024-25 is not yet available, but the underlying data is available on a program-wide basis from information in UO's records that the Department tracks through the year and compiles on an annual basis. *See* Mullens Depo. 100:15-21. Counsel's preliminary analysis of that underlying data shows a disparity in 2024-25 even greater than in previous years.

from similar guarantees. Zyla Decl. ¶7. Further, plaintiffs will be able to demonstrate with common evidence that there is no non-discriminatory reason for this facially discriminatory policy, as other teams are similarly required to be on campus during the summer. *See, e.g.*, Tholin Decl. Ex. I (email attached to women's acro and tumbling budget requesting additional funds and explaining "[t]he need to report early for our sport is crucial for preparation and to lower the risk of injury for our student-athletes").

### D. Count III: Common evidence can establish that UO does not provide female students equal opportunities to participate in varsity sports as compared to male students.

Plaintiffs will be able to use UO's own program-wide data to demonstrate that it has offered proportionally more intercollegiate-level varsity participation opportunities to its male students than to its female students for more than 20 years. In 2023-24, for example, women represented 56.4% of the total undergraduate population at UO, but the squad lists show that women represented only 46.5% of the varsity student athletes. Lopiano Rep. at 50, tbl. 8.

This common data can be used to determine whether UO meets the "substantial proportionality" prong of plaintiffs' participation claim. Substantial proportionality is met if "'the number of additional participants ... required for exact proportionality' [is] insufficient 'to sustain a viable team.'" *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014) ("*Ollier III*") (quoting *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 94 (2d Cir. 2012)). The available data will allow plaintiffs' expert to calculate the "participation gap," or the difference between the percentage of women and men in full-time undergraduate enrollment and the percentage of male and female varsity student athletes. *See* Lopiano Rep. VIII.A. (describing methodology). An analysis of the data provided in discovery shows that the participation gap has been more than 100 students in every year going back at least to 2020-21. Lopiano Rep. at 51, tbl. 9. Common evidence can also be used to show that this disparity is more than enough to field

a viable team, as UO's participation gap is larger than all current women's teams at UO, Tholin Decl. Ex. S at UO0000732, and exceeds the roster limit of every women's sport under the *House* settlement. *See id.* Ex. U (e.g., roster limit is 50 for women's equestrian team, 65 for women's stunt). The current maximum roster limit for a Division I women's rowing team is 68, *id.*, and a rowing team can be significantly smaller than that. *See Lazor v. Univ. of Connecticut*, 560 F.Supp.3d 674, 682 (D. Conn. 2021) (finding credible rowing coach's testimony that an "ideal team size is 40 to 42 members."). The maximum squad size of a rowing team at the NCAA Championships is only 25. NCAA, 2024 Division I Rowing Championships Participant Manual, p. 30, https://ncaaorg.s3.amazonaws.com/championships/sports/rowing/d1/2023-24D1WCR_ParticipantManualFinals.pdf. The maximum squad size of a women's equestrian team is 50, and very successful teams can be much smaller. Tholin Decl. Ex. U; *see* Dartmouth Sports, *Big Green Capture NCEA Single-Discipline National Championship*, April 19, 2025, https://dartmouthsports.com/news/2025/4/19/equestrian-big-green-capture-ncea-single-discipline-national-championship.aspx (2025 national championship winning varsity equestrian team from Dartmouth had only 16 women).

Because the classwide data establish significant disproportionality, UO will have to defend this claim based on either prong two or three, both of which also depend on common evidence. Prong two requires UO to prove it has a "history and continuing practice of program expansion" for the underrepresented sex. 44 Fed. Reg. 71,418. The relevant evidence for that defense is program-wide. UO's decision about whether to add another varsity team is "an institutional decision" that Johnson testified would be made "with the leadership of Rob Mullens, our athletic director, and the president." Johnson Depo. 119:2-6; *see* Mullens Depo. 16:3-24 (discussing centralized decision-making process). Yet despite having multiple women's club

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    19

sports with robust participation and a history of success, UO has not introduced a new varsity team for over a decade. Mullens Depo. 108:16-21. Accordingly, common evidence will establish that UO cannot prevail on prong two.

Prong three requires UO to establish that, despite the lack of proportionality or history of program expansion, "it nonetheless 'fully and effectively accommodate[s]' the interests of women." *Mansourian*, 602 F.3d at 965 (quoting 44 Fed. Reg. 71,418). This standard likewise requires classwide evidence of the interest and ability among current and prospective UO students as a whole and the steps UO has taken to determine whether to create at least one additional varsity women's team. Plaintiffs will rely on common evidence to show that UO cannot prevail on prong three, given the sports interest and ability of UO female students as a whole. For example, UO's women's club rowing team has continuously existed since 1973. According to both a recent coach of UO's women's club rowing team and the current Head Coach of the University of Washington varsity women's rowing team, UO could field a competitive varsity women's rowing team with club rowers, other students on campus, and recruits from the same geographic pool in which UO recruits athletes for its existing varsity teams. Hedeen Decl. ¶5; Farooq Decl. ¶¶11, 13. A varsity rowing team would have accessible facilities and available competition in the Big 10 Conference and at the Division I level generally. Hedeen Decl. ¶¶6, 7; Farooq Decl. ¶¶14-17. Whether there is interest and ability to support one or more other varsity women's team, for example women's equestrian or women's stunt, will depend on common, classwide evidence as well.

UO's most recent decision not to add any new women's teams was based solely on the results of a single athletic interest survey that it conducted just before the fall term began in 2023, after receiving a pre-litigation letter from plaintiffs' counsel that summer. Johnson Depo.

102:1-6; Tholin Decl. Ex. D; *id.* Ex. V. UO has not taken any other steps to evaluate whether there is unmet interest and ability for additional women's varsity sports. Johnson Depo. 120:17-121:4. The Department has not evaluated participation rates of female students in club sports at the university, spoken with coaches or students on women's club teams regarding interest, attended women's club sports intercollegiate competitions, or even met with female students who have sent emails to the Department requesting to add a varsity sport. Johnson Depo. 100:19-22, 110:10-17, 112:5-17; 120:2-16. *See* U.S. DOE, OCR, Dear Colleague Letter (April 20, 2010) (providing non-exhaustive list of indicators institutions should evaluate to assess interest and ability).[9] Analysis of UO's survey data and UO's failure to have taken any other steps to assess interest and ability is common evidence that plaintiffs will be able to use to show the weakness of UO's justification for not adding a team. The 2023 survey itself was circulated before the start of the academic year, and only 14% of UO's female students responded. Tholin Decl. Ex. D at UO0000012. UO improperly chose to treat the students who did not respond to a pre-semester survey (86% of female students) as having no athletic interest or ability. Johnson Depo. 124:20-22. And the survey itself revealed interest sufficient to sustain a team: 3.9% (57) of female respondents expressed interest in participating on a varsity stunt (competitive cheerleading) team. Tholin Decl. Ex. D at UO0000018.

In evaluating UO's prong three defense, plaintiff's expert and the Court will be able to evaluate the survey, deposition testimony, documents, and publicly available data to "assess, on a classwide basis, whether there are sports not currently offered by OU in which females have the interest and ability to participate and for which there are an adequate number of institutions

---

[9] Available at https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-20100420.pdf.

available to compete against within OU's normal geographic competition footprint." Lopiano Rep. VIII.C.

### E.  Common evidence can establish the extent to which the class was damaged.

Plaintiffs' damages expert David M. Duffus will assess the classwide damages caused by UO's discriminatory treatment and benefits and unequal provision of financial aid (Counts I and II). Duffus is well-qualified to assess these damages, given his experience as a forensic accountant and as the past Chairman of the American Institute of Certified Public Accountants' Economic Damages Task Force. Duffus Rep ¶¶5-6. In his report, Duffus opines that "reliable class-wide damages models can be developed to quantify the damages associated with each of the damages claims," and he sets out the methodology behind those models. Duffus Rep. ¶17. The models he proposes rely on available classwide data, including UO's centralized expenditure documents and NCAA reports, as well as common public information, for the equal treatment and benefits claim, *see* Duffus Rep. ¶¶50-53, and NCAA data for the financial aid claim, *id.* ¶37.

### F.  Representative plaintiffs

Ashley Schroeder, Batia Rotshtein, Carly Wallace, Natasha George, and Abigail Plevin are current or former beach volleyball players who seek to represent the classes on the treatment and benefits (Count I) and athletic financial aid (Count II) claims. Rotshtein Decl. ¶¶1, 3; Schroeder Decl. ¶¶1, 3; Wallace Decl. ¶¶1, 3; George Decl. ¶¶1, 3; Plevin Decl. ¶¶1, 3. Plaintiff George is a current student, and Plaintiffs Schroeder, Rotshtein, and Plevin were seniors when the Complaint was filed. Rotshtein Decl. ¶2; Schroeder Decl. ¶2; George Decl. ¶2; Plevin Decl. ¶2. All four seek to represent the injunctive relief and damages classes for Counts I and II. Plaintiff Wallace seeks to represent the damages classes for those counts.

Elise Haverland, River Ribeiro, Sophia Schmitz, and Sydney Weddle were all current students and members of the women's club rowing team when the Complaint was filed, and all

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    22

bring the same athletic participation opportunities claim (Count III). Weddle Decl. ¶¶1-3; Schmitz Decl. ¶¶1-3; Haverland Decl. ¶¶1-3; Ribeiro Decl. ¶¶1-3. They each seek to be appointed class representatives for the injunctive relief class for Count III.

## PRIOR PROCEEDINGS

Plaintiffs filed this class action in December 2023. ECF 1. On July 3, 2024, UO filed three dispositive motions, ECF 25, 26, 27, which this Court denied in whole or in part. ECF 83. In its rulings, the Court held that plaintiffs have standing to seek damages for their unequal treatment and benefits claim and their unequal financial aid claim, ECF 83 at 8-10, and that plaintiffs who were students at the time of filing have standing to pursue injunctive relief and their claims will not become moot because of their graduation. ECF 83 at 10-17. In denying UO's motion to dismiss Count I (the unequal treatment and benefits claim), the Court held that the complaint states a claim focusing on UO's treatment of its men's and women's programs overall, rejecting defendants' argument that plaintiffs compared the treatment of only beach volleyball and football. The Court also held that the applicable statute of limitations is two years from the time the plaintiffs knew or had reason to know that UO was discriminating against female students and student athletes, meaning the statute goes back to at least 2020-21. ECF 83 at 24-29.

Discovery is ongoing and, at the Court's suggestion, has thus far focused on matters applicable to class certification.

## ARGUMENT

### I.    Legal Standards for Class Certification.

A class should be certified if the four prerequisites of Rule 23(a) are met and if the action satisfies one of the three provisions of Rule 23(b). *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th

Cir. 2023). The four prerequisites under Rule 23(a) are numerosity, commonality, typicality and adequacy of representation. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). Plaintiffs here seek to certify three injunctive relief classes under Rule 23(b)(2) and two damages classes under Rule 23(b)(3).

Although the Court conducts a "rigorous analysis," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011), plaintiffs need only show that Rule 23's requirements are met "by a preponderance of the evidence." *Olean*, 31 F.4th at 665. The evidence considered "should not be limited to only admissible evidence." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018). Rather, the Court may consider "material sufficient to form a reasonable judgment" regarding Rule 23's requirements. *Id.*; *see Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 864 (9th Cir. 2025) (in evaluating an expert model at the class certification stage, "the court considers only if expert evidence is useful in evaluating whether class certification requirements have been met" without conducting a full *Daubert* analysis) (quotation omitted). Merits questions may only be considered to the extent they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

**II.      Plaintiffs Satisfy All the Rule 23(a) Requirements.**

1.  Numerosity. Each class is "so numerous that joinder of all members is impracticable." F.R.C.P. 23(a)(1). "'There is no threshold number of class members that automatically satisfies this requirement,' but 40 is generally an adequate number." *Reichert v. Keefe Commissary Network, L.L.C.*, 331 F.R.D. 541, 550 (W.D. Wash. 2019) (quotation omitted).

Here, each of the proposed injunctive relief and damages classes satisfies the numerosity requirement. Between 228 and 248 female athletes participated in UO's varsity teams each year

from 2020-21 to 2023-24. Duffus Rep. tbl. 1. The injunctive relief classes are even larger when all prospective and future female students are considered, and certification is appropriate to protect the interests of these currently unknown class members. *See, e.g., A.B.*, 30 F.4th at 838 (claims of future students "makes the impracticability analysis all the more lopsided in favor of finding numerosity"); *Cmtys. for Equity*, 192 F.R.D. at 572.

2.  Commonality. There can be no dispute that "there are questions of law or fact common to the class." F.R.C.P. 23(a)(2). Only one common question is necessary. *Dukes*, 564 U.S. at 359. "A question is common if the issue can be proven by generalized, class-wide proof." *Hanney v. Epic Aircraft, LLC*, 2024 WL 2106210, at *3 (D. Or. May 10, 2024) (citing *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016)).

Each of plaintiffs' claims raises one or more common questions that will be answered with common evidence, including UO's data and testimony of Department witnesses, as analyzed by plaintiffs' experts. Fundamentally, "[t]he common questions of law and fact belonging to both the named plaintiffs and the larger class include whether [the university] is in compliance with its obligations under Title IX and, if not, whether any proposed corrective actions [the university] might take would bring it into compliance with the statute." *Foltz*, 269 F.R.D. at 423.

The legal question of whether UO is in compliance with Title IX turns on many common factual questions, including but not limited to:

*   What treatment and benefits (including equipment, uniforms, coaching, facilities, travel, academic support, etc.) does UO provide to all its male teams combined as compared to all its female teams combined? *See* Lopiano Rep. Part VII & Ex. E (listing treatment and benefits elements to be examined and methodology for program-wide comparison).

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    25

- How much athletic financial aid does UO provide on a program-wide basis to all its male athletes combined as compared to all its female athletes combined? *See* Lopiano Rep. at 32-33 (describing methodology used to make this calculation).

- "Does [UO] provide athletic participation opportunities to its female students compared to its male students in a substantially proportionate manner," *Portz*, 297 F.Supp.3d at 945, or fully and effectively accommodate the interests of current and future female students? *See* Lopiano Rep. at 47-53.

"Resolution of threshold questions as to the allocation of benefits and opportunities between male student-athletes and female student-athletes at the athletic department level are of general applicability to the class because they go directly to determining whether there has been a Title IX violation with respect to effective accommodation, equal treatment or both." *Anders v. Cal. State Univ.*, 2022 WL 3371600, at *8 (E.D. Cal. Aug. 16, 2022) ("*Anders I*"). These common questions are more than sufficient for certification.

 3. <u>Typicality.</u> Plaintiffs' claims are "typical of the claims ... of the class." F.R.C.P. 23(a)(3). Commonality and typicality "tend to merge" as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5.

 The claims of the proposed class representatives are typical of those of each class. "[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017). Here, each proposed class representative for Counts I and II alleges that she has been discriminated against by UO through

UO's unequal treatment of its women's varsity athletics program and through UO's unequal provision of opportunities for financial aid experienced by the entire class. The various "manifestations of discrimination" in treatment and benefits experienced by women on different varsity teams, "such as inequitable facilities, scheduling," uniforms, or coaching, are all part of the same underlying course of conduct against the class as a whole, supporting class certification. *Cmtys. for Equity*, 192 F.R.D. at 573 (finding typicality in Title IX treatment and benefits claim).

Similarly, each proposed class representative for Count III suffered from UO's illegal failure to offer female students an equitable opportunity to participate in varsity intercollegiate athletics. Again, "their claims are typical of those of the class because they arise from the same practices:" UO's "failure to comply with Title IX by providing inadequate athletic opportunities … for its female students." *Foltz*, 269 F.R.D. at 423.

That the proposed class representatives for each class are on the same team does not defeat typicality for any class. Courts have held that even where named plaintiffs were motivated by a university's actions toward a particular sport or sports, "their legal theories and desired relief extend to all female student-athletes in the class," thus satisfying typicality. *Portz*, 297 F.Supp.3d at 947 (certifying participation, financial assistance, and benefits class claims brought by members of two teams). In *Foltz v. Delaware State University*, the district court squarely rejected the university's argument that the proposed class representatives—all members of the equestrian team—did not share common interests with the women who played other sports. 269 F.R.D. at 421, 423-24. As the court explained, "Plaintiffs' legal theories and desired relief are not limited to DSU's treatment of the equestrian team. Instead, their theories of discrimination are common to and typical of those of the class, and the broad relief they seek (compliance with Title IX) would benefit the entire class." *Id.* at 423. Analyzing the claims of any class member

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    27

requires the same program-wide analysis, regardless of which team the player is on.

4. <u>Adequacy.</u> The class representatives will "fairly and adequately protect the interests of the class." F.R.C.P. 23(a)(4).

There are no conflicts of interest between the class representatives and the classes. The proposed class representatives asserting the equal treatment and benefits (Count I) and financial aid (Count II) claims all share the same interest in "ensur[ing] equal athletic financial aid, and equal treatment and benefits, for all female varsity athletes going forward, and to ensure that all female varsity athletes, on all teams, are adequately compensated for the unequal athletic financial aid and treatment and benefits we received." Rotshtein Decl. ¶10; Schroeder Decl. ¶12; Wallace Decl. ¶7; George Decl. ¶9; Plevin Decl. ¶7. The class representatives asserting the participation claim (Count III) seek to compel UO to provide equal varsity participation opportunities for female students as required by Title IX, even if "relief might involve elevating one or more women's teams other than rowing to varsity status." Weddle Decl. ¶17; Schmitz Decl. ¶19; Haverland Decl. ¶19; Ribeiro Decl. ¶18. Each of those plaintiffs are adequate class representatives. *Portz*, 297 F.Supp.3d at 947 (finding adequacy for class representatives on two teams where "[a]ll Plaintiffs in this case have filed declarations stating that their primary goal is 'to force SCSU to provide sex-based equality in athletics *overall*'"); *see Anders v. Cal. State Univ.*, 2024 WL 177332 (9th Cir. Jan. 17, 2024) ("*Anders II*") (reversing district court's denial of class certification for abuse of discretion where district court had held plaintiffs inadequate because they were all members of lacrosse team).

The proposed class representatives understand their responsibilities and have each provided valuable assistance in the investigation and prosecution of this matter. Rotshtein Decl. ¶¶11-18; Schroeder Decl. ¶¶13-20; Weddle Decl. ¶¶12-17; Schmitz Decl. ¶¶14-19; Haverland

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    28

Decl. ¶¶14-19; Ribeiro Decl. ¶¶13-18; Wallace Decl. ¶¶8-13; George Decl. ¶¶11-15; Plevin Decl. ¶¶9-14; Bullock Decl. ¶8.

Plaintiffs are represented by experienced class counsel who have investigated and vigorously pursued the claims in this action, have considerable experience litigating Title IX and other discrimination class actions, and have adequate resources to litigate this action. Bryant Decl. ¶¶2-13; Bullock Decl. ¶¶3-9; Middleton Decl. ¶¶3-10; Murray Decl. ¶¶4-16.

**III.    The Injunctive Relief Classes Should Be Certified Under Rule 23(b)(2).**

The Court should certify injunctive relief classes for plaintiffs' Counts I, II, and III. Rule 23(b)(2) authorizes injunctive relief classes where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." F.R.C.P. 23(b)(2). Under Rule 23(b)(2), "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998); *see also id.* ("23(b)(2) was adopted in order to permit the prosecution of civil rights actions."). UO has chosen to operate a sex-segregated athletic program. It does not provide different programs for each individual student. Rather, it treats all class members the same: UO provides certain treatment and benefits to female teams and certain treatment and benefits to male teams that can be considered as a whole, decides the overall amount of financial aid it will provide to all female teams and all male teams, and offers the same array of varsity sports to all female students. UO has necessarily acted in a way that is generally applicable to the classes.

Accordingly, a single injunction per class—requiring UO to provide female athletes equal treatment and benefits as compared to male athletes, equal financial aid as compared to male

athletes, and/or to provide female students equal participation opportunities as compared to male students—"would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. Indeed, the "classes seek the same remedy: that [UO] abide by Title IX." *Anders III*, 2025 WL 755664, at *11. That is sufficient to certify each of the injunctive relief classes. *Id.*

IV.     **The Damages Classes Should Be Certified Under Rule 23(b)(3).**

The Court should also certify the damages classes for equal treatment and benefits (Count I) and for equal athletic financial aid (Count II) under Rule 23(b)(3). Rule 23(b)(3) authorizes a class action where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." F.R.C.P. 23(b)(3). This Court has already held that damages are available for plaintiffs' claims. ECF 83 at 9-10; *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) ("[A] damages remedy is available for an action brought to enforce Title IX."). Those damages can be pursued on a classwide basis under Rule 23(b)(3).

1.  Predominance. Rule 23(b)(3)'s predominance inquiry assesses whether the class's interests are "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry calls for a weighing of "the relation between common and individual questions in a case." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Predominance does not require a showing that there are no individual issues, but rather an analysis of "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* The same factors that support commonality in this case also demonstrate predominance.

*Treatment and Benefits.* As discussed in Part II, *supra*, the applicable standards for

liability in Title IX athletics cases are particularly well-suited to class treatment, as allegations of "unequal treatment and benefits[] explicitly rest on allegations of systemic discrimination … that, if proved, would necessarily apply to all current female student athletes." *A.B.*, 30 F.4th at 837. There are thus substantial common issues and questions relevant to plaintiffs' treatment and benefits claim, including:

- What treatment and benefits (including equipment, supplies, uniforms, coaching, facilities, travel, meals, recruitment, academic support, etc.) did UO provide to all its male teams combined as compared to all its female teams combined? *See supra* at 25.

- Which elements of treatment and benefits provided to each team can be classified as superior, which adequate, and which inadequate on a sport-neutral basis? *See* Lopiano Rep. Ex. E (listing treatment and benefits elements to be examined).

- For each element of treatment and benefits, what proportion of female student athletes did UO provide with superior, adequate, and inadequate treatment or benefits?

- For each element of treatment and benefits, what proportion of male student athletes did UO provide with superior, adequate, and inadequate treatment?

These questions far outweigh any non-common, individual issues that might arise in this case.

Duffus's expert report demonstrates that plaintiffs will be able to calculate classwide damages for this claim. The Ninth Circuit has "repeatedly found class treatment to be appropriate … based upon a showing that damages *could* be calculated on a classwide basis, even where such calculations have not yet been performed." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025); *accord Noohi*, 146 F.4th at 864.

Duffus explains how damages can be calculated for the different categories of treatment

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                                   31

and benefits used to determine liability for Count I. His model sets out the method of calculating damages most appropriate to each category that will be analyzed by Lopiano (or addressed by other evidence), allowing the calculation to be adjusted if Lopiano's report (or other evidence) demonstrates that disparities in some elements of treatment and benefits are explained by nondiscriminatory sport-specific variations. *See* Duffus Rep. ¶¶60-68. Duffus's model relies on common evidence, specifically UO's own documents currently available and the further information available as discovery continues, including information from a site visit, as well as additional publicly available data that he explains can be gathered and assessed on a classwide basis. *Id.* ¶¶64-68; *see* Lopiano Rep. at 42. Duffus' proposed damages model is thus entirely consistent with plaintiffs' theory of liability for the treatment and benefits claim.

*Financial Aid.* Predominance is also satisfied for plaintiffs' claim for unequal availability of athletic financial aid. As with the evaluation of treatment and benefits, the assessment of the financial aid claim is inherently conducted on a program-wide basis. *See supra* at 6-7. Title IX requires athletic financial aid to be provided in substantial proportionality to the number of varsity athletes of each gender, *see* 1998 OCR Guidance; *supra* at 7, which requires an assessment of only common questions:

- How many male and female UO students participated in intercollegiate varsity athletics?

- How much total financial aid did UO award to male and female athletes?

- If the disparity between the amount of financial aid awarded to male and female athletes exceeds 1%, does UO have any legitimate, nondiscriminatory reasons for the disproportionate allocation?

These claims do not depend on an analysis of whether any individual athlete received or did not receive a scholarship, and so common questions far again outweigh individual ones.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION    32

Duffus also provides a method for calculating classwide damages for the financial aid claim. Damages can be determined by calculating the additional money that female athletes should receive in order to make the combined amount received by its female athletes proportional to the total amount of athletic financial aid that UO provided to its male athletes. Duffus Rep. ¶¶40-41. This amount, which Duffus explains how to calculate, is the appropriate measure of damages, as the amount of money given to male athletes since 2020-21 is fixed and cannot be reallocated to female athletes. *See* Duffus Rep. ¶40-41.[10]

Duffus's methods of calculating damages for both the treatment and benefits claim and the athletic financial aid claim are also consistent with similar types of contract damages awarded by courts. *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212 (2022) (contract analogy is relevant to relief for claims based on statutes enacted under Spending Clause). For example, where a promisor violates a most-favored nations clause that guarantees the promisee at least as favorable terms as a third party, federal courts consistently hold that the promisees are entitled to damages sufficient to place them in the same position as the third party. *See, e.g., See Rambus Inc. v. Hynix Semiconductor Inc.*, 629 F.Supp.2d 979, 1012 (N.D. Cal. 2009); *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 823 F.3d 1006, 1007-08, 1013 (5th Cir. 2016). Likewise here, the class is entitled to damages that would place varsity female athletes as a whole in a position of equality with varsity male athletes as a whole, as UO agreed to do pursuant to Title IX when it accepted federal funds. Duffus's models thus "chart out a path to obtain all necessary data [to calculate damages] and demonstrate that the proposed method will be viable as applied to the facts of" this case, given the Title IX standards and possible bases

---

[10] Moreover, this calculation can be adjusted to account for any quantifiable non-discriminatory factor that UO raises and is able to prove in its defense. Duffus Rep. ¶43.

for liability. *Lytle*, 114 F.4th at 1032.

Duffus's models also describe how classwide damages could be distributed to individual class members. Duffus Rep. ¶44. In any event, to the extent UO may assert individual issues regarding distribution of damages to specific plaintiffs, those do not defeat predominance or preclude certification. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015) ("damage calculations alone cannot defeat class certification").

2. Superiority. Allowing this case to proceed on a class basis is also far superior to requiring class members to litigate their claims individually. Several non-exhaustive factors inform the superiority analysis, including (1) class members' interests in individually controlling their own litigation; (2) the extent and nature of any already pending litigation concerning the controversy; (3) the desirability of concentrating claims in a particular judicial forum; and (4) potential problems that could arise in managing the case as a class action. F.R.C.P. 23(b)(3)(A)-(D). Each factor weighs in favor of certification.

First, class members here have minimal interest in controlling their own separate actions. Any class member who brought an individual claim would have to prove Title IX violations on the same program-wide basis as the current plaintiffs, and the issues in an individual case would be identical to those addressed here. At the same time, prosecuting their claims individually would be impracticable for all or nearly all class members—many of whom are current student athletes with significant time constraints. And "[t]he individual damages of each [student] are too small to make litigation cost effective in a case against funded defenses and with a likely need for expert testimony," which "vividly points to the need for class treatment." *Just Film*, 847 F.3d at 1123.

The second and third factors also favor certification. This Court has already invested

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION                                    34

considerable judicial resources ruling on numerous issues, including UO's three dispositive motions. ECF 25, 26, 27, 83. Plaintiffs are not aware of any other pending lawsuits raising similar claims against UO. Given the University's location, concentrating litigation in this forum is efficient for all parties.

Finally, trial of a certified class action will be manageable. As discussed above, establishing liability for any individual plaintiff would require the same analysis and case management that establishing classwide liability would, as any individual bringing a claim would need to prove that UO engages in program-wide violations. *Supra* Part II. Title IX athletics cases can and have been manageably tried through final judgment. *See, e.g.*, *Paton*, 275 F.3d at 1276 (describing Title IX case appealed after jury trial); *McCormick*, 370 F.3d at 279 (appeal from trial on stipulated facts).

Most of the evidence relating to damages in this case is UO data that can be analyzed by experts, and thus manageably explained to a jury. Those experts will be the principal witnesses in this case, perhaps along with some of UO's own Department staff who will describe its centralized operations and decision-making process with respect to the athletic program as a whole.

Class certification will also not require an unmanageable number of class witnesses. Although plaintiffs may call some plaintiffs and class member witnesses to provide examples and descriptions of the benefits available (and denied) to them as student athletes, most of the evidence relevant to liability will be based on classwide documents and data. Those documents and evidence are in the hands of the University, and not available to any particular class member, who can only directly experience the benefits provided to her own sport. Nor can UO defend itself from classwide liability by calling individual female class members who were treated well

or male athletes who were treated poorly, because it is well-settled that individual treatment is irrelevant under Title IX in comparing men's and women's sports programs as a whole. Moreover, any individual athlete testimony can be easily limited to manage the case and avoid duplicative witnesses.

## CONCLUSION

For all these reasons, the Court should (1) certify the proposed injunctive relief classes under Rule 23(b)(2); (2) certify the proposed damages classes under Rule 23(b)(3); (3) appoint the plaintiffs identified in the Motion as class representatives; and (4) appoint plaintiffs' counsel as class counsel.

Dated: September 22, 2025

Respectfully submitted,

*/s/ Matthew J. Murray*

Jennifer J. Middleton (OSB No. 071510)
jmiddleton@justicelawyers.com
**JOHNSON JOHNSON LUCAS & MIDDLETON PC**
975 Oak St., Ste. 1050
Eugene, OR 97401-3124
Tel: 541-484-2434

Michael Rubin (*pro hac vice*)
Eve H. Cervantez (*pro hac vice*)
Matthew J. Murray (*pro hac vice*)
Robin S. Tholin (*pro hac vice*)
mrubin@altshulerberzon.com
ecervantez@altshulerberzon.com
mmurray@altshulerberzon.com
rtholin@altshulerberzon.com
**ALTSHULER BERZON LLP**
177 Post St., Ste. 300
San Francisco, CA 94108-4733
Tel: 415-421-7151

Arthur H. Bryant (*pro hac vice*)
arthur@arthurbryantlaw.com
**ARTHUR BRYANT LAW, P.C.**

1999 Harrison St., 18th Floor
Oakland, CA 94612-4700
Tel: 510-391-5454

Lori Bullock (*pro hac vice*)
lbullock@bullocklawpllc.com
**BULLOCK LAW PLLC**
309 E 5th Street, Suite 202B
Des Moines, Iowa 50309
Tel: 515-423-0051

*Attorneys for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,964 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED:  September 22, 2025                    By: _s/  Matthew J. Murray_
                                                       Matthew J. Murray