Stephen F. English, OSB No. 730843
SEnglish@perkinscoie.com
Sarah J. Crooks, OSB No. 971512
SCrooks@perkinscoie.com
Adrianna Simonelli, OSB No. 222481
ASimonelli@perkinscoie.com
Colin Lubelczyk, OSB No. 245841
CLubelczyk@perkinscoie.com
Sheila Panyam, OSB No. 245184
SPanyam@perkinscoie.com
PERKINS COIE LLP
1120 NW Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Telephone: 503.727.2000

Thomas J. Tobin, OSB No. 232184
TTobin@perkinscoie.com
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: 206.359.8000

Douglas Park, OSB No. 980904
Dougpark@uoregon.edu
Jeslyn Everitt, OSB No. 190852
Jeveritt@uoregon.edu
University of Oregon
Office of General Counsel
6251 University of Oregon
Eugene OR 97403
Telephone: 541.346.6110

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ASHLEY SCHROEDER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSITY OF OREGON, <br><br> Defendant. | Case No. 6:23-cv-01806-MC <br><br> **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

    A.    Athletics at the University of Oregon ................................................................. 2

    B.    History of Women's Beach Volleyball ............................................................... 3

    C.    History of Women's Rowing ............................................................................... 5

    D.    COVID-19 and its Impact on the University's Athletics Program ...................... 5

    E.    The Class Representatives and Their Claims ....................................................... 6

LEGAL BACKGROUND OF TITLE IX ........................................................................... 7

LEGAL STANDARD FOR CLASS CERTIFICATION ................................................... 9

ARGUMENT ...................................................................................................................... 10

I.    ALL OF THE PROPOSED CLASSES FAIL UNDER RULE 23(A) ........................... 10

    A.    The Beach Volleyball Plaintiffs Cannot Satisfy Rule 23(a). ............................. 10

        1.    The Beach Volleyball Plaintiffs are not typical because they are distinctly unlike other varsity female athletes. ........................................ 10

        2.    The Beach Volleyball Plaintiffs are not adequate class representatives ................................................................................. 17

    B.    The Rowing Plaintiffs Cannot Satisfy Rule 23(a). ............................................. 20

        1.    Plaintiffs' effective accommodation class fails numerosity. ................... 20

        2.    The Rowing Plaintiffs are not typical or adequate .................................. 22

II.    THE DAMAGES CLASSES FAIL RULE 23(B)(3)'S REQUIREMENTS. ................. 23

    A.    Common Issues Do Not Predominate In Plaintiffs' Damages Classes ............... 23

        1.    The treatment and benefits damages class fails predominance. .............. 23

        2.    The financial-aid damages class fails predominance. ............................. 31

    B.    Plaintiffs' Damages Classes Fail Rule 23(b)(3)'s Superiority Requirement. ...... 33

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

# TABLE OF CONTENTS

**Page**

III.   THE PROPOSED INJUNCTIVE CLASSES FAIL TO MEET RULE 23(B)(2). ......... 34

IV.   CONCLUSION ................................................................................................. 35

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.B. v. Hawaii State Dep't of Educ.*,
   30 F.4th 828 (9th Cir. 2022) ................................................................................26

*Allen v. Wright*,
   468 U.S. 737 (1984)........................................................................................27

*Alston v. Va. High School League, Inc.*,
   184 F.R.D. 574 (W.D. Va. 1999).................................................................14, 15

*Alvarez v. NBTY, Inc.*,
   331 F.R.D. 416 (S.D. Cal. 2019) .................................................................23

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013)........................................................................................9

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)....................................................................................17, 18

*Anders v. California State Univ.*,
   2025 WL 755664 (E.D. Cal. Mar. 10, 2025) ...........................................17

*Anders v. California State University*,
   2024 WL 177332 (9th Cir. Jan. 17, 2024) ..............................................18

*Beasley v. Ala. State Univ.*,
   966 F. Supp. 1117 (M.D. Ala. 1997) ........................................................32

*Biediger v. Quinnipiac Univ.*,
   691 F.3d 85 (2d Cir. 2012)..........................................................................9, 17

*Birdsall v. Coolidge*,
   93 U.S. 64 (1876).........................................................................................30

*Black Lives Matter Los Angeles v. City of Los Angeles*,
   113 F.4th 1249 (9th Cir. 2024) ..................................................................9, 23

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)......................................................................................7, 25

*Boucher v. Syracuse Univ.*,
   164 F.3d 113 (2d Cir. 1999)........................................................................18

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## TABLE OF AUTHORITIES

**Page(s)**

*Bowerman v. Field Asset Servs. Inc.*,
   60 F.4th 459 (9th Cir. 2023) ................................................................................29

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ..............................................................................33

*Bryant v. Colgate Univ.*,
   1996 WL 328446 (N.D.N.Y. June 11, 1996) ..............................................15, 18, 35

*Burlington N., Inc. v. Boxberger*,
   529 F.2d 284 (9th Cir. 1975) ................................................................................33

*Cannon v. Univ. of Chicago*,
   441 U.S. 677 (1979) ..............................................................................................26

*Carello v. Aurora Policeman Credit Union*,
   930 F.3d 830 (7th Cir. 2019) ................................................................................27

*City of Los Angeles Dept. of Water & Power v. Manhart*,
   435 U.S. 702 (1978) ..............................................................................................25

*Cohen v. Brown Univ.*,
   991 F.2d 888 (1st Cir. 1993) ................................................................................17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ............................................................................23, 29, 30, 32

*Comcast Corp. v. National Ass'n of Afr. Am.-Owned Media*,
   589 U.S. 327 (2020) ................................................................................................7

*Doe v. Unified Sch. Dist. 259*,
   240 F.R.D. 673 (D. Kan. 2007) ............................................................................27

*Foltz v. Delaware State Univ.*,
   269 F.R.D. 419 (D. Del. 2010) ............................................................................16

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ..............................................................................................34

*Gen. Tel. Co. Sw. v. Falcon*,
   457 U.S. 147 (1982) ................................................................................10, 15, 16, 22

*Grandson v. Univ. of Minnesota*,
   272 F.3d 568 (8th Cir. 2001) ................................................................................13, 34

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

# TABLE OF AUTHORITIES

**Page(s)**

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...................................................................................22

*Heckler v. Mathews*,
  465 U.S. 728 (1984)...............................................................................................27

*In re Artha Mgt., Inc.*,
  91 F.3d 326 (2d Cir. 1996).....................................................................................19

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018).....................................................................................24

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)....................................................................................10

*Ivie v. AstraZeneca Pharms., LP*,
  2024 WL 4553862 (D. Or. Oct. 23, 2024)..............................................................33

*Johannessohn v. Polaris Indus. Inc.*,
  9 F.4th 981 (8th Cir. 2021) .....................................................................................24

*Kim v. Allison*,
  87 F.4th 994 (9th Cir. 2023) ...................................................................................17

*Kulig v. Midland Funding, LLC*,
  2014 WL 5017817 (S.D.N.Y. Sept. 26, 2014).................................................19, 20

*Lab'y Corp. of Am. Holdings v. Davis*,
  605 U.S. 327 (2025) (Kavanaugh, J., dissenting) ...................................................24

*Lilly v. Jamba Juice Co.*,
  308 F.R.D. 231 (N.D. Cal. 2014)............................................................................35

*Miller v. Univ. of Cincinnati*,
  241 F.R.D. 285 (S.D. Ohio 2006) ...........................................................................18

*Monreal III v. Potter*,
  367 F.3d 1224 (10th Cir. 2004) ..............................................................................35

*Murray v. Mayo Clinic*,
  934 F.3d 1101 (9th Cir. 2019) ..................................................................................7

*Nehad v. Mukasey*,
  535 F.3d 962 (9th Cir. 2008) ..................................................................................19

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

TABLE OF AUTHORITIES

**Page(s)**

*Niblock v. Univ. of Kentucky*,
    2024 WL 4891025 (E.D. Ky. Oct. 28, 2024)...........................................................20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) .......................................................................24

*Ollier v. Sweetwater Union High School District*,
    251 F.R.D. 564 (S.D. Cal. 2008) ...................................................................17

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
    667 F.3d 910 (7th Cir. 2012) .........................................................................7

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) .......................................................................34

*Paton v. New Mexico Highlands Univ.*,
    275 F.3d 1274 (10th Cir. 2002) ...................................................................17

*Portz v. St. Cloud State Univ.*,
    297 F. Supp. 3d 929 (D. Minn. 2018)................................................16, 17, 22

*Robb v. Lock Haven Univ. of Penn.*,
    2019 WL 2005636 (M.D. Pa. May 7, 2019)..................................................14, 18

*Ruggles v. California Polytechnic State Univ.*,
    797 F.2d 782 (9th Cir. 1986) .......................................................................33

*Rupe v. Beard*,
    2013 WL 841370 (E.D. Cal. Mar. 6, 2013) ....................................................14

*S.G. ex rel. Gordon v. Jordan Sch. Dist.*,
    2018 WL 4899098 (D. Utah Oct. 9, 2018) .................................................18, 29

*Sacora v. Thomas*,
    2009 WL 4639635 (D. Or. Dec. 3, 2009) .......................................................35

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) .........................................................10, 11, 12, 14

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)...............................................................................2, 24

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...........................................................................2, 26, 28

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## TABLE OF AUTHORITIES

**Page(s)**

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ..........................................................................33

*Volcan Group, Inc. v. T-Mobile USA, Inc.*,
  940 F. Supp. 2d 1327 (W.D. Wash. 2012)......................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).......................................................................................9, 16

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) ...........................................................................23

*Weiss v. York Hospital*,
  745 F.2d 786 (3d Cir. 1984)..............................................................................12

*Wilcox Dev. Co. v. First Interstate Bank of Oregon, N.A.*,
  97 F.R.D. 440 (D. Or. 1983) .................................................................... passim

STATUTES

20 U.S.C. § 1681(a) ..........................................................................................7, 25

28 U.S.C. § 2072(b) ........................................................................................12, 27

Pub.L. No. 93–380, § 844 (1974) ..........................................................................7

OTHER AUTHORITIES

34 C.F.R. § 106.37 .......................................................................................7, 8, 13

34 C.F.R. § 106.41 .................................................................................... passim

43 Fed. Reg. 58,070 (Dec. 11, 1978) ...................................................................30

44 Fed. Reg. 71,413 (Dec. 11, 1979) .......................................................8, 30, 31

Federal Rule of Civil Procedure 23 .......................................................... passim

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## INTRODUCTION

Plaintiffs' Motion for Class Certification asks this Court to do the unprecedented: certify sweeping Title IX classes comprising every single female varsity athlete at the University of Oregon (the "University" or "UO") (at least several hundred athletes) based on the experiences of five members of a single, uniquely situated team. Plaintiffs' novel proposal contravenes numerous provisions of Rule 23 and binding precedent. Their Motion should be denied in full.

Plaintiffs' first problem is with Rule 23(a)'s typicality requirement. The Beach Volleyball Plaintiffs cannot satisfy that standard because their experiences are not typical of the broader female varsity athlete population.[1] That atypicality reflects the fact that their playing careers coincided with a unique time in the beach volleyball program's short history: while that team was still emerging, before it had transitioned out of being an offseason outlet for indoor volleyball players, and amidst the COVID-19 pandemic that significantly hampered college athletics across the country. As a result, the Beach Volleyball Plaintiffs were uniquely situated in number of key respects. Because the Beach Volleyball Plaintiffs' experiences have virtually nothing in common with those of their fellow female varsity athletes in the proposed classes, Plaintiffs fail to show the typicality required by Rule 23(a).

Plaintiffs' arguments to the contrary rest almost exclusively on the idea that portions of Title IX and its implementing regulations envision a "program-wide" assessment (Mot. at 3) in certain cases. That argument proves far too much: that certain elements of Title IX compliance may be addressed at the program level does not mean that all of Rule 23's requirements are somehow automatically satisfied in every Title IX case.

Independently, Rule 23(b)(3)'s demanding predominance requirement forecloses the Beach Volleyball Plaintiffs' novel attempt to certify program-wide damages classes. Those proposed classes—comprising all past and present varsity female athletes at the University over

---

[1]    In this brief, the terms "Beach Volleyball Plaintiffs" and "Rowing Plaintiffs" refer only to the nine individuals who Plaintiffs have moved to appoint as class representatives.

1-    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
      MOTION FOR CLASS CERTIFICATION

a six-year period—are plagued with both legal and factual problems. For one, Plaintiffs' proposed classes would sweep in an untold number of uninjured absent class members who lack standing under both Article III and Title IX, either because the treatment and benefits they received were materially equivalent to a similarly situated male comparators (*e.g.*, women's track and field compared to men's track and field), or because they played on a team that had scholarships funded to the NCAA maximum (every single team besides beach volleyball). Those uninjured people cannot be part of the proposed damages class as a matter of law. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And the only way to weed them out would be to conduct a series of team-by-team and player-by-player mini-trials. That the Court would need to conduct "person-specific inquiries" in order to determine even potential liability precludes either of Plaintiffs' damages classes from satisfying the Rule 23(b)(3) predominance requirement. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016). Furthermore, Plaintiffs' own submission confirms their inability to prove damages on a classwide basis.

Plaintiffs fare no better in their attempt to invoke the alleged experience of a few female club rowers (the "Rowing Plaintiffs") to certify an effective-accommodation class broadly comprising "all present and future female students at UO who are [purportedly] being deprived of the opportunity to participate on women's varsity intercollegiate athletic teams." Mot. at 2. Discovery has confirmed the Rowing Plaintiffs' atypicality and inadequacy. The record makes clear that they lack the ability to effectively compete in Division I rowing, so they necessarily are not being deprived of the opportunity to compete—and cannot represent anyone who might be.

## FACTUAL BACKGROUND

### A.     Athletics at the University of Oregon

The University of Oregon was established in 1872 and opened to its first class of students in 1876. Declaration of Lorraine Davis ¶ 2. The University's male students began participating in athletics in the early 1880s. *Id.* Women began to participate shortly thereafter, forming a club basketball team in 1899 and a club tennis team in 1909. *Id.* In 1913, the University formed the

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

Women's Athletic Association, which was designed to facilitate the development of women's sports. *Id.* By the end of the 1920s, the number of female athletes at the University doubled, and women participated in a broad array of sports including basketball, tennis, baseball, and field hockey. *Id.* Women's sports continued to grow at the University between 1960 and 1990, during which time the University established basketball, indoor volleyball, softball, golf, soccer, cross country, and track and field teams, and simultaneously expanded student participation at intercollegiate competitions. *Id.* ¶ 3. With the development of new athletics opportunities came the integration of substantial coaching staffs—including full-time head coaches, financial scholarships, and the construction of new facilities. Declaration of Jody Sykes ¶ 27.

During this period, the University expanded its offerings for female athletes more than it did for its male athletes. In 1974, the University funded eight men's sports: football, basketball, track and field, baseball, cross-country, swimming, gymnastics, and wrestling. Davis Decl., ¶¶ 3-4. But by the 1980s, the University eliminated men's gymnastics, baseball, swimming, and wrestling. *Id.* ¶ 4. Due to funding pressures in the 1980s, the University was forced temporarily to phase out some women's teams as well, including soccer and golf. *Id.* Both of those female teams were reinstated by the 1990s. *Id.* And in 2004, the University became the first school in the Pacific Northwest to sponsor women's lacrosse on an intercollegiate basis. *Id.* ¶ 5.

Today, the University sponsors 12 Division I women's varsity teams and eight Division I men's varsity teams. *Id.* ¶¶ 6-7. The University is recognized as offering one of the nation's top collegiate athletic programs for both men and women. *Id.* ¶ 6. The University's women's varsity teams have achieved considerable success in intercollegiate competition and boast more than 19 National Championships in the last 50 years, compared to 14 for the University's men's teams. *See* Davis Decl. Ex. 1.

### B.    History of Women's Beach Volleyball

The NCAA first recognized beach volleyball as an official NCAA sport in 2015.  Sykes Decl. ¶ 3. Before that, "sand volleyball" was on NCAA's list of "Emerging Sports." *Id.*

3-   DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1.503.727.2000
Fax:  +1.503.727.2222

Emerging sports are women's sports that NCAA is actively promoting in order to increase opportunities for female athletes and help close participation gaps and build toward full NCAA recognition. *Id*. The University founded its women's beach volleyball program in the 2013-2014 academic year, when it was still an emerging sport and prior to full NCAA recognition. *Id*. At first, the University intended the beach volleyball team to be a crossover sport for the varsity athletes already playing on the indoor volleyball team: specifically, the beach volleyball season would provide an outlet for indoor volleyball players to get year-round practice time. *Id*. ¶¶ 4-5. To that end, for several seasons, the beach volleyball roster exclusively comprised members of the indoor volleyball team, many of whom were receiving full athletic scholarships. *Id*. ¶ 6. Recently, however, the program has evolved such that the team's roster is now majority "beach only." *Id*. ¶ 14. The Beach Volleyball Plaintiffs played during the transitory period. *Id*.

When UO launched the beach volleyball program, it did not maintain competitive-regulation sand courts on campus. *See id*. ¶ 24. To support the team as it began to transition to a separate program, the University contracted to use two sand volleyball courts at the City of Eugene's Amazon Park, which is a short drive from campus. *Id*. Currently, the beach volleyball team practices and competes at the Grace Community Fellowship Church's 3-court facility, which was constructed and opened in June 2024. *Id*.  But those solutions were only temporary; over the last several years and prior to the filing of Plaintiffs' Complaint, the University approved plans to construct a best-in-class beach volleyball facility at a central on-campus location. *Id*. ¶¶ 25-26. The University recently completed new locker rooms for the beach volleyball team at the Matthew Knight Arena and is in the process of clearing the approved volleyball site for the court construction to begin. *Id*. The University has also steadily increased funding to the team, including initially allocating six scholarships—the maximum allowed by the NCAA rules in place at the time—and now eight scholarships for use in recruitment in upcoming years. *See id*. ¶¶ 21-22. Earlier this year, the University hired Kristian Kuld—a former Division I volleyball player and decorated assistant coach from Long Beach State—as head coach of the

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1.503.727.2000
Fax:  +1.503.727.2222

beach volleyball team. *Id.* ¶ 20.

In short, the beach volleyball program at the University has grown immensely and continues to flourish as it has been transitioning from an emerging, crossover sports team.

### C.    History of Women's Rowing

The University also supports 41 club sports teams, including women's rowing. Declaration of Ben Prahl ¶ 4. The women's rowing club was founded in 1973. *Id.* ¶ 6. The women's rowing team practices at Dexter Reservoir. *Id.*

In the NCAA, Women's Rowing Championship teams are ranked by their results in the Varsity 8, the second Varsity 8, and the Varsity 4. *See* Crooks Decl. Ex. 1. Generally, a team's ability to field a competitive Varsity 8 is the best measure of that team's competitiveness. Crooks Decl. Ex. 5 (Haverland Depo. Tr. 12:5-9). In the 2024-25 NCAA Women's Rowing Championships, the row times for the Division I Varsity 8 boats ranged from 6:06.138 in first place through 6:59.486 in last. *See* Crooks Decl. Ex. 2. Throughout that Championship, not one Varsity 8 boat had a race time exceeding 6:59.486. *Id.* By contrast, when competing in the same event at recent intercollegiate competitions, the University's women's club rowing team recorded times of 7:41.688 and 8:01.643. Crooks Decl. Ex. 3 at 9, 12.

Notably, according to the Rowing Plaintiffs themselves, the women's club rowing team at the University has struggled with retention. ███████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ Plaintiffs fail to address this retention problem in their Motion and supporting declarations.

### D.    COVID-19 and its Impact on the University's Athletics Program

In March and April 2020, Governor Kate Brown issued executive orders requiring the University to shift to remote education and to close campus to large gatherings at sports and

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

other events through September due to the COVID-19 pandemic. Sykes Decl. ¶ 13.

Universities—particularly athletics departments—were forced to adjust, delay, or outright cancel

their fall 2020 programming. *See id.* ¶¶ 13-14. At the University, the pandemic resulted in the

modification and delay of the fall sports season. *Id.* It also resulted in the shift of the fall 2020

indoor volleyball season to the winter and spring 2021 terms, which overlapped with the 2021

beach volleyball season. *Id.* Because the indoor volleyball season overlapped with the beach

volleyball season, the head coach of the teams was less available to the beach volleyball team.

*Id.* ¶¶ 14-15. Additionally, the assistant coach for beach volleyball was less available during the

Spring 2021 season because her spouse was suffering with cancer. *Id.* The confluence of these

events resulted in an abnormal season for the beach volleyball athletes.

### E.    The Class Representatives and Their Claims

Plaintiffs' Motion seeks to certify five separate classes:

Count I (failing to provide female varsity athletes equal treatment and benefits
compared to male varsity athletes): a class for declaratory and injunctive relief
under Federal Rule of Civil Procedure 23(b)(2) of all current and future female
students who participate or will participate in intercollegiate varsity athletics at [the
University], and a class for damages under Rule 23(b)(3) of all current and former
female students who participated or will participate in intercollegiate varsity
athletics at [the University] at any time from the start of the 2020-21 academic year
until the end of the 2025-26 academic year.

Count II (failing to provide female varsity athletes equal athletic financial aid): a
class for declaratory and injunctive relief under Rule 23(b)(2) of all current and
future female students who participate or will participate in intercollegiate varsity
athletics at [the University] and do not receive all athletic financial aid permissible
under federal law, and a class for damages under Rule 23(b)(3) of all current and
former female students who participated or participate in intercollegiate varsity
athletics at [the University] and did or do not receive all athletic financial aid
permissible under federal law at any time from the start of the 2020-21 academic
year until the end of the 2025-26 academic year.

Count III (failing to provide female students equal opportunities to participate in
intercollegiate athletics): a class for declaratory and injunctive relief under Rule
23(b)(2) of all present and future female students at [the University] who are being
deprived of the opportunity to participate on women's varsity intercollegiate
athletic teams.

Mot. at 1-2 (citations omitted).

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## LEGAL BACKGROUND OF TITLE IX

Title IX provides that "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Title IX's "on the basis of sex" language triggers a but-for causation standard. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1106 (9th Cir. 2019). That standard "directs [courts'] attention to the counterfactual—what would have happened if the plaintiff had been" a different sex? *Comcast Corp. v. National Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). To carry their burden to show but-for causation, a Title IX plaintiff must identify a similarly situated comparator of the opposite sex and—holding "constant" all variables except sex—establish differential treatment. *See Bostock v. Clayton County*, 590 U.S. 644, 654, 671 (2020). Paying careful attention to hold constant *all other variables* besides sex is critical to performing the analysis correctly, because that is the only way to determine whether the plaintiff's allegedly differential treatment was based on sex rather than some other factor(s). *Id.* at 656 ("[A] but-for test directs us to change one thing at a time and see if the outcome changes.").

After Title IX was passed, Congress directed the Department of Health, Education, and Welfare (HEW) to draft regulations implementing Title IX, including in the area of "intercollegiate athletic activities." Education Amends. of 1974, Pub.L. No. 93–380, § 844 (1974). HEW published regulations that specifically addressed the statute's requirements in the athletic programs of educational institutions. *See* 34 C.F.R. §§ 106.37, 106.41(c). Three distinct types of Title IX claims have sprung from those regulations: (1) financial aid claims, (2) treatment and benefits claims, and (3) effective accommodation claims. *See Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 918 (7th Cir. 2012).

*Financial Aid.* The regulations make clear that "[s]eparate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex." 34 C.F.R. § 106.37(c)(2). Institutions must provide only "reasonable opportunities

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

for such awards [of financial assistance] for members of each sex in proportion to the number of students of each sex participating in inter-collegiate athletics." *Id.* § 106.37(c)(1).

*Treatment and Benefits.* The regulations also make clear that "[n]o person shall, on the basis of sex . . . be denied the benefits of, [or] be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 34 C.F.R. § 106.41(a). They go on to provide a list of nine non-exhaustive factors that help assess whether an institution is complying with its treatment and benefits related obligations: the provision and maintenance of equipment and supplies; scheduling of games and practice times; travel and per diem expenses; opportunity to receive coaching and academic tutoring; assignment and compensation of coaches and tutors; provision of locker rooms, practice, and competitive facilities; provision of medical and training services and facilities; provision of housing and dining services and facilities; and publicity. *See id.* § 106.41(c)(2)-(10). Critically, however, the federal agency has made clear that some sports, like football, demand more resources than others:

> Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities. . . . Generally, these differences will be the result of factors that are inherent to the basic operation of specific sports. Such factors may include the rules of play, nature/replacement of equipment, rates of injury resulting from participation, nature of facilities required for competition, and the maintenance/upkeep requirements of those facilities. For the most part, differences involving such factors will occur in programs offering football, and consequently, these differences will favor men. If sport-specific needs are met equivalently in both men's and women's programs, however, differences in particular program components will be found to be justifiable.

Title IX of the Education Amendments of 1972; a Policy Interpretation ("1979 Policy Interpretation"), 44 Fed. Reg. 71,413 (Dec. 11, 1979) at § VII(B)(2)(a); *see also id.* § VII(B)(2)(c) ("At many schools . . . certain sports—notably football and men's basketball—traditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event management to men's and women's programs may differ in degree and kind.").

8- DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

*Effective Accommodation.* Finally, institutions must accommodate the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes. 34 C.F.R. 106.41(c)(1). Funding recipients have "three safe harbors in defending against an effective accommodation claim under § 106.41(c)(1)." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 93 (2d Cir. 2012).

## LEGAL STANDARD FOR CLASS CERTIFICATION

Certifying a class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "Class certification is thus not to be granted lightly." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024). Rule 23 of the Federal Rules of Civil Procedure "imposes stringent requirements for certification that in practice preclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

To certify a class, Plaintiffs bear the burden of establishing by a preponderance of evidence that they have met each of Rule 23(a)'s four requirements of numerosity, commonality, typicality, and adequacy. A plaintiff seeking certification must also demonstrate compliance with at least one prong of Rule 23(b). A plaintiff seeking injunctive or declaratory relief must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b). And a plaintiff seeking monetary relief must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

Rule 23 does not erect a "mere pleading standard." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. Rather, plaintiffs seeking class certification "must affirmatively demonstrate [their] compliance with the Rule—that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

## ARGUMENT

## I.    ALL OF THE PROPOSED CLASSES FAIL UNDER RULE 23(a).

### A.    The Beach Volleyball Plaintiffs Cannot Satisfy Rule 23(a).

#### 1.    The Beach Volleyball Plaintiffs are not typical because they are distinctly unlike other varsity female athletes.

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). To meet Rule 23(a)'s typicality requirement, Plaintiffs must show that they "possess the same interest and suffer the same injury as the class members." *Id.* at 156 (quotation marks omitted). "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016).[2]

This Court has previously raised concerns about Plaintiffs' ability to maintain program-wide class claims. The Court observed that Plaintiffs' Complaint makes "a poor argument that [the beach volleyball] Plaintiffs here are representative of a class of all female student athletes at UO." ECF 83 at 19. And while the Court allowed some of Plaintiffs' claims to proceed beyond the pleading stage, it emphasized that "whether a single women's sport is representative of an entire class of women athletes at the University is still another hurdle for the future." *Id.* at 21. That language echoed concerns the Court voiced at the February 26, 2025 hearing, when it told Plaintiffs' counsel that "I'm really wondering in the long-run how this can be a representative class when it's only, you know, women involved in a single sport with no comparator . . . That's kind of where I'm sitting right now in terms of my doubts about . . . this as a class case." ECF 82 at 18-19. Despite knowing full-well the Court's typicality concerns, Plaintiffs have failed to

---

[2]    To the extent there are any common issues here, they are easily outweighed by individualized ones given, among other things, the need to conduct team-by-team mini-trials in light of the sport-specific differences across teams (*see infra*, pp. 27-29). *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (noting that "the Rule 23(b)(3) predominance requirement, which is far more demanding, incorporates the Rule 23(a) commonality requirement").

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax:  +1.503.727.2222

adequately address them in their Motion.

The Beach Volleyball Plaintiffs serve as paradigmatic examples of atypical class representatives. They are not typical because their experiences fundamentally do not resemble those of the other female varsity athletes in the proposed classes in many key respects. Much of the conduct that Plaintiffs complain about is "unique to the named plaintiffs" in that it was *not* experienced by *any athlete* on *any other varsity team*. *Torres*, 835 F.3d at 1141. Beach volleyball's status as an emerging sport that was initially an outgrowth of the indoor volleyball team caused the Beach Volleyball Plaintiffs' experiences to be idiosyncratic. This reality is exemplified by the facts that:

- The University funded scholarships for every varsity female sports team other than beach volleyball to the maximum NCAA limit (Mot. at 16).

- Beach volleyball is unique in that it was added recently, was an emerging sport, and was initially contemplated as a crossover sport for indoor volleyball players to receive additional practice time. Sykes Decl. ¶¶ 5-6; *see also id.* ¶ 31.

- Because it was added so recently, beach volleyball has a significantly lower budget than every other female sport. *Id.* ¶ 6.

- The beach volleyball team was the only varsity female sports team that practiced at Amazon Park, *id.* ¶ 12, whereas most of the other varsity female sports teams had practice facilities on campus. *Id.* ¶ 27.

- Every varsity female sports team besides beach volleyball had a dedicated full-time coach who was not simultaneously coaching another team. *Id.* ¶ 7.

- Every varsity female sports team besides beach volleyball [and golf] had a dedicated locker room on campus. With the exception of golf,[3] every other varsity female sports teams have access to locker rooms in close proximity to where they practice and compete. *Id.* ¶ 26.

- No other varsity female sports team besides beach volleyball was created for the purpose of strengthening an existing varsity sports team. *See id.* ¶¶ 3-6.

- Because beach volleyball became an NCAA sport so recently, it has less national

---

[3]    Neither the men's golf team nor the women's golf team have access to traditional locker room facilities consistent with the needs of this specific sport.

11-    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
       MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

competition. There are only 68 teams competing at the NCAA Division I level, compared to 338 teams in indoor volleyball, 304 teams in women's tennis, and 354 teams in basketball. The Big 10 Conference (of which the University is a member) does not even sponsor beach volleyball. *Id*. ¶ 3.

Those beach volleyball-only experiences preclude a typicality finding.

As this Court noted, "by all accounts, the Plaintiffs here are poorly provisioned when compared to many of the women's teams" (ECF 83 at 18), as confirmed by the University's state-of-the-art facilities for those teams. *See, e.g.*, Sykes Decl. Exs. 1-3. That observation likewise forecloses the Beach Volleyball Plaintiffs from establishing typicality. Indeed, Plaintiffs offer no explanation for how they possibly could have suffered "the same or similar injury," *Torres*, 835 F.3d at 1141, as, say, a star women's basketball player who was recruited and coached by Kelly Graves, received a full athletic scholarship (like many of her teammates), and played in front of packed arenas. Yet Plaintiffs seek to represent that hypothetical basketball star and many others like her in this action. Rule 23's typicality requirement exists to prevent such disparate claims from being litigated all together in the same action. *See Weiss v. York Hospital*, 745 F.2d 786, 809 n.36 (3d Cir. 1984) (typicality not satisfied "where the named plaintiff's individual circumstances are markedly different . . . from . . . the claims of other class members"). Aggregating them together threatens to deprive the University of its right to litigate individual defenses, in violation of the Rules Enabling Act and due process. *See* 28 U.S.C. § 2072(b).

The Beach Volleyball Plaintiffs' experience was atypical of other women's varsity sports because beach volleyball was (and still is) emerging at the University during the class period. Plaintiffs' theory hinges on the allegation that, at all times, the beach volleyball team practiced off campus at Amazon Park and did not have a locker room of their own. *See* Compl. at ¶¶ 472-92. But those perceived treatment and benefits deficiencies are obviously not a function of the plaintiffs' sex; they are all attributable to the fact that it naturally took the University time to build out facilities for the new beach volleyball program, which did not even become a varsity sport at the University until 2013. Sykes Decl. ¶ 3. Those efforts were complicated by the facts

12-  **DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

that, during the first few years of the beach volleyball team's existence, the team comprised exclusively women *already competing* on the University's varsity indoor volleyball team, and later by the COVID-19 pandemic. *Id.* ¶¶ 6-9. The beach volleyball team later transitioned into its own separate program, but that took years of recruiting efforts. *Id.* ¶¶ 11-19. Indeed, the team's current head coach has required, for the first time in program history, that players commit to the beach volleyball program for the entire 2025-2026 year. *Id.* ¶ 20. That beach volleyball is still in its infancy within the NCAA and at the University is also reflected in the financial data. And while beach volleyball has a significantly smaller budget compared to other women's sports, the team is also experiencing the fastest proportionate growth with its budget increasing by 50% in the past year. *Id.* ¶ 6. Simply put, the Beach Volleyball Plaintiffs' atypicality should come as no surprise given that no other women's varsity team had a remotely similar situation during the class period. *See id.*

Notably, the Beach Volleyball Plaintiffs' grievances surrounding facilities, coaching, and scholarships are either already moot or soon to be moot. The University has invested significant funds into building a state-of-the-art on-campus beach volleyball facility, which is scheduled to be completed in the next year. *Id.* ¶ 25. Earlier this year, the University hired Kristian Kuld as head beach volleyball coach. Coach Kuld—a former Division I volleyball player at UCLA—has spent the last 11 seasons as an assistant coach for the Long Beach State beach volleyball team, helping it to five NCAA/AVCA Championship appearances as well as more than 225 wins and seven top-10 finishes. *Id.* ¶ 20. Also, in light of the *House* Settlement, the University now offers eight scholarships to the beach volleyball team; the fact that it did not do so during parts of the class period was purely a function of the unique fact that beach volleyball was a brand new team originally composed of indoor volleyball players, all of whom were already on full scholarship. *See id.* ¶ 22. It is settled that funding recipients may "phase in scholarships for newly created varsity teams" consistent with Section 106.37(c). *Grandson v. Univ. of Minnesota*, 272 F.3d 568, 576 (8th Cir. 2001). These developments demonstrate that even a far narrower class comprising

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

just current and former beach volleyball players would still be fatally overbroad. The experiences of players who graduated in 2020 have little in common with those who are slated to graduate in 2028—yet Plaintiffs propose lumping them all together in the same class.

The Beach Volleyball Plaintiffs' atypicality is especially palpable in the context of their financial aid claim. That is because throughout the class period, the University fully funded all women's scholarships for *all women's sports* except beach volleyball, which was an emerging sport that, in its first few years, existed primarily to support the indoor volleyball team. *See* Mot. at 16. Plaintiffs nonetheless ask this Court to certify a financial aid class that includes both the Beach Volleyball Plaintiffs and, say, a nationally renowned athlete like Sabrina Ionescu, who was on a full scholarship her entire career and appeared on the cover of Sports Illustrated during her time at the University. That is precisely the type of "conduct which is . . . unique to the named plaintiffs" that precludes certification on typicality grounds. *See Torres*, 835 F.3d at 1141; *Rupe v. Beard*, 2013 WL 841370, at *4 (E.D. Cal. Mar. 6, 2013) (similar).

That the Beach Volleyball Plaintiffs have little in common with other female varsity athletes at the University is further exemplified by their failure to recruit *any* member of *any* other women's sports team to join this litigation. That was not for a lack of trying. The Beach Volleyball Plaintiffs testified that they reached out to numerous other female varsity athletes about joining their lawsuit. *See* Crooks Decl. Ex. 6 (Rothstein Depo. Tr. 262:18-24). None did. The Beach Volleyball Plaintiffs' failed attempts to recruit other female varsity athletes severely undermine their efforts to certify program-wide classes because "there is a strong chance that some girls who declined to join the lawsuit did so because they, like a majority of female . . . athletes [at the University], do not share the goals and interests of these plaintiffs." *Alston v. Va. High School League, Inc.*, 184 F.R.D. 574, 581 (W.D. Va. 1999). Multiple other courts have denied certification of program-wide classes in Title IX cases where, as here, there is a lack of cohesiveness across different female athletic teams and the pleaded claims were based on the idiosyncratic experiences of a single team. *See, e.g.*, *Robb v. Lock Haven Univ. of Penn.*, 2019

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

WL 2005636, at *12-13 (M.D. Pa. May 7, 2019); *Bryant v. Colgate Univ.*, 1996 WL 328446, at *6 (N.D.N.Y. June 11, 1996). For good reason: it would be fundamentally inconsistent with Rule 23 to certify a class whose representatives have little in common with the other class members. In short, the Beach Volleyball Plaintiffs cannot be certified as typical representatives of female varsity athletes in other sports because those other athletes have indicated that the Beach Volleyball Plaintiffs do not speak for their interests.

*Alston*, a Title IX case where the plaintiffs attempted to certify a class of all female student athletes in a school district, illustrates the trend against cross-team certification. The court recognized that "[e]ven in the context of class actions alleging discrimination on the basis of sex or gender, the typicality and adequacy requirements must still be met with something more than a mere allegation of across-the-board discrimination," and that "[a] putative class representative cannot succeed in meeting the typicality requirement just because discrimination is alleged." *Alston*, 184 F.R.D. at 578. That is because "[i]f the mere allegation that discriminatory practices in general cause injury to all members of the class could suffice to show typicality, the typicality requirement would be eviscerated by allowing even the most remote similarity of interests between class representatives and other members of the class to qualify as the basis for class certification." *Id.* The court further concluded that the named plaintiffs were not typical, in part because their experiences and incentives diverged from other members of the class. *Id.* That same analysis applies with equal force here.

Plaintiffs argue that they have satisfied the typicality requirement because the alleged "manifestations of discrimination" in treatment, benefits, and financial aid experienced by women across different University teams "are all part of the same underlying course of conduct against the class as a whole." Mot. at 27. But the Supreme Court has made clear that the "mere fact that a complaint alleges . . . discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative." *Gen. Tel. Co.*, 457 U.S. at 157 (quotation marks omitted). Indeed, "[i]f one allegation of specific discriminatory treatment were sufficient

15- DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

to support an across-the-board attack, every [Title IX] case would be a potential [University-wide] class action." *Id.* at 159. And Plaintiffs' unsupported assertion that the alleged discrimination has been "experienced by the entire class" (Mot. at 27) is insufficient: "Rule 23 does not set forth a mere pleading standard"—rather, "a party seeking class certification must *affirmatively demonstrate* his compliance with the Rule." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (emphasis added). It is thus insufficient for Plaintiffs to baldly assert that the "class as a whole" has been discriminated against. Mot. at 27.

In arguing otherwise, Plaintiffs consistently conflate the concept of a "program-wide" assessment under Title IX (Mot. at 3) with the notion that anyone within a "program-wide" class of student-athletes is typical and can represent a program-wide class. If that were true, then Rule 23(a)(3)'s typicality requirement would be satisfied *in every single Title IX case*. As the authorities discussed above confirm, that is not the law.

Plaintiffs' appeals to case law fare no better. In arguing that members of a single team can represent a department-wide class, they principally rely on two out-of-circuit district court cases—*Foltz v. Delaware State Univ.*, 269 F.R.D. 419 (D. Del. 2010) and *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929 (D. Minn. 2018)—where courts certified Title IX classes even though the named plaintiffs came from one or two sports teams. Neither case supports Plaintiffs. *Foltz* is inapposite because it did not even involve the treatment and benefits and financial aid claims that the Beach Volleyball Plaintiffs assert here. Instead, the *Foltz* plaintiffs—all members of an equestrian team that their school decided to eliminate—brought only an effective-accommodation claim. 269 F.R.D. at 420. The court's typicality analysis was thus confined to the narrow question whether members of a *single eliminated sport* could share common interests in "participating in varsity sports" with members of remaining varsity sports such that they satisfied the typicality and commonality requirements for an effective accommodation class. *See id.* at 423-24. *Foltz* says nothing about whether athletes on one sports team bringing treatment and benefits and financial aid claims can do so on behalf of a program-wide class where, as here,

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

all the other the female teams receive vastly different levels of treatment, benefits, and aid.

Plaintiffs' reliance on *Portz* is similarly misplaced. *Portz* arose in an entirely different context: a university's attempt to reorganize its entire athletics program and eliminate multiple women's sports teams. *See* 297 F. Supp. 3d at 934. There is no such overarching University action here. Rather, Plaintiffs challenge micro-level spending decisions carried out at the team level related to things like facilities, locker rooms, equipment, and uniforms.[4]

In sum, the Beach Volleyball Plaintiffs' unique claims—which arise from their atypical experiences at the University—precludes them from being typical class representatives. Plaintiffs have failed to identify any apt authority suggesting otherwise.

### 2.    The Beach Volleyball Plaintiffs are not adequate class representatives.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "The adequacy inquiry is addressed by answering two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quotation marks omitted). The Beach Volleyball Plaintiffs fail both requirements.

*First*, the Beach Volleyball Plaintiffs have a conflict with the remaining class members.

---

[4]    The remaining authorities Plaintiffs cite in passing for the proposition that "Title IX sex discrimination claims for injunctive relief challenging inequality in intercollegiate athletics are necessarily class-wide" and thus routinely certified (Mot. at 3) are inapt for similar reasons. First, as Plaintiffs implicitly concede, those cases differ fundamentally from this one because the plaintiffs in those cases did not seek compensatory damages. Moreover, three of Plaintiffs' other authorities centered on effective accommodation claims arising from the *elimination* of varsity programs. *See Anders v. California State Univ.*, 2025 WL 755664 (E.D. Cal. Mar. 10, 2025); *Biediger*, 691 F.3d at 85; *Cohen v. Brown Univ.*, 991 F.2d 888 (1st Cir. 1993). In another case, the defendants conceded all of the Rule 23 factors, so the court did not engage in any Rule 23 analysis. *Ollier v. Sweetwater Union High School District*, 251 F.R.D. 564 (S.D. Cal. 2008). *Paton v. New Mexico Highlands Univ.*, 275 F.3d 1274 (10th Cir. 2002) is even further afield because it concerned the post-trial recertification of an injunctive class, and the court did not engage in any meaningful Rule 23 analysis.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

Because the University's resources are finite, these plaintiffs have an interest in the University diverting those finite resources to the beach volleyball program instead of to other women's sports teams. Similar concerns have led a number of courts to find conflicts of interest between members of one sports team and the members of other teams they sought to represent in Title IX litigation. *See Robb*, 2019 WL 2005636, at \*12 (members of one sports team were inadequate representatives of proposed treatment and benefits class "since the named plaintiffs would likely advocate in favor of . . . giving their own teams the extra equipment"); *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 290 (S.D. Ohio 2006) (similar); *Bryant*, 1996 WL 328446, at \*6 (similar); *Boucher v. Syracuse Univ.*, 164 F.3d 113, 119 (2d Cir. 1999) (similar); *S.G. ex rel. Gordon v. Jordan Sch. Dist.*, 2018 WL 4899098, at \*2 (D. Utah Oct. 9, 2018) (similar).

Plaintiffs attempt to paper over this conflict by asserting that both they and the absent class members on other teams share the same interest in ensuring "equal treatment and benefits (Count I) and athletic financial aid (Count II)." Mot. at 28. But that is no answer to the University's argument. Regardless of whether the class shares an overarching interest in Title IX compliance, the University necessarily has limited resources, so benefits, aid, or opportunities for one team necessarily come at the expense of benefits, aid, or opportunities to another. That is precisely why Title IX requires but-for causation. And because this case is fundamentally about securing additional benefits for the women's beach volleyball team (*see, e.g.*, Compl. ¶¶ 472-92), the interests of the Beach Volleyball Plaintiffs inevitably "tug[] against the interest[s]" of players on other women's teams. *Amchem Prods.*, 521 U.S. at 626.[5]

████████████████████████████████████████████████

---

[5]     The Ninth Circuit determined in an unpublished summary order that there was insufficient evidence of a conflict between class representatives on one team and other female varsity athletes in *Anders v. California State University*, 2024 WL 177332 (9th Cir. Jan. 17, 2024). That nonbinding decision has no import because it involved an effective-accommodation claim solely for an injunction "only requir[ing] Fresno State to comply with Title IX," which could be accomplished without an intra-class conflict. *Id.* at \*2. Plaintiffs here seek far more. *See* Compl. at ¶¶ 114-115.

18-   DEFENDANT'S OPPOSITION TO PLAINTIFFS'
      MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222



19-    DEFENDANT'S OPPOSITION TO PLAINTIFFS'
        MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax:  +1.503.727.2222

**B.     The Rowing Plaintiffs Cannot Satisfy Rule 23(a).**

The Rowing Plaintiffs fare no better in their attempt to certify an injunctive relief class comprising "all present and future female athletes at [the University] who are being deprived of the opportunity to participate on women's varsity intercollegiate athletic teams." Mot. at 2.

### 1.     Plaintiffs' effective accommodation class fails numerosity.

The Rowing Plaintiffs' certification bid fails at the threshold because they cannot demonstrate compliance with Rule 23(a)'s numerosity requirement, which requires "approximately forty members" and a showing that joinder is impractical. *See Wilcox Dev. Co. v. First Interstate Bank of Oregon, N.A.*, 97 F.R.D. 440, 443 (D. Or. 1983).

Plaintiffs assert that the numerosity requirement is satisfied because they defined the effective accommodation class to include "all prospective and future female students." Mot. at 25. But for a student to be deprived of the opportunity to participate on a varsity team, that student must, among other things, have the "interest[] *and abilit[y]*" to compete on that team. *See* 34 C.F.R. § 106.41(c) (emphasis added). In other words, Plaintiffs must prove that there are sufficiently numerous "female students actually able to compete at a varsity level in a sport." *Niblock v. Univ. of Kentucky*, 2024 WL 4891025, at *16 (E.D. Ky. Oct. 28, 2024). Plaintiffs have not and cannot meet their burden to show that there are enough students—present or future— who fit that description such that their joinder would be impractical.

The University's 2023 Interest and Ability Survey highlights Plaintiffs' numerosity shortcomings.[6] Of the 1,456 respondents who indicated they were female, only 71 indicated an *interest* in participating in NCAA Division I or Emerging Sports programs not currently offered at the University, with only 17 respondents expressing any interest in rowing. *See* Declaration of Renée Delgado-Riley Ex. 1 ("2023 Survey") at 4, 11-12.; *id.* ¶ 13 ("I note that the 2023 Survey

---

[6]     Recognizing that the survey effectively forecloses their effective accommodation claim, Plaintiffs have critiqued its results as unreliable. Those critiques are baseless. *See* Declaration of Dr. Joseph D. Levy ¶ 28.

20-     DEFENDANT'S OPPOSITION TO PLAINTIFFS'
        MOTION FOR CLASS CERTIFICATION

findings indicate that there is virtually no interest by female students and prospective students in a varsity rowing team."). Further, of those 71 students who indicated interest in participating in an Emerging Sport, *only 22* students self-reported that they had the ability to participate in their sport of choice at the varsity level. Delgado-Riley Decl. Ex. 1 at 11-16. Just *six* students reported that they had the ability to participate on a Division I rowing team. *Id.* at 15. Those self-reported responses should, of course, be taken with a grain of salt: there is no evidence in the record that any of the students in question actually have the ability to compete at the Division I level—they merely reported having such an ability. Delgado-Riley Decl. ¶ 18.

Plaintiffs attempt to cure this problem with the Declarations of Zach Hedeen (ECF 109) and Yasmin Farooq (ECF 108). Hedeen, a former volunteer coach of the University's club rowing team, asserts that he has "no doubt that there are more than sufficient current and prospective UO students with the interest and ability to form a varsity women's rowing team" and goes on to list a few scattered examples of "the team's successes." Hedeen Decl. ¶¶ 3-4. But the team's race times speak for themselves. *Compare, e.g.*, Crooks Decl. Ex. 2 *with* Crooks Decl. Ex. 3 at 9, 12; Crooks Decl. Ex. 5 (Haverland Depo. Tr. 42:11-16 (testifying that "if placed into competition against division [I] teams, our boats would not win that race or place in that race")). Race times aside, the Hedeen Declaration suggests at most that there may be a few isolated club rowers who could compete on a Division I team. That is insufficient for class certification, because Hedeen Declaration fails to provide any support for the proposition that there are sufficient athletes to satisfy *Rule 23(a)'s numerosity requirement* of "approximately forty members." *Wilcox Dev. Co.*, 97 F.R.D. at 443. To the contrary, statements from the Rowing Plaintiffs clarify that the University did not have enough people to fill a varsity 8 team. *See, e.g.*, Crooks Decl. Ex. 5 (Haverland Depo. Tr. 71:22-24).

Farooq, the Head Coach of the University of Washington's ("UW") varsity women's rowing team, is even less persuasive. Farooq does not even mention the 2023 Interest and Ability survey, much less attempt to explain how her conclusion could be reconciled with it. Farooq also

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

simply assumes her conclusion, baldly opining without any explanation that "UO's recruiting pool would be similar to, if not the same as," UW's recruiting pool. Farooq Decl. ¶ 12. Such *ipse dixit* assertions devoid of any underlying support or foundation are per se unreliable, and the Court should disregard the Farooq Declaration in full on those grounds. *See Volcan Group, Inc. v. T-Mobile USA, Inc.*, 940 F. Supp. 2d 1327, 1335 (W.D. Wash. 2012) (declining to consider "self-serving declarations [that] rely almost entirely upon *ipse dixit*"). All told, Plaintiffs have failed to meet their burden of demonstrating that there are *any* students—present or future—who would be members of their proposed effective accommodation class.

### 2.    The Rowing Plaintiffs are not typical or adequate.

The Rowing Plaintiffs are not also typical of the class they seek to certify, either. A court should not certify a class if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). That requirement precludes certification here because all of the Rowing Plaintiffs are subject to a unique defense: their team does not have the ability to row at a Division I level and thus are not even members of their own proposed class. *See Gen. Tel*, 457 U.S. at 156 (finding that "[b]ecause . . . the named plaintiffs were not qualified for line-driver positions . . . they were . . . simply not eligible to represent a class of persons" who were qualified). The record makes clear that the Rowing Plaintiffs do not have the ability to compete at the Division I level.[7] *See* pp. 20-21, *supra*. ███████████████████████

████████████████████████████████████████████████████

████████████████████████

Finally, that Plaintiffs chose to broadly define their class to include all "future female students at UO" (Mot. at 2) forecloses their ability to demonstrate typicality or adequacy. The Rowing Plaintiffs fail to explain how they could adequately represent the interests of, say, a high

---

[7]    The few cases Plaintiffs cite are distinguishable because the class representatives were *currently playing* on varsity teams, so their ability to do so could not be credibly questioned. *See, e.g., Portz*, 297 F. Supp. 3d at 934.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

school bowler who has not yet applied to the University.

## II.    THE DAMAGES CLASSES FAIL RULE 23(B)(3)'S REQUIREMENTS.

Plaintiffs' motion also fails Rule 23(b)'s more stringent requirements.

### A.    Common Issues Do Not Predominate In Plaintiffs' Damages Classes.

Rule 23(b)(3) imposes a "demanding" predominance requirement, mandating that a party seeking certification show that "questions affecting only individual members" do not predominate over questions common to the class. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013). This requirement aims to ensure that any putative class is "sufficiently cohesive to warrant adjudication by representation." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020). "Showing predominance is difficult, and it 'regularly presents the greatest obstacle to class certification.'" *Black Lives Matter Los Angeles*, 113 F.4th at 1258. To meet the predominance requirement, a plaintiff must prove liability with "evidence that [is] common to the class rather than individual to its members." *Comcast*, 569 U.S. at 30. Further, "[u]nder the predominance inquiry, plaintiffs must demonstrate that 'damages are capable of measurement on a classwide basis.'" *Alvarez v. NBTY, Inc.*, 331 F.R.D. 416, 426 (S.D. Cal. 2019). Thus, "Plaintiff must present a damages model consistent with her theory of liability—that is, a damages model 'purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.'" *Id.*

### 1.    The treatment and benefits damages class fails predominance.

Plaintiffs' treatment and benefits damages class—which is broadly defined to include "all current and former female students who participated or will participate in intercollegiate varsity athletics at [the University] at any time from the start of the 2020-21 academic year until the end of the 2025-26 academic year" (Mot. at 1)—fails the predominance requirement for at least three independent reasons: the class includes absent members who lack Article III standing; adjudicating Plaintiffs' claims would require a series of mini-trials; and Plaintiffs' damages model is irreconcilable with their deeply flawed liability theory.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

*First*, Plaintiffs' proposed class sweeps in a significant number of uninjured people who lack standing under Article III and Title IX because they were not treated any differently than similarly situated male athletes. That dooms Plaintiffs' attempt to certify a program-wide class.

The Supreme Court has made clear that "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC*, 594 U.S. at 427. That is because "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *Id.* (quotation marks omitted). It follows that "a federal court may not certify a damages class that includes both injured and uninjured members . . . [a]nd when a damages class includes both injured and uninjured members, common questions do not predominate." *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 328 (2025) (Kavanaugh, J., dissenting); *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018); *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987–88 (8th Cir. 2021). Accordingly, "a court must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022). And "[w]hen a class is defined so broadly as to include a great number" of members who lack standing, "the class is defined too broadly to permit certification." *Id.*

This Court has already expressed considerable skepticism of Plaintiffs' treatment and benefits claim, which, as pleaded, rests almost entirely on an "apples to oranges" comparison of women's beach volleyball—a sport that only gained varsity status in 2014—to the "juggernaut" of college football. *See* ECF 83 at 18-20. Plaintiffs cannot demonstrate that they were representative of all female athletes at the University through "broad and generalized statements unsupported by facts or by comparing themselves to the men's football program." *Id.* Instead, they must compare particular athletes within equivalent varsity sports: "women's basketball versus men's basketball; women's softball versus men's softball; women's golf versus men's

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1.503.727.2000
Fax:  +1.503.727.2222

golf; women's track and field versus men's track and field." *Id.*

That equivalency requirement is grounded in the text of Title IX, which states that "[n]o person . . . shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Title IX thus requires a plaintiff to show "treatment of a person in a manner which but for that person's sex would be different." *City of Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (applying Title VII). "In other words, a but-for test directs us to change *one thing at a time* and see if the outcome changes." *Bostock*, 590 U.S. at 656 (emphasis added). It is not enough to ask simply what treatments and benefits the University provides to its male and female athletes and then compare numbers. After all, "[u]nequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams" does "not constitute noncompliance" with Title IX. 34 C.F.R. § 106.41(c). The relevant question is whether the challenged disparities would exist *but for* the athlete's sex, as opposed to but for some independent factor—such as the sport in which that athlete competes. *See Bostock*, 590 U.S. at 656.

Plaintiffs have not come close to establishing a program-wide Title IX injury experienced by every female varsity athlete insofar as treatment and benefits are concerned: To the extent any disparities exist, they were not *on the basis of sex*. The University's treatment of *similarly situated* male and female athletes—*e.g.*, track athletes, baseball and softball players, and golfers—confirms as much. Those similarly situated male and female athletes receive substantially similar treatment and benefits. Sykes Decl. ¶¶ 27-29. For example, the men's and women's track and field teams practice in the same facilities, travel to meets using the same modes of transportation, have access to the same locker rooms, and receive the same gear. *Id.* And when disparities do exist across sports, those disparities are a function of the fact that different sports have different needs. *Id.* ¶ 29. Because Title IX recognizes a cognizable injury only for "*the victims of illegal discrimination*," Plaintiffs' proposed damages class is fatally

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

overbroad through its purported inclusion of every single female varsity athlete over a six-year period. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979) (emphasis added). Due Process considerations as well as Article III's case-or-controversy requirement preclude an award of compensatory damages to athletes who did not receive unequal treatment because of their sex and thus did not suffer actual harm. *See Tyson Foods, Inc.*, 577 U.S. at 466 (Roberts, C.J., concurring) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.").

Plaintiffs overlook this fundamental problem. Instead, they declare that predominance is met because "Title IX athletics cases are particularly well-suited to class treatment, as allegations of 'unequal treatment and benefits[] explicitly rest on allegations of systemic discrimination . . . that, if proved, would necessarily apply to all current female student athletes.'" Mot. at 31 (citing and quoting *A.B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 837 (9th Cir. 2022)). But the passage Plaintiffs quote is pulled from the *A.B.* decision's Rule *23(a) numerosity analysis*. The *A.B.* plaintiffs did not even attempt to certify a Rule 23(b)(3) damages class. Moreover, Plaintiffs' quotation of *A.B.* is selective and misleading. What the opinion actually says is that "[s]ome aspects of Plaintiffs' first cause of action, which alleges unequal treatment and benefits, explicitly rest on allegations of systemic discrimination (such as, for example, the *complete lack of standalone athletic locker facilities*) that, if proved, would necessarily apply to all current female student athletes." *A.B.*, 30 F.4th at 837 (emphasis added). That analysis does not help Plaintiffs here. Far from "a complete lack of standalone athletic . . . facilities" for all women, beach volleyball was one of the *only* varsity teams, men's or women's, without a standalone locker room and University-operated practice facilities (because beach volleyball was an emerging sport and building facilities took time). Sykes Decl. ¶ 26. Plaintiffs do not and cannot offer any explanation as to how female athletes with access to facilities that mirrored ones used by similarly situated male comparator teams could possibly have suffered a Title IX injury.

Plaintiffs' reliance on such inapposite authority highlights that their attempt to certify a

26- DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

program-wide Rule 23(b)(3) damages class is wholly unprecedented. As far as the University is aware, no court has ever certified a program-wide treatment and benefits class under Rule 23(b)(3). For good reason: as courts have noted, "[a] tension exists in the individualized nature of Title IX claims and Rule 23" because "[w]ith Title IX claims, the Court has noted that each individual claim is specific." *Doe v. Unified Sch. Dist. 259*, 240 F.R.D. 673, 679-80 (D. Kan. 2007) (declining to certify a putative Title IX class action outside the athletics context).

Though Plaintiffs have not clearly articulated this theory in their motion, they may pivot by arguing that all female varsity athletes suffered *dignitary harm* and thus have Article III standing solely by virtue of attending a university out of compliance with Title IX. But the Supreme Court has long made clear that a stigmatizing injury "accords a basis for standing only to those persons who are *personally denied equal treatment by the challenged discriminatory conduct.*" *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quotation marks omitted) (emphasis added); *see Carello v. Aurora Policeman Credit Union*, 930 F.3d 830, 834 (7th Cir. 2019). That is because discrimination "can cause serious non-economic injuries" but only "to those persons who are personally denied equal treatment [but for] their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984). Plaintiffs offer no explanation for how anyone besides the Beach Volleyball Plaintiffs could possibly have been "personally denied equal treatment." *Id.*[8] Allowing uninjured members to be part of the proposed class notwithstanding that would also "enlarge" their "substantive right[s]," in violation of the Rules Enabling Act. *See* 28 U.S.C. § 2072(b).

*Second*, standing issues aside, Plaintiffs' proposed treatment and benefits class fails predominance because litigating it would devolve into a series of team-by-team mini-trials. That is because federal regulations and case law emphasize that Title IX treatment and benefits claims

---

[8]    And not even the Beach Volleyball Plaintiffs can show on this record that any unequal treatment was but for their sex, as opposed to attributable to independent variables, such as the fact that beach volleyball was an emerging sport that was added at the University to support and strengthen its indoor volleyball team.

27-  DEFENDANT'S OPPOSITION TO PLAINTIFFS'
     MOTION FOR CLASS CERTIFICATION

turn on the "laundry list" of factors, including the provision and maintenance of equipment; scheduling of games and practice times; travel and per diem expenses; opportunity to receive coaching and academic tutoring; assignment and compensation of coaches and tutors; provision of locker rooms, practice, and competitive facilities; provision of medical and training services; provision of housing and dining services; and publicity. 34 C.F.R. § 106.41(c)(2)-(10).

It follows that the Court would need to evaluate *each individual factor* for *each individual athlete* on *each individual team*, and then assess how every factor compared to a similarly situated male comparator—to the extent one existed. *Id.* As discovery in this case has confirmed, those factors all vary wildly from team to team (because, as noted, any distinctions turn on sex-neutral factors like the relevant *sport*), so the inquiry would be altogether unwieldy. For example, the beach volleyball team has unique equipment and supplies including outdoor gear and balls; unique facilities with sand courts; unique scheduling and travel with a shorter season of competition and fewer matches than other female varsity sports; and unique recruitment given that the recruitment landscape is less competitive with high-school level interest concentrated in certain geographic areas, primarily California. Sykes Decl. ¶¶ 4, 11, 31.

The Court's only option would thus be to conduct highly granular team-by-team, athlete-by-athlete, factor-by-factor comparative analyses. Plaintiffs "allege that because UO treated them unequally, they had to purchase their own socks, shorts, pants, sports bras, winter jackets, practice shirts, and rain gear," so computing their alleged damages would literally involve compiling and inspecting each putative class member's receipts one by one. ECF 83 at 11. Any common questions are thus easily outweighed by the "person-specific inquiries" necessary to determine liability on a "member to member" basis. *Tyson Foods, Inc.*, 577 U.S. at 453-54.

Plaintiffs effectively concede as much in their Motion. They admit that the University "allocate[s] responsibilities for determining treatment of different teams among different administrators" and that "treatment and benefits varsity athletes receive depend on which team they play for." Mot. at 8–9. And their purported expert Donna Lopiano's methodology for

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

evaluating the treatment and benefits afforded to female athletes will involve a "category-by-category" evaluation of all of the men's and women's teams. *See* Mot. at 11. Plaintiffs fail to cite any Title IX case where a treatment and benefits class was certified under Rule 23(b)(3), and cases from analogous contexts confirm that there is no basis to do so. *See, e.g.*, *Bowerman v. Field Asset Servs. Inc.*, 60 F.4th 459, 470-71 (9th Cir. 2023) (denying certification because of the "complexity of the individualized questions" in the case that resulted in "a series of mini-trials"); *S.G. ex rel. Gordon*, 2018 WL 4899098, at *6 (denying certification in Title IX athletics claim because "the court would need to look to whether female students in each of the three Defendant school districts lack interest in athletics. This is necessarily an individualized assessment.").

*Third*, to prove that common issues predominate, Plaintiffs must propose a damages model consistent with their theory of liability and "establish[] that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. But Plaintiffs' damages model—which is based primarily on the report of David M. Duffus (ECF 105-2, "Duffus Report")—is fundamentally flawed as a matter of both law and logic. The Duffus Report fails out of the gate because Duffus concedes that his entire model is based on an assessment of the University's "*amounts expended* on the male and female athletics programs in each of the treatment and benefits categories." Duffus Report ¶ 55 (emphasis added). But Title IX's implementing regulations do not tether liability to "aggregate" expenditures on either financial aid or benefits, nor do they absolve Plaintiffs of their burden to show that sex is a but-for cause of any differential spending or treatment as applied to any "person" asserting a Title IX claim. The regulatory text makes those points expressly: "Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section." 34 C.F.R. § 106.41(c).

Duffus's spending-based model also flouts common sense. At bottom, Duffus falsely assumes a one-to-one relationship between the funds expended on a particular sports team and the *damages* members of that team suffered. That is wrong. If, for example, the University opts

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

not to build a $2 million locker room for the beach volleyball team, the athletes who could have used that locker room do not suffer *$2 million* in damages; they simply lack access to the hypothetical locker room during their tenure on the team. *Contra* Duffus Report ¶ 70 (asserting that "a reliable class-wide model can be developed that considers the costs to build, upgrade or maintain locker rooms"). Similarly, Duffus falsely assumes that the value of a coaching contract in an entirely different sport is somehow compensable.[9] Duffus Report ¶¶ 75-76. But like the construction cost of a locker room, the value of a coaching contract is not something that the Beach Volleyball Plaintiffs would logically be entitled to receive. *See Comcast*, 569 U.S. at 35 ("It follows that a model purporting to serve as evidence of damages in this class action must measure *only those damages attributable to that theory*" (emphasis added)). Tellingly, Plaintiffs are unable to point to a single Title IX case where a similar damages model has been approved. The absence of authority is unsurprising: Duffus's expenditure-based model flies in the face of both Title IX and compensatory damages, which must be "precisely commensurate with the injury suffered, neither more nor less." *Birdsall v. Coolidge*, 93 U.S. 64, 64 (1876).

Duffus attempts to cure that flaw by employing a "per capita approach," which "evaluates costs on a per-person basis instead of total expenditures for a team." Duffus Report ¶ 61. But that proposal once again ignores the federal regulations, which expressly reject an aggregate-expenditure model, 34 C.F.R. § 106.41(c), and the 1979 Policy Interpretation, which explained that a similar proposal to construe Title IX as requiring equal "per capita expenditures" across entire athletic departments is incorrect. 43 Fed. Reg. 58,070 (Dec. 11, 1978). As the agency recognized, "characteristics common to most revenue producing sports … *could result in legitimate nondiscriminatory differences in per capita expenditures*" and such disparities would

---

[9]     The 1979 Policy Interpretation that Plaintiffs invoke recognizes that coaching salaries are highly individualized. Coaching compensation is a "per sport" inquiry that considers, e.g., the "[n]ature of coaching duties," "experience," "number of participants," "number of assistant coaches supervised," and "level of competition"—all of which are extremely idiosyncratic. 44 Fed. Reg. at 71,416. The guidance also recognizes "there may be unique situations in which a particular person may possess such an outstanding record of achievement as to justify an abnormally high salary." *Id.*

30- DEFENDANT'S OPPOSITION TO PLAINTIFFS'
    MOTION FOR CLASS CERTIFICATION

not give rise to liability. 44 Fed. Reg. at 71,421 (emphasis added). That makes sense: a football team with over one hundred athletes and tens of thousands of attendees for every game will necessarily require different facilities and expenditures than a beach volleyball team. Unlike Duffus, the 1979 Policy Interpretation accounted for this reality when it explained that "certain sports—notably football and men's basketball—traditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event management to men's and women's programs may differ in degree and kind." 1979 Policy Interpretation § VII(B)(2)(c).

### 2.  The financial-aid damages class fails predominance.

For at least three reasons, Rule 23(b)'s predominance requirement likewise dooms Plaintiffs' financial aid class. *First*, like the treatment and benefits class, Plaintiffs' financial aid damages class—which consists of "all current and former female students who participated or will participate in intercollegiate varsity athletics at UO and did not or do not receive all athletic financial aid permissible under federal law at any time from the start of the 2020-2021 academic year until the end of the 2025-2026 academic year" (Mot. at 1)—comprises almost entirely uninjured people. As explained (pp. 14, *supra*), throughout the class period, every women's team besides the developing beach volleyball team received the maximum amount of financial aid allowable under NCAA rules. Had one athlete on those teams received even a partial scholarship more, that athlete would have been ineligible to compete. It follows that none of the players on fully funded teams can claim any Article III or statutory injury by the perceived disparity in scholarship funds. Quite the opposite: those athletes—*i.e.*, *every single* non-beach volleyball member of Plaintiffs' proposed class—would have been injured had the University proceeded as Plaintiffs advocate because their teams would have been barred from all NCAA sponsored competition. NCAA Rules impose harsh penalties on institutions that permit ineligible players to compete, including fines, forfeitures of games, vacating games, and being banned from postseason competition. *See* NCAA, Division I 2024-25 Manual 66, Rule 12.11.4.2.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone:  +1.503.727.2000
Fax:  +1.503.727.2222

*Second*, again, class certification would force the Court to conduct individualized inquiries to determine whether, in a but-for world, certain female athletes would have actually *received* additional scholarship funds had they been available.[10] "Title IX directly affords . . . no individual right to a scholarship." *Beasley v. Ala. State Univ.*, 966 F. Supp. 1117, 1126 (M.D. Ala. 1997). Because there is no such right, scholarship decisions are typically made on a discretionary basis by coaches who weigh a variety of factors including but not limited to: (1) the athlete's ability and potential, (2) the team's present and future needs at the athlete's position, (3) whether the athlete has scholarship offers from other schools, and (4) the award size required to make an institution's offer competitive in a given market for the athlete. Thus, determining whether any member of the proposed class would have actually received a scholarship and its amount (and thus experienced any harm) presents a highly individualized inquiry involving that student-athlete's athletic performance, the remaining aid available to the team under NCAA regulations, and that team's coach's discretion. Under Plaintiffs' interpretation, those highly discretionary decisions regarding who should receive an athletic scholarship, and if so for how much, would be transferred away from the subject-matter experts in athletics departments to the federal courts. It bears repeating that no court has ever agreed with that vision of Title IX.

*Third*, Plaintiffs' damages model once again fails. *See Comcast*, 569 U.S. at 34. In Plaintiffs' view, each putative class member would receive a pro-rata share of the purported financial aid disparity. *See* Duffus Report ¶¶ 42-44. That makes no sense. For one, by Plaintiffs' theory, the University could cut scholarships to male athletes in order to achieve parity, and the value of those cut scholarships would constitute Plaintiffs' damages. But Plaintiffs offer no explanation for why payment of that money to them could somehow restore them to the position they would have been in in a but-for world where there had been fewer male scholarships.

---

[10]     The University raised similar arguments in its motion to dismiss briefing, ECF 27 at 5-8. This Court recognized that the University is "correct that a damages award may involve a consideration of how many scholarships would have been awarded if UO did not deprive women of the financial aid opportunities required by Title IX." *See* ECF 83 at 8-9.

32-   DEFENDANT'S OPPOSITION TO PLAINTIFFS'
      MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax:  +1.503.727.2222

Furthermore, Plaintiffs' damages model overlooks that the University funded scholarships for every women's team (besides beach volleyball) *to the NCAA maximum*.[11] *See* Mot. at 16. Allowing players on such teams to recover damages under such circumstances would be irreconcilable with the fundamental principles of compensatory damages because that result would inevitably leave many class members in a far better financial position than they would have been absent the alleged discrimination. "Under the compensatory theory of damages . . . [a] windfall over and above what [plaintiffs] would have received had the [alleged discrimination] not occurred cannot be justified in fairness or logic." *Burlington N., Inc. v. Boxberger*, 529 F.2d 284, 292 (9th Cir. 1975); *Ivie v. AstraZeneca Pharms., LP*, 2024 WL 4553862, at *8 (D. Or. Oct. 23, 2024) (noting that in the Title VII context, "the court cannot place the plaintiff in a better position than she would have been in had the employer not discriminated against her" (citation omitted)); *see also Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 786 (9th Cir. 1986) (similar). The Duffus Report itself thus makes clear that damages cannot properly be calculated on a classwide basis in a manner that is consistent with Title IX.

### B.     Plaintiffs' Damages Classes Fail Rule 23(b)(3)'s Superiority Requirement.

Rule 23(b)(3) also tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Plaintiffs' proposed damages classes fail that requirement.

For one, it is well established that "the manageability criterion of the superiority requirement" performs a vital function, ensuring that a class action remains administratively feasible. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127-28 (9th Cir. 2017). But here, the proposed classes include athletes from multiple teams and years, each with wildly divergent experiences and claims. *See* pp. 27-29, *supra*. The complexity and diversity of the claims would

---

[11]     On July 1, 2025, NCAA rules changed for schools opting into the *House* settlement. Going forward, universities can offer scholarships to every athlete on each team's roster, but the size of the roster will be capped by NCAA rule. As relevant here, opt-in universities can make available up to 19 beach volleyball roster slots (instead of six scholarships). The University plans to offer eight scholarships. *See* Sykes Decl. ¶ 22.

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

make a class action unmanageable, as the Court would have to conduct numerous individualized inquiries and comparisons into the granular details of things like practice schedules, the provision of equipment and gear, and facility quality and maintenance. *See* 34 C.F.R. § 106.41(c). To the extent that the Beach Volleyball Plaintiffs have complaints about their idiosyncratic experiences, those complaints can be litigated individually without sweeping in nearly a dozen other sports teams whose experiences were palpably different.

Rule 23(b)(3) also requires that a class action be "superior to *other available methods* for fairly and efficiently adjudicating the controversy." But here, there is another available mechanism: the administrative process. In *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), the Supreme Court emphasized that Title IX's primary means of enforcement is through federal agencies empowered to investigate, seek voluntary compliance, and, if necessary, terminate funding. *Id.* In light of this regulatory mechanism, it would make little sense to have "the district court function as a de facto super-athletic department director," and attempt to craft "sweeping class-wide damage relief for all . . . women students who might have benefitted from a more generous funding of women's athletics." *Grandson*, 272 F.3d at 573. That is especially true of Plaintiffs' unprecedented theories.

## III.    THE PROPOSED INJUNCTIVE CLASSES FAIL TO MEET RULE 23(B)(2).

To certify the proposed Rule 23(b)(2) classes, Plaintiffs must show that the party opposing the class has acted (or refused to act) on grounds "that apply *generally to the class*" so that injunctive relief is "appropriate respecting the class *as a whole*." Fed. R. Civ. P. 23(b)(2) (emphasis added). Each of Plaintiffs' injunctive classes fail to meet Rule 23(b)(2).

*First*, Plaintiffs' treatment and benefits claim does not challenge "generally applicable" conduct. *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (citation omitted). The challenged conduct is the product of a variety of policies, practices, or discretionary decisions unique to each sport, not to a single, uniform policy applicable to all female varsity athletes. *See* Sykes Decl. ¶¶ 27-29.; *see* Mot. at 9 (admitting that the University "allocate[s] responsibilities for

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

determining treatment of different teams among different administrators").

 *Second*, there is no cohesive injury among the class members. Given the beach volleyball team's status as an emerging team that practiced off campus in a city park until fall 2024, did not have a locker room dedicated for their exclusive use until fall 2025, and did not have scholarships until the 2021-2022 academic year, those Plaintiffs' experiences differed wildly from other female athletes at the University. *See generally* Sykes Decl.; pp. 11-12, *supra*. Because the experiences and alleged harms of the female varsity athletes may differ significantly depending on their team, sport, or individual circumstances, the University's actions did not remotely affect all class members in the same way. *See Bryant*, 1996 WL 328446, at *6 (denying program-wide certification after finding no justification for "relief for any female athlete except members of the women's club ice hockey team"). The class thus lacks the cohesiveness required for Rule 23(b)(2) certification. *See Monreal III v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004) ("Plaintiffs simply have not articulated a policy—besides generalized non-compliance with Title VII—that could be the subject of injunctive . . . relief.").

 Plaintiffs' proposed effective accommodation class does not meet Rule 23(b)(2) either. As discussed above, the Rowing Plaintiffs have failed to show that they could have played on a varsity team had one been available to them and therefore have not shown that the University acted in a way that applies *generally to the class*. Also, "there is an implied prerequisite that the class be adequately defined and readily ascertainable." *See, e.g.*, *Sacora v. Thomas*, 2009 WL 4639635, at *11 (D. Or. Dec. 3, 2009). Class members must be identifiable through "a manageable process that does not require much, if any, individual factual inquiry." *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 237 (N.D. Cal. 2014). Plaintiffs' effective accommodation class fails this requirement through its inclusion of "future female students at UO." Mot. at 2. Plaintiffs offer no explanation for how such future female students could be identified.

## IV. CONCLUSION

 The Court should deny Plaintiffs' Motion for Class Certification in full.

35- DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Phone: +1.503.727.2000
Fax: +1.503.727.2222

DATED: December 22, 2025

**PERKINS COIE LLP**


By:*/s/ Sarah J. Crooks*
    Stephen F. English, OSB No. 730843
    SEnglish@perkinscoie.com
    Sarah J. Crooks, OSB No. 971512
    SCrooks@perkinscoie.com
    Adrianna Simonelli, OSB No. 222481
    ASimonelli@perkinscoie.com
    Colin Lubelczyk, OSB No. 245841
    CLubelczyk@perkinscoie.com
    Sheila Panyam, OSB No. 245184
    SPanyam@perkinscoie.com
    1120 N.W. Couch Street, Tenth Floor
    Portland, Oregon 97209-4128
    Telephone: 503.727.2000

    Thomas J. Tobin, OSB No. 232184
    TTobin@perkinscoie.com
    1301 Second Avenue, Suite 4200
    Seattle, Washington 98101-3804
    Telephone:  206.359.8000

    Douglas Park, OSB No. 980904
    Dougpark@uoregon.edu
    Jeslyn Everitt, OSB No. 190852
    Jeveritt@uoregon.edu
    Office of General Counsel
    UNIVERSITY OF OREGON
    6251 University of Oregon
    Eugene OR 97403
    Telephone: 541.346.6110

    *Attorneys for Defendant*

36- DEFENDANT'S OPPOSITION TO PLAINTIFFS'
    MOTION FOR CLASS CERTIFICATION